Of Counsel:
ASHFORD & WRISTON

CUYLER SHAW      1413-0
DAVID C. FARMER    3946-0
Alii Place, Suite 1400
1099 Alakea Street
P.O. Box 131
Honolulu, Hawaii 96810
Telephone: (808) 539-0400

MICHAEL D. HONG    682-0
DAVID A. KWOCK     1790-0
Hong & Kwock
Central Pacific Plaza
220 S. King St., Suite 1220
Honolulu, Hawaii 96813
Telephone: (808) 528-1400

Proposed Attorneys for
HAWAIIAN GROCERY STORES, LTD.
Debtor-in-Possession

FILED
U.S. BANKRUPTCY COURT
DISTRICT OF HAWAII
2000 JAN 28 AM 10: 56

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re | ) CASE NO. 99-05157 |
| | ) (Chapter 11) |
| HAWAIIAN GROCERY STORES, LTD., | ) |
| | ) DATE: _____ |
| Debtor. | ) TIME: _____ |
| | ) JUDGE: LLOYD KING |

DECLARATION OF DAVID C. FARMER IN SUPPORT OF HAWAIIAN
GROCERY STORES, LTD.'S MOTION TO COMPEL THE CUSTODIAN
TO TURN OVER PROPERTY OF THE ESTATE; EXHIBITS "A"-"C"

DAVID C. FARMER, under penalty of perjury, states as follows:

I HEREBY CERTIFY THAT A COPY
WAS MAILED TO THE IRS ON:

JAN 28 2000

BY: _____

254197 v1

19

1.     I am counsel with the law firm of Ashford & Wriston, co-counsel for

HAWAIIAN GROCERY STORES, LTD. ("HAWAIIAN GROCERY") in this case and am

competent to testify to the matters set forth herein and do so based on personal knowledge,

information provided to me by, and the records and files of this case.

2.     I am submitting this declaration to support HAWAIIAN GROCERY'S Motion to

Compel Custodian to Turn Over Property of the Estate filed of even date herewith.

3.     Attached hereto as Exhibit "A" is a true and correct copy of the First Amended

Complaint for Declaratory Relief, Interpleader and Damages, Filed March 22, 1999 by

HAWAIIAN GROCERY in Hawaiian Grocery Stores, Ltd. v. GSH and K Investment Group, fka

GSH and K Properties, et al., Civil No. 99-0424-02 DDD ("Pending Litigation"), which involved

issues, among others, as to disputed rent increases and the amount of monthly rent payments

owed to GSH and K Investment Group under a Lease dated February 1, 1990.

4.     Plaintiff's Supplemental Settlement Conference Statement filed in the Pending

Litigation May 12, 1999 provides the factual and legal background as to issues involved.  See

Exhibit "B" attached hereto.

5.     Attached hereto as Exhibit "C" is a true and correct copy of the Findings of Fact,

Conclusions of Law and Order Denying Defendant and Third-Party Plaintiff GSH and K

Investment Group's and Defendant Katsumi Kazama's Motion for Order Directing Payment of

All Amounts Due Under Lease to Defendant and Third-Party Plaintiff GSH and K Investment

Group Filed March 9, 1999, and Ordering Rent Trust Fund, filed June 3, 1999 in the Pending

Litigation ("Order").

6.     The Order established a Rent Trust Fund at the request of HAWAIIAN

GROCERY, pursuant to Hawaii Revised Statutes § 666-21.  See Exhibit "B," Order ¶2.

7.    Payments in the total amount of approximately $360,000 were made into the Rent Trust Fund by HAWAIIAN GROCERY through June 30, 1999, at which time the leased premises were vacated.

8.    HAWAIIAN GROCERY filed a voluntary Chapter 11 bankruptcy petition on December 15, 1999.

9.    Bankruptcy Code 11 U.S.C. § 543(b)(1) provides, in relevant part, that a custodian shall – (1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody or control on the date that such custodian acquires knowledge of the commencement of the case.

10.    A "Custodian" is defined in § 101 as: (1) a receiver or trustee in a non-bankruptcy proceeding; (2) an assignee for the benefit of creditors; or (3) a trustee, receiver, or agent under applicable law or contract that is appointed or authorized to take charge of the debtor's property to enforce a lien thereon or for the purpose of general administration of such property for the debtor's property for the debtor's creditors.

11.    The Clerk of the Court is a custodian as defined by § 101(11). See NLP Computer Services Corporation v. Capital Computer Systems, Inc., 755 F. 2d 1253 (6th Cir. 1984); see also In re Great Western Coal, Inc., 146 B.R. 702, 705 (Bankr. S.D. Texas 1992).

12.     HAWAIIAN GROCERY therefore respectfully requests this Court to order the

Chief Clerk of the Circuit Court of the First Circuit, State of Hawaii to turn over property of the

estate to HAWAIIAN GROCERY, consisting of the amounts deposited into the Rent Trust Fund.

DATED:  Honolulu, Hawaii; _____ JAN 2 8 2000 _____ .

DAVID C. FARMER
Attorney for Debtor-in-Possession
HAWAIIAN GROCERY STORES, LTD.

Of Counsel:
ALSTON HUNT FLOYD & ING
Attorneys At Law
A Law Corporation

LOUISE K. Y. ING      2394-0
PAUL M. IGUCHI      6047-0
18th Floor, Pacific Tower
1001 Bishop Street
Honolulu, Hawai'i 96813
Telephone: (808) 524-1800

Attorneys for Plaintiff

FIRST CIRCUIT COURT
STATE OF HAWAII
FILED

1999 MAR 22 PM 4: 00

F. OTAKE
CLERK

## IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

## STATE OF HAWAI'I

| | |
|---|---|
| HAWAIIAN GROCERY STORES, LIMITED, a Hawaii corporation,    ) <br> ) <br> ) <br> Plaintiff,    ) <br> ) <br> vs.    ) <br> ) <br> GSH AND K INVESTMENT GROUP, fka ) <br> GSH and K Properties, a Hawaii general ) <br> partnership; KATSUMI KAZAMA, and THE ) <br> ESTATE OF HARUKO KAZAMA,    ) <br> ) <br> Defendants.    ) <br> _____) | CIVIL NO. 99-0424-02 DDD <br> (Declaratory Judgment) <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INTERPLEADER AND DAMAGES; EXHIBITS A-E; SUMMONS** |

## FIRST AMENDED COMPLAINT FOR
## DECLARATORY RELIEF, INTERPLEADER AND DAMAGES

Plaintiff HAWAIIAN GROCERY STORES, LIMITED ("HGS"), by and

through its attorneys and pursuant to Rule 22 of the Hawaii Rules of Civil Procedure,

hereby files this First Amended Complaint for Interpleader, for Declaratory Relief and

for damages and alleges as follows:

109119-1 / 4405 - 8

I do hereby certify that this is a full, true, and correct copy of the original on file in this office.

Clerk, Circuit Court, First Circuit

EXHIBIT "A"

1. Plaintiff HGS is and was at all relevant times a corporation engaged in the business of food storage and distribution, which was incorporated and exists under the laws of the State of Hawai`i, with its principal place of business in Honolulu, Hawai`i.

2. Defendant GSH AND K INVESTMENT GROUP, formerly known as GSH and K Properties ("GSH&K"), is and was at all relevant times a Hawai`i general partnership with its principal place of business in Honolulu, Hawai`i.

3. Defendant KATSUMI KAZAMA ("MR. KAZAMA") is and was at all relevant times a resident of the City and County of Honolulu, State of Hawai`i.

4. Defendant ESTATE OF HARUKO KAZAMA came into existence upon the death of HARUKO KAZAMA, wife of MR. KAZAMA, on or about January 23, 1999. Upon information and belief, assets of the ESTATE are and were at all relevant times located in the City and County of Honolulu, State of Hawai`i, and the ESTATE is being or will be administered in the City and County of Honolulu, State of Hawai`i.

5. GSH&K is the landlord of premises located at 2911 and 2915 Kaihikapu Street, Honolulu, Hawai`i ("the Premises") under a Lease dated February 1, 1990, between GSH&K, as Lessor, and GROCERS SPECIALTY COMPANY ("GROCERS"), as Lessee. A true and correct copy of the Lease is attached as Exhibit A. The parties subsequently amended the Lease by an Amendment to Lease dated July 1, 1992, and an undated Second Amendment to Lease, which was notarized March 9, 1995. True and correct copies of the Amendment and Second Amendment are attached as Exhibits B and C, respectively. The Lease and Amendments shall be collectively referred to as "the Lease."

6.     Upon information and belief, HGS has occupied the Premises since before May 1996, when its common stock was acquired by the current stockholders and has paid its rent directly to GSH&K from the beginning of its occupancy.

7.     In or around June 1996, RHL Management Group, Inc., acquired all of the common stock of HGS, and at the same time, the newly-acquired HGS entered into a written Sublease of the Premises with GROCERS. A true and correct copy of the Sublease, of which HGS only has an unsigned copy, is attached as Exhibit D.

8.     GSH&K consented to the Sublease and the change of HGS' common stock ownership by way of a Consent dated May 22, 1996, a true and correct copy of which is attached as Exhibit E.

9.     Thereafter, HGS continued to pay its rent directly to GSH&K and to deal with GSH&K directly for other purposes, as if GSH&K were its landlord.

10.     The Second Amendment of Lease provides in paragraph 3 that monthly base rent for each of the Premises' two parcels would be adjusted annually between January 1, 1996 and December 31, 2002, and that monthly ground rent would increase effective January 1, 1999.

11.     Part of the rent increase that began in 1996 and accrued before the acquisition of HGS' common stock by RHL in May 1996, was never paid by GROCERS nor the pre-acquisition HGS. Upon information and belief, GSH&K agreed to waive such increase.

12.     In or around mid-1997 to the present, members of the KAZAMA family, purporting to be representatives of GSH&K, visited HGS' Premises on at least a monthly basis to collect rent directly from HGS. Beginning in the same period,

MR. KAZAMA instructed HGS to make its rent check payable directly to KATSUMI KAZAMA, rather than to GSH&K as a partnership. MR. KAZAMA then deposited HGS' rent checks into a joint personal account in the names of his wife, the late HARUKO KAZAMA, and himself.

13. At various times in 1997 and 1998, representatives of HGS had various discussions with MR. KAZAMA and his son Wally Kazama, purporting to be representatives of GSH&K, in which GSH&K agreed not to collect increased rent due to poor market and economic conditions, and to allow HGS to pay the same rent that GROCERS had paid at the time of the HGS common stock acquisition in 1996. HGS continued to pay such rent directly to GSH&K as instructed by MR. KAZAMA, and otherwise to deal directly with GSH&K, such as regarding the condition and repair of the Premises.

14. By written notice dated April 27, 1998, addressed to GSH&K, HGS exercised the right under paragraph 2 of the Second Amendment and paragraphs 5.1, 5.2 and 5.3 of the Sublease to terminate the Lease upon fifteen months advance written notice, or effective July 31, 1999.

15. In response, GSH&K hired a broker, began showing the Premises to prospective tenants, distributed hundreds of brochures advertising the Premises' immediate availability, and to HGS" dismay, posted signs on the Premises advertising the Premises for lease. HGS was dismayed by the immediate posting of "for lease" signs on the Premises because they gave the erroneous impression that HGS was not viable and was going out of business.

16. In reliance on GSH&K's lack of objection to the notice, on GSH&K's actions as described in paragraph 15 above and on the representations of GSH&K's

broker that he would be leasing the Premises, HGS searched for and located new premises to lease, entered into a lease of such premises, and otherwise made plans to vacate the Premises by July 31, 1999.

17.    It was not until December 12, 1998, nearly eight months after HGS' giving of termination notice, that GSH&K wrote HGS, claiming that the termination notice was ineffective because HGS was not a party to the Second Amendment of Lease, that the notice should have come from GROCERS, and that GROCERS had not yet given such notice to GSH&K.

18.    By letter dated December 16, 1998, GSH&K again wrote HGS enclosing a demand letter to GROCERS seeking rent increases from January 1, 1996 through December 31, 1998, of $108,817.68, and notifying HGS that effective January 1, 1999, total monthly rent would increase to $72,712.73 per month. This was the first notice HGS received that GSH&K was purporting to revoke its prior waiver of rent increases. GSH&K has since produced a demand notice to GROCERS, correspondence to HGS and bills to HGS that were supposedly sent in 1997 and 1998, but which HGS never received.

19.    By letter from HGS' counsel dated December 28, 1998, HGS informed GSH&K that GSH&K had waived any right to (a) claim the termination notice was ineffective by dealing directly with HGS throughout the term of the Sublease and failing to object to the notice in a timely manner and (b) claim any rent increase for 1996 through 1998, by agreeing in 1997 and 1998 not to require HGS to pay increased rent.

20.    Thereafter, GSH&K has continued to correspond with HGS and with CERTIFIED GROCERS OF CALIFORNIA, LTD., who on information and belief is the parent corporation of GROCERS, reiterating its position that its lease relationship is

with GROCERS, that increased rent is due from 1996, and that HGS' notice of termination is ineffective.

## FIRST CLAIM FOR RELIEF - DECLARATORY RELIEF (TERMINATION NOTICE)

21.     Plaintiff HGS realleges and incorporates by reference paragraphs 1-20 above.

22.     A dispute has arisen between GSH&K and HGS over the validity of HGS' lease termination notice.

23.     Section 5 of the Sublease incorporates the Master Lease into the Sublease, including paragraph 2 of the Second Amendment to Lease providing for early termination of the lease.  Pursuant to this incorporation, HGS has a right to terminate the Sublease with Grocers, while GROCERS continues to have a right to terminate the Lease with GSH&K.

24.     *However*, the Sublease contemplates a pass-through of obligations and performance from HGS directly to GSH&K, a relationship which continued past practice between the parties.  Consequently, pursuant to ¶ 5.7 in the Sublease, GSH&K as Lessor, if it so elected, could deal directly with HGS, and in such a case, HGS agreed to deal directly with GSH&K.  Under ¶ 5.7, Grocers appointed HGS as its agent to make payments or deliver communications on its behalf as Lessee under the Lease directly to GSH&K.

25.     The direct dealings between HGS and GSH&K continued throughout HGS' occupancy of the Premises (including but not limited to direct communications between the parties' representatives on the poor condition of the

Premises, discussions between the parties' representatives about the amount of rent, and GSH&K's accepting rent directly from HGS) constitute GSH&K's consent to deal directly with HGS under the Lease. Therefore, HGS was also authorized under ¶ 5.7 of the Sublease to provide direct notice to GSH&K on behalf of Grocers, including the notice to terminate the Lease, and HGS in fact provided such termination notice. Once the Lease is terminated, the Sublease automatically terminates under ¶ 5.3 of the Sublease -- *"The Sublease shall be deemed automatically terminated concurrently with any termination of the Master Lease."*

26. By consenting to the Sublease, GSH&K consented to all of the foregoing provisions.

27. GSH&K attempts to rely on ¶ 5.8 of the Sublease, requiring HGS to provide notice first to Grocers with a request that Grocers send a termination notice to GSH&K, to support its claim that the termination notice was ineffective. However, ¶ 5.8 would be effective only if HGS were proceeding under the provisions of the Master Lease which were incorporated into the Sublease; *i.e.*, if HGS was terminating only the Sublease. Instead, HGS was acting as GROCERS' agent to terminate the Lease on behalf of GROCERS pursuant to ¶ 5.3 of the Sublease.

28. GSH&K is not entitled to rely on ¶ 5.8 of the Sublease to invalidate HGS' termination notice, for this paragraph is only a provision for the benefit of GROCERS and HGS. Moreover, GSH&K's position is simply form over content. GSH&K negotiated for fifteen months' lead time for a termination notice and received the benefit of its bargain.

29. In addition, GSH&K waived its right to object to the notice by its delays in doing so and by taking action inconsistent with any intent to object, thereby inducing HGS to act in reliance on GSH&K's failure to object.

30. HGS is therefore entitled to a declaratory judgment upholding the validity of its Lease termination notice of April 27, 1998, in effectively terminating the Lease and Sublease as of July 31, 1999.

## SECOND CLAIM FOR RELIEF -
## DECLARATORY JUDGMENT (RENT INCREASES)

31. Plaintiff HGS realleges and incorporates by reference paragraphs 1-30 above.

32. A dispute exists between GSH&K and HGS over whether GSH&K waived its right to collect rent increases from HGS and GROCERS/CERTIFIED for 1996 through the present.

33. GSH&K waived its right to collect such rent increases from either the Lessee or Sublessee by agreeing, through MR. KAZAMA and his Son Wally Kazama in 1996, 1997 and 1998 not to collect increased rent because of poor economic and market conditions. Despite GSH&K's belated production of correspondence and bills allegedly written in 1997 and before December 28, 1998, demanding rent increases, HGS never received such documents.

34. In reliance on GSH&K's agreement, HGS continued to remain in the Premises and not to seek earlier termination of the Lease or Sublease nor to make any other claims arising from the poor condition of the Premises. In December 1998, GSH&K belatedly reasserted a claim for increased rent in retaliation for HGS' sending of a lease termination notice.

8

35. HGS is therefore entitled to a declaratory judgment that GSH&K is not entitled to collect increased rent from January 1, 1996 through the end of the Lease and Sublease term from HGS (July 31, 1999), either directly from HGS or indirectly through GROCERS/CERTIFIED, because GSH&K has waived its right to so.

## THIRD CLAIM FOR RELIEF - INTERPLEADER OF RENT

36. Plaintiff HGS realleges and incorporates by reference paragraphs 1-35 above.

37. Plaintiff HGS is uncertain about the proper recipient of monthly rent because GSH&K has given inconsistent instructions. GSH&K has now demanded payment of rent, but HGS was previously instructed by MR. KAZAMA to pay rent directly to him, which he then deposited the rent to the benefit of himself and his late wife, HARUKO KAZAMA, and HGS has more recently informed HGS that it should be dealing with GSH&K through GROCERS. The aforesaid claims of the Defendants are such that the Plaintiff cannot determine without hazard to itself which of the Defendants or other parties is legally entitled to monthly rent without assuming the responsibility of determining doubtful questions of law and fact. The payment of monthly rent to any one of the Defendants or to GROCERS will expose the Plaintiff to the threat of multiple and vexatious litigation in the future as well as double or multiple liability for the same claim.

38. Plaintiff HGS does not in any respect collude with any Defendant touching the matters in this action. HGS claims no beneficial interest in the aforesaid rent and is a mere stakeholder. HGS is now and has at all times been ready, willing and able to pay the person legally entitled to monthly rent of $62,854.66 per month.

109119-1 / 4405 - 8                                    9

Upon order of the Court, HGS will deposit the sum of **$62,854.66** into the Registry of the Court (consisting of monthly rental due February 1, 1999) and will continue to deposit the sum of $62,854.66 on a monthly basis from March 1, 1999, through July 31, 1999 (the end of the Lease term), there to abide the judgment of this Court. Until such an order is entered, HGS will deposit such amounts in interest-bearing accounts with third-party agents.

## FOURTH CLAIM FOR RELIEF -
## BREACH OF CONTRACT

39. Plaintiff HGS realleges and incorporates by reference paragraphs 1-38 above.

40. The Lease identifies the only purpose and use for the Premises as: "Food storage and distribution and other uses related thereto."

41. HGS is informed, and based on such information believes, that GSH&K has caused or permitted the Premises to be environmentally contaminated from sources located on properties surrounding the Premises. According to recent testing, there currently exists E.Coli, petroleum residue and other bacteriological colonies in water sources on the Premises. Petroleum residue was also detected in soil samples on the Premises. Flaking lead paint has also been detected and tests are being conducted to determine the extent of asbestos on the Premises. There has also occurred a backup and accumulation of water and problems with the septic tank which has caused unsanitary conditions and related problems at the Premises.

42. HGS is informed, and based on such information believes, that the Premises has inadequate drainage which creates an environment making the Premises unfit for the purpose for which it was leased which is for a food wholesale operation.

43.    GSH&K has materially breached the express and implied terms of the Lease by causing or permitting the Premises to be environmentally contaminated, and by permitting the Premises to subside despite GSH&K's knowledge that the Premises have been and are being used as a food storage and distribution operation.

44.    As a proximate result of GSH&K's breach of the Lease, HGS has been damaged in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF - NUISANCE

45.    Plaintiff HGS realleges and incorporates by reference paragraphs 1-44 above.

46.    GSH&K's conduct of causing or permitting the Premises to be environmentally contaminated was intentional or negligent, and substantially interfered with HGS' use of the Premises as a food storage and distribution operation so as to constitute a nuisance.

47.    As a proximate result of GSH&K's creation of a nuisance, HGS has been damaged in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF - TRESPASS

48.    Plaintiff HGS realleges and incorporates by reference paragraphs 1-47 above.

49.    GSH&K's conduct of causing or permitting the Premises to be environmentally contaminated was intentional and interfered with HGS's use of the Premises as a food storage and distribution operation so as to constitute a trespass.

50.     As a proximate result of GSH&K's trespass, HGS has been damaged in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF -
## NEGLIGENCE

51.     Plaintiff HGS realleges and incorporates by reference paragraphs 1-50 above.

52.     GSH&K owed HGS a duty of due care.

53.     GSH&K materially breached its duty of due care by causing or permitting the Premises to be environmentally contaminated, and by permitting the Premises to subside despite GSH&K's knowledge that the Premises have been and are being used as a food storage and distribution operation.

54.     As a direct, proximate, and foreseeable result of GSH&K's breach of its duties, HGS has been damaged in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF -
## CONSTRUCTIVE EVICTION

55.     Plaintiff HGS realleges and incorporates by reference paragraphs 1-54 above.

56.     HGS is in the process of vacating the Premises because of the environmental contamination and subsidence.

57.     GSH&K's conduct of causing or permitting the Premises to be environmentally contaminated, and of permitting the Premises to subside, substantially interfered with HGS's use of the Premises as a food storage and distribution operation and caused HGS to vacate the Premises so as to constitute a constructive eviction.

58.     As a proximate result of GSH&K's constructive eviction, HGS has been damaged in an amount to be proven at trial.

## TENTH CLAIM FOR RELIEF -
## DECLARATORY RELIEF (CONSTRUCTIVE EVICTION)

59.     Plaintiff HGS realleges and incorporates by reference paragraphs 1-58 above.

60.     As a result of the GSH&K's constructive eviction of HGS, impossibility of performance, frustration of purpose, or failure of consideration, HGS is entitled to terminate the Lease and Sublease.

61.     GSH&K takes the position that HGS is not entitled to terminate the Lease.

62.     Therefore, an existing controversy exists and HGS is entitled to a declaration that the Lease and Sublease are terminated.

WHEREFORE, Plaintiff HGS prays this Court to enter judgment in its favor as follows:

A.     That the Court issue a declaratory judgment in favor of HGS and against GSH&K upholding the validity of HGS' lease termination notice of April 27, 1998.

B.     That the Court issue a declaratory judgment in favor of HGS and against GSH&K, holding that GSH&K is not entitled to collect increased rent from either HGS nor GROCERS/CERTIFIED for the period from January 1, 1996 through the end of the Lease term--July 31, 1999--because it waived its right to so.

C.     That the Court order the Clerk of the United States District Court for the District of Hawaii to accept into the Registry of this Court the sum of **$62,854.66** (consisting of monthly rental due February 1, 1999), plus monthly rental of $62,854.66 on March 1, 1999, and each month thereafter until July 31, 1999--the end of the Lease

term--to be deposited in interest-bearing accounts for future disbursement according to the judgment of the Court;

D.     That the Court adjudicate that the amounts deposited into the Registry of the Court, as aforesaid, is the total extent of Plaintiff's liability to Defendants under the Lease and Sublease for the period beginning January 1, 1996 through July 31, 1999, the end of the Lease term.

E.     That the Defendants be required to assert their respective claims to the funds to be into the Registry of the Court and to settle between themselves their rights or claims to the aforesaid rents.

F.     That this Court issue an order of injunction enjoining and restraining the Defendants, their agents, attorneys or assigns from instituting or prosecuting any suit or proceeding against the Plaintiff in any other court on account of the aforesaid benefits, and that in due course said order of injunction be made permanent;

G.     That an award be made to the Plaintiff out of the funds herein deposited into the Registry of the Court to pay for the costs, attorneys fees, and other expenses which Plaintiff is compelled to expend in the prosecution of this suit;

H.     That the Plaintiff be discharged from all further liability for monthly rent due under the Lease and Sublease for the period from January 1, 1996 through the end of the Lease term, and that this Court adjudicate to whom the Clerk for this Court should disburse the aforesaid funds.

I.     As to the Fourth through Ninth Claims for Relief, for damages in an amount to be proven at trial.

J.      That the Court issue a declaratory judgment in favor of HGS and against GSH&K, holding that HGS is entitled to terminate the Lease based upon GSH&K's constructive eviction of HGS, impossibility of performance, frustration of purpose and/or failure of consideration.

K.      For prejudgment interest.

L.      For punitive damages in an amount to be proven at trial.

M.      For Plaintiff's costs and expenses herein, including reasonable attorneys' fees.

N.      That the Plaintiff be granted such other and further relief as the Court determines to be proper in the premises.

DATED:      Honolulu, Hawaii, March 22, 1999.


_____
LOUISE K. Y. ING
PAUL M. IGUCHI
Attorneys for Plaintiff

TITLE OF DOCUMENT:          LEASE

PARTIES TO DOCUMENT:

      LESSOR:                 GSH AND K PROPERTIES
                         a Hawaii general partnership

      LESSEE:                 GROCERS SPECIALTY COMPANY
                         a California corporation

PROPERTY DESCRIPTION:       Lots 65, 66 and 67, as shown on
                         Map 2, Land Court Consolidation
                         No. 42.

DOCUMENT AFFECTED:          Document No. 693,444

TRANSFER CERTIFICATE        TCT No. 43,325
 OF TITLE:

# LEASE

## TABLE OF CONTENTS

Page

1.    PARTIES . . . . . . . . . . . . . . . . . . .    1

2.    PREMISES . . . . . . . . . . . . . . . . . .    1

3.    TERM; USE . . . . . . . . . . . . . . . . . .    1

    3.1   Original Term . . . . . . . . . . . . .    1
    3.2   Lessee's Right to Extend Term. . . . . .    1
    3.3   Delay in Possession . . . . . . . . . .    2
    3.4   Early Possession . . . . . . . . . . . .    2
    3.5   Use . . . . . . . . . . . . . . . . . .    3

4.    RENT; SECURITY DEPOSIT; TAXES AND OTHER
    PAYMENTS . . . . . . . . . . . . . . . . . .    3

    4.1   Base Rent . . . . . . . . . . . . . .    3
    4.2   Master Ground Lease Rent . . . . . . . .    3
    4.3   Base Rent During Extension Period . . .    3
    4.4   Payment of Rent . . . . . . . . . . . .    4
    4.5   Security Deposit . . . . . . . . . . . .    4
    4.6   Net Lease . . . . . . . . . . . . . .    4
    4.7   Tax on Lease Rentals . . . . . . . . . .    5
    4.8   Real Property Taxes . . . . . . . . . .    5
    4.9   Utilities . . . . . . . . . . . . . . .    6

5.    SECURITY DEPOSIT . . . . . . . . . . . . . .    6

6.    USE . . . . . . . . . . . . . . . . . . . .    7

    6.1   Use . . . . . . . . . . . . . . . . . .    7
    6.2   Compliance with Law . . . . . . . . . .    7
    6.3   Condition of Premises . . . . . . . . .    7

7.    MAINTENANCE, REPAIRS AND ALTERATIONS . . . .    8

    7.1   Lessor's and Lessee's Obligations. . . .    8
    7.2   Maintenance of Chill and Freezer Units .    9
    7.3   Surrender . . . . . . . . . . . . . . .    9
    7.4   Lessor's and Lessee's Rights . . . . . .    9
    7.5   Alterations and Additions . . . . . . .    10

8.   INSURANCE; INDEMNITY . . . . . . . . . . .   11

     8.1  Liability Insurance . . . . . . . . . .   11
     8.2  Property Insurance . . . . . . . . . . .   11
     8.3  Insurance Policies . . . . . . . . . . .   12
     8.4  Lessor as Additional Insured . . . . . .   12
     8.5  Indemnity . . . . . . . . . . . . . . .    12
     8.6  Waiver of Subrogation. . . . . . . . . .   13

9.   DAMAGE OR DESTRUCTION . . . . . . . . . . .   14

     9.1  Definitions . . . . . . . . . . . . . .    14
     9.2  Insured Loss . . . . . . . . . . . . . .   14
     9.3  Uninsured Loss . . . . . . . . . . . . .   14
     9.4  Damage Near End of Term . . . . . . . .    15
     9.5  Abatement of Rent; Lessee's Remedies . .   15
     9.6  Termination--Advance Payments . . . . .    16

10.  ASSIGNMENT AND SUBLETTING . . . . . . . . .   16

     10.1  Lessor's Consent Required . . . . . . .   16
     10.2  Corporate or Partnership Lessee . . . .   16
     10.3  No Release of Lessee . . . . . . . . .    16
     10.4  Attorney's Fees . . . . . . . . . . . .   17

11.  DEFAULTS; REMEDIES . . . . . . . . . . . .    17

     11.1  Defaults . . . . . . . . . . . . . . .    17
     11.2  Remedies . . . . . . . . . . . . . . .    18
     11.3  Interest on Unpaid Sums . . . . . . . .   19
     11.4  Default by Lessor . . . . . . . . . . .   19
     11.5  Late Charges . . . . . . . . . . . . .    19

12.  CONDEMNATION . . . . . . . . . . . . . . .     20

13.  ESTOPPEL CERTIFICATE . . . . . . . . . . . .   20

14.  LESSOR'S LIABILITY . . . . . . . . . . . . .   21

15.  SEVERABILITY . . . . . . . . . . . . . . . .   21

16.  TIME OF ESSENCE . . . . . . . . . . . . . .    21

17.  ADDITIONAL RENT . . . . . . . . . . . . . .    22

18.  INCORPORATION OF PRIOR AGREEMENTS;
     AMENDMENTS . . . . . . . . . . . . . . . . .   22

19.  NOTICES . . . . . . . . . . . . . . . . . .    22

20. WAIVERS . . . . . . . . . . . . . . . . . . . . 22

21. HOLDING OVER . . . . . . . . . . . . . . . 23

22. CUMULATIVE REMEDIES . . . . . . . . . . . 23

23. COVENANTS AND CONDITIONS . . . . . . . . . 23

24. BINDING EFFECT; CHOICE OF LAW . . . . . . . 23

25. SUBORDINATION . . . . . . . . . . . . . . . 23

26. ATTORNEY'S FEES . . . . . . . . . . . . . . 24

27. LESSOR'S ACCESS . . . . . . . . . . . . . . 24

28. AUCTIONS . . . . . . . . . . . . . . . . . 25

29. SIGNS AND PARKING . . . . . . . . . . . . . 25

30. MERGER . . . . . . . . . . . . . . . . . . 25

31. ABANDONMENT . . . . . . . . . . . . . . . . 25

32. QUIET POSSESSION . . . . . . . . . . . . . 25

33. SECURITY MEASURES . . . . . . . . . . . . . 26

34. EASEMENTS . . . . . . . . . . . . . . . . . 26

35. AUTHORITY . . . . . . . . . . . . . . . . . 26

36. CONFLICT . . . . . . . . . . . . . . . . . 26

37. ADDENDUM . . . . . . . . . . . . . . . . . 27

38. GOVERNING LAW . . . . . . . . . . . . . . . 27

    SIGNATURES . . . . . . . . . . . . . . . . 27

    ACKNOWLEDGEMENTS . . . . . . . . . . . . . 28

    EXHIBIT "A"

# LEASE

1. <u>PARTIES</u>.

This Lease, dated, for reference purposes
only, _____, 19____, is made by and between

GSH AND K PROPERTIES, a Hawaii general partnership,
whose principal place of business and post office
address is 99-128 Aiea Heights Drive, Suite 605, Aiea,
Hawaii 96701

(hereinafter called "Lessor") and

GROCERS SPECIALTY COMPANY, a California corporation,
whose principal place of business and post office
address is 2601 South Eastern Avenue, Commerce,
California 90040

(hereinafter called "Lessee") and

2. <u>PREMISES</u>.

Lessor hereby leases to Lessee and Lessee leases from
Lessor for the term, at the rental, and upon all of the
conditions set forth herein, those certain premises situated at
2911 and 2915 Kaihikapu Street, Honolulu, Hawaii, more
particularly described in Exhibit "A" attached hereto and made
a part hereof by this reference, TOGETHER WITH all buildings,
improvements, structures and appurtenances thereunto belonging
or appertaining or held and enjoyed in connection therewith.
Said premises, including all buildings, improvements,
structures and appurtenances are herein called "the Premises".

3. <u>TERM; USE</u>.

3.1 <u>Original Term</u>. The term of this Lease shall
commence on _____ and shall end on
December 31, 1992, unless sooner terminated pursuant to any
provision hereof.

3.2 <u>Lessee's Right to Extend Term</u>.

(a) Lessee shall have the right to extend the term of
the Lease for one (1) 5-year period next following the
termination date set forth above, subject to the terms and
conditions set forth herein.

(b) Lessor shall provide Lessee with written notice
of Lessee's right to exercise its extension rights granted
hereunder at least 200 days prior to the expiration of the
original term of the Lease. As a condition precedent to

Lessee's right to extend the term of the Lease, Lessee shall provide Lessor with written notice of its intention to exercise its extension rights hereunder no later than 180 days prior to the expiration of the original term of the Lease or 20 days after Lessee's receipt of the aforesaid written notice from Lessor, whichever event shall occur last. Upon Lessee's delivery of the written notice to Lessor as provided herein, a binding agreement shall have been created between Lessee and Lessor extending the Lease term for said 5-year period subject to the terms, conditions and covenants herein contained. The parties acknowledge and agree that with respect to the providing of said notices, time is of the essence, and if Lessee fails to provide Lessor with the requisite written notice within the time periods specified above, Lessee's right to extend the Lease hereunder shall terminate and be of no further force or effect.

(c) Lessee may exercise its right to extend the term of the Lease if, at the time it is exercised, Lessee is not in default of this Lease and is itself occupying all of the Premises and has not assigned or sublet all or any portion of the Premises. The extension rights granted herein shall be exercised only by Lessee or its affiliates and under no circumstances shall Lessee have the right to sell or assign said rights to any person other than its affiliates.

3.3 _Delay in Possession_. Notwithstanding the commencement date specified hereinabove, if for any reason Lessor cannot deliver possession of the Premises to Lessee on said date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or the obligations of Lessee hereunder or extend the term hereof, but in such case, Lessee shall not be obligated to pay rent until possession of the Premises is tendered to Lessee; provided, however, that if Lessor shall not have delivered possession of the Premises within sixty (60) days from said commencement date, Lessee may, at Lessee's option, by notice in writing to Lessor within ten (10) days thereafter, cancel this Lease, in which event the parties shall be discharged from all obligations hereunder.

3.4 _Early Possession_. If Lessee occupies the Premises prior to said commencement date, such occupancy shall be subject to all the provisions hereof and shall not advance the termination date. Lessee shall pay rent for such period of early occupancy at the initial monthly rates set forth below; provided, however, that if the first month of such occupancy is less than a whole month, the rent for said initial month shall be prorated based on the actual days of occupancy during said month.

3.5  Use.  The Premises shall be used and occupied only for the following purpose, and no other purpose:

Food storage and distribution and other uses related thereto.

## 4.  RENT; SECURITY DEPOSIT; TAXES AND OTHER PAYMENTS.

4.1  Base Rent.  Lessee shall pay to Lessor as Base Rent for the Premises, monthly in advance, on the first day of each month of the term hereof, the following amounts:

| Month | Monthly Base Rent |
|---|---|
| Lease commencement date to December 31, 1991 | $ 35,485.68 |
| January 1, 1992 to December 31, 1992 | $ 37,429.01 |

4.2  Master Ground Lease Rent.  As used herein, the term "Master Ground Lease" shall refer to that certain Indenture of Lease dated February 20, 1973 made by and between the TRUSTEES UNDER THE WILL AND OF THE ESTATE OF SAMUEL M. DAMON, DECEASED, as lessor, and SEAIR CORPORATION, a Hawaii corporation, as lessee, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii as Document No. 692444, and duly noted on Transfer Certificate of Title No. 43,325; the lessee's interest under said Master Ground Lease, by mesne assignments, was assigned to Lessor herein.

In addition to the Base Rent, Lessee shall pay to Lessor, as additional rent, monthly in advance, an amount equal to the monthly rent due under the Master Ground Lease, including any increases thereto as may occur under the terms thereof, together with such other assessments and charges as may be imposed thereunder, it being the intent of the parties hereto that during the term of this Lease, as said term may be extended, Lessor's obligations to pay rent and other charges and assessments under the Master Ground Lease shall pass directly through to Lessee and become Lessee's obligations.

4.3  Base Rent During Extension Period.  In the event that Lessee exercises its right to extend the term of this Lease for one (1) 5-year period, as provided under paragraph 3.2 of this Lease, Lessee shall pay monthly Base Rent during said extension period as follows:

The Base Rent for the first year of said extension period shall be $ 39,674.75      per month.  Thereafter, the

-3-

monthly Base Rent shall be increased 6% per year for the duration of the extension period.

4.4 _Payment of Rent._ Rent for any period during the term hereof which is for less than one month shall be a pro rata portion of the monthly installment. Rent shall be payable in lawful money of the United States to Lessor at the address stated herein or to such other persons or at such other places as Lessor may designate in writing.

4.5 _Security Deposit._ Lessee shall deposit with Lessor upon the execution hereof, $49,485.68 , being a sum equal to the first full month's Base Rent and the Master Ground Lease Rent, as security for Lessee's faithful performance of Lessee's obligations hereunder.

4.6 _Net Lease._ This is a triple net lease, it being the intention of the parties hereto that except as specifically provided herein, (i) Lessor shall have and enjoy the rent herein reserved to it without deduction therefrom on any account whatsoever with respect to the Premises, Lessee hereby agreeing to pay the same, and (ii) Lessor, except as otherwise specifically provided herein, shall not be required to provide any service or do any act in connection with the Premises, Lessee hereby assuming the full and sole responsibility for the condition, operation, repair, replacement and maintenance of the Premises. In furtherance thereof, it is agreed that no abatement, diminution or reduction of the rental herein reserved to Lessor shall be claimed by or allowed to Lessee for any repairs made to the Premises by Lessee or any inconvenience, interruption, cessation or loss of business or change in permitted use or operation of the Premises, nor diminution of the amount of space used by Lessee, or otherwise, however caused, except as specifically provided herein or as such diminution of space is caused by Lessor's affirmative acts. Except as otherwise provided herein, Lessor shall not be liable for the failure of any service or utility, or injury (including death) or damage to person or property caused by or resulting from any services or utilities, except if due to the willful misconduct or gross negligence of Lessor; nor shall any such failure relieve Lessee from the duty to pay the full amount of the rent herein reserved or constitute or be construed as a constructive or other eviction of Lessee, it being understood and agreed that except as otherwise provided herein, Lessee hereby assumes the full and sole responsibility for the condition, operation, repair, replacement, maintenance and management of the Premises. Lessee shall pay any conveyance tax due on this Lease.

-4-

4.7 **Tax on Lease Rentals.** All of the rent provided for in this Lease, including without limitation the monthly Base Rent and the Master Ground Lease Rent, shall be net above taxes, assessments and charges of any kind otherwise payable by Lessee; and Lessee shall also pay (in addition to such rent, taxes, assessments and charges) an amount which, when added to the rental payments and other reimbursements reserved under this Lease, shall yield to Lessor after the deduction of all Hawaii general excise and use taxes and any other taxes imposed under any other law on account of the receipt, actual or constructive, by Lessor of the rental payments, reimbursement of real property taxes, payment or reimbursement of general excise and use taxes and any other tax attributable to the Premises or this Lease (but excluding any local, state or federal tax relating to Lessor's income), a net amount equal to that which Lessor would have realized from such payments and reimbursements had no such taxes been imposed. During such time as the Hawaii General Excise and Use Tax remains at its present rate of four percent (4%) and no other taxes are imposed upon the receipt by Lessor of the rental payments and other reimbursements due hereunder, such additional amount will be equal to 4.167% of the rental payments and reimbursements reserved under this Lease.

4.8 **Real Property Taxes.**

(a) **Payment of Taxes.** Lessee shall pay the real property tax, as defined in paragraph 4.8(b), applicable to the Premises during the term of this Lease. All such payments shall be made at least ten (10) days prior to the delinquency date of such payment. Lessee shall promptly furnish Lessor with satisfactory evidence that such taxes have been paid. If any such taxes paid by Lessee shall cover any period of time prior to or after the expiration of the term hereof, Lessee's share of such taxes shall be equitably prorated to cover only the period of time within the tax fiscal year during which this Lease shall be in effect, and Lessor shall reimburse Lessee to the extent required. If Lessee shall fail to pay any such taxes, Lessor shall have the right to pay the same, in which case Lessee shall repay such amount to Lessor with Lessee's next rent installment together with interest at 12% per annum or the maximum rate then allowable by law, whichever is less.

Lessee's obligations under this Paragraph to pay the real property taxes shall apply only to the real property taxes which are assessed against the Premises (which is described in the attached Exhibit "A") and shall not apply to any real property taxes which may be assessed against any other properties owned by Lessor. Lessor agrees that Lessee shall have the right, at its sole expense, to contest any increase in

the real property taxes and any such contest shall not constitute a default under this Lease; provided, however, that Lessee shall indemnify and hold Lessor harmless from and against any costs, penalties, interest expenses and any other liabilities which may accrue to Lessor as a result of any such action.

(b) Definition of "Real Property Tax". As used herein, the term "real property tax" shall include any form of real estate tax or assessment, general, special, ordinary or extraordinary, and any license fee, commercial rental tax, improvement bond or bonds, levy or tax (other than inheritance, personal income or estate taxes) imposed on the Premises by any authority having the direct or indirect power to tax, including any city, state or federal government, or any school, agricultural, sanitary, fire, street, drainage or other improvement district thereof, as against any legal or equitable interest of Lessor in the Premises or in the real property of which the Premises are a part, as against Lessor's right to rent or other income therefrom, and as against Lessor's business of leasing the Premises.

4.9  Utilities.  Lessee shall pay for all water, gas, heat, light, power, telephone and other utilities and services supplied to the Premises, together with any taxes thereon.

5.  SECURITY DEPOSIT.

If Lessee fails to pay rent or other charges due hereunder, or otherwise defaults with respect to any provision of this Lease, Lessor may use, apply or retain all or any portion of the deposit referred to in paragraph 4.5 (as such deposit may from time to time be increased hereunder) for the payment of any rent or other charge in default or for the payment of any other sum to which Lessor may become obligated by reason of Lessee's default, or to compensate Lessor for any loss or damage which Lessor may suffer thereby.  If Lessor so uses or applies all or any portion of said deposit, Lessee shall within ten (10) days after written demand therefor deposit cash with Lessor in an amount sufficient to restore said deposit to the full amount hereinabove stated and Lessee's failure to do so shall be a material breach of this Lease. Lessor shall not be required to keep said deposit separate from its general accounts.  If Lessee performs all of Lessee's obligations hereunder, said deposit, or so much thereof as has not theretofore been applied by Lessor, shall be returned, without payment of interest or other increment for its use, to Leseee (or, at Lessor's option, to the last assignee, if any, of Lessee's interest hereunder) at the expiration of the term hereof, and after Lessee has vacated the Premises.  Unless and

until all or any portion of the security deposit is applied by Lessor as provided herein, said security deposit shall be held by Lessor solely for the benefit of Lessee subject only to the provisions of this Paragraph; provided, however, that it is expressly understood and agreed to by the parties that no trust relationship is created herein between Lessor and Lessee with respect to the security deposit.

6. **USE.**

6.1 **Use.** The Premises, and Lessee's use thereof, is subject to all applicable zoning, municipal, county and state laws, ordinances and regulations governing and regulating the use of the Premises, and any encumbrances, covenants or restrictions of record, and Lessee hereby accepts this Lease subject thereto and to all matters disclosed thereby and by any exhibits attached hereto.

6.2 **Compliance with Law.** Lessee shall, at Lessee's expense, comply promptly with all applicable statutes, ordinances, rules, regulations, orders, encumbrances, covenants and restrictions of record, and building, fire, electrical, plumbing and other applicable codes and with all requirements in effect during the term or any part of the term hereof regulating the use by Lessee of the Premises. Lessee shall not use nor permit the use of the Premises in any manner that will tend to create waste or a nuisance.

6.3 **Condition of Premises.** Lessee hereby accepts the Premises in their condition existing as of the Lease commencement date or the date that Lessee takes possession of the Premises, whichever is earlier, in "as is" condition, which condition shall be described in a document to be prepared by Lessee following an inspection by Lessee of the Premises and to be executed by Lessor and Lessee. Lessor agrees to give Lessee reasonable access to the Premises in order to conduct such inspection, and any such inspection and such access shall not constitute occupancy of the Premises for purposes of this Lease. Lessee acknowledges that neither Lessor nor Lessor's agent has made any representation or warranty as to the present or future suitability of the Premises for the conduct of Lessee's business. Lessee further acknowledges that neither Lessor nor Lessor's agent has made any representation or warranty, and Lessor hereby disclaims any representation or warranty, as to the physical condition of the Premises or anything installed or contained therein, including, but not limited to, any express or implied warranty of habitability, merchantability or fitness for a particular purpose.

# 7. MAINTENANCE, REPAIRS AND ALTERATIONS.

7.1 <u>Lessor's and Lessee's Obligations</u>. Lessee shall, at its expense, keep in good order, condition and repair the Premises and every part thereof, structural (if the repair of such structural portion of the Premises is made necessary or occasioned by any act or omission of Lessee or any of Lessee's customers, suppliers, employees, agents, licensees or invitees) and non-structural (whether or not such portion of the Premises requiring repair, or the means of repairing the same are reasonable or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises) unless said non-structural repair is made necessary or occasioned by any act or omission of Lessor or any of Lessor's customers, suppliers, employees, agents, licensees or invitees.

Lessor shall, at its expense, keep in good order, condition and repair the structural components of the buildings on the Premises (whether or not such portion of the Premises requiring repair, or the means of repairing the same are reasonable or readily accessible to Lessor, and whether or not the need for such repairs occurs as a result of Lessor's use, any prior use, the elements or the age of such portion of the Premises), unless said structural repair is made necessary or occasioned by any act or omission of Lessee or any of Lessee's customers, suppliers, employees, agents, licensees or invitees.

As used herein, "structural repairs" shall mean repairs to any structural component of the buildings constructed on the Premises, and, without limiting the generality of the foregoing, shall include repairs to the foundation, underground sewer and water pipes, roof and weight bearing walls of said buildings and shall exclude repairs to non-weight bearing walls, windows, floor coverings, ceilings, wall and ceiling fixtures, wall and ceiling coverings, including paint, aboveground sewer and water pipes, chill and freezer units and storage tanks; provided, however, that the removal of clogs in the sewer pipes shall constitute a nonstructural repair for which Lessee shall be responsible irrespective of whether the clog is aboveground or underground.

As used herein, "non-structural repairs" shall mean and include repairs to all plumbing, heating, air conditioning, ventilating, electrical, and lighting facilities, equipment and fixtures, aboveground utility lines including sewer and water pipes, non-weight bearing walls (interior and exterior), ceilings, floors, windows, doors, plate glass, skylights, storage tanks and chill and freezer units located within the Premises and all other repairs to the Premises which do not fall within the meaning of structural repairs as defined above.

7.2 **Maintenance of Chill and Freezer Units.**
Notwithstanding any other provision to the contrary, Lessee
shall keep in good order, condition and repair the chill and
freezer units located on the Premises. Said chill and freezer
units shall be maintained and repaired by an air conditioning
service company pursuant to a monthly service contract which
shall be procured and paid for by Lessee, or, at Lessee's
option, by in-house maintenance personnel having the necessary
skills and expertise to keep the said units in good repair,
maintenance and upkeep. Lessor shall have the right at
reasonable times to come onto the Premises for the purpose of
having said chill and freezer units inspected, at Lessor's
expense, to ensure that they are being properly maintained,
repaired and upkept. If any of the chill and freezer units
need to be replaced, they shall be replaced at Lessee's sole
expense and the old units may be removed by the Lessee provided
that all areas affected by the removal of the units are
adequately repaired and made safe pursuant to plans approved by
Lessor.

7.3 **Surrender.** On the last day of the term hereof,
or on any sooner termination, Lessee shall surrender the
Premises to Lessor in the same condition as when received,
ordinary wear and tear excepted, clean and free of debris.
Lessee may, and shall at Lessor's direction, remove all trade
fixtures, furnishings and equipment installed in the Premises
by Lessee, and shall repair any damage to the Premises
occasioned by the installation or removal of Lessee's trade
fixtures, furnishings and equipment. Notwithstanding anything
to the contrary otherwise stated in this Lease, unless Lessor
requires their removal, all carpeting, air lines, power panels,
electrical distribution systems, lighting fixtures, air
conditioning, plumbing and fencing on the Premises shall be
surrendered to Lessor in the same condition as when received,
ordinary wear and tear excepted.

7.4 **Lessor's and Lessee's Rights.** If Lessor or
Lessee fails to perform its obligations under this paragraph 7
or under any other paragraph of this Lease, the nondefaulting
party may, at its option (but shall not be required to), enter
upon the Premises after thirty (30) days prior written notice
to the defaulting party (except in the case of an emergency, in
which case no notice shall be required), perform such
obligations on said defaulting party's behalf and put the same
in good order, condition and repair, and the cost thereof
together with (a) interest thereon at the rate of one percent
per month and (b) a sum equal to fifteen percent (15%) of such
cost for overhead and supervision, shall become due and payable
as additional rental to Lessor together with Lessee's next

rental installment or shall be used as an offset against Lessee's next rental installment to Lessor, whichever is applicable.

### 7.5 Alterations and Additions.

(a) Lessee shall not, without Lessor's prior written consent, make any alterations, improvements, additions or Utility Installments in, on or about the Premises, except for nonstructural alterations not exceeding $25,000 per occurrence or $100,000 in cumulative costs during the term of this Lease. In any event whether or not in excess of $25,000 per occurrence or $100,000 in cumulative cost, Lessee shall make no change or alteration to the exterior of the Premises nor the exterior of the building(s) in which the Premises is located without Lessor's prior written consent. As used in this paragraph 7.5 the term "Utility Installation" shall mean carpeting, window coverings, air lines, power panels, electrical distribution systems, lighting fixtures, space heaters, air conditioning, plumbing, and fencing. Lessor may require that Lessee remove any or all of said alterations, improvements, additions or Utility Installations at the expiration of the term, and restore the Premises to their prior condition. Lessor may require Lessee to provide Lessor, at Lessee's sole cost and expense, performance and labor and material payment bonds, each naming the Lessor as an additional obligee and each in an amount equal to 100% of the estimated cost of such improvements, to insure Lessor against any liability for mechanics' and materialmen's liens and to insure completion of the work. Should Lessee make any prohibited alterations, improvements, additions or Utility Installations without the prior approval of Lessor, Lessor may require that Lessee remove any or all of the same at Lessee's expense.

(b) Any alterations, improvements, additions or Utility Installations in or about the Premises that Lessee shall desire to make and which requires the consent of Lessor shall be presented to Lessor in written form with proposed detailed plans. Lessor shall not unreasonably withhold its consent. If Lessor shall give its consent, the consent shall be deemed conditioned upon Lessee acquiring a permit to do so from appropriate governmental agencies, the furnishing of a copy thereof to Lessor prior to the commencement of the work, the compliance by Lessee with said detailed plans and all conditions of said permit, and completion of such alterations, improvements, additions or utility installations in a reasonably prompt and expeditious manner free and clear of mechanic's and materialmen's liens.

rental installment or shall be used as an offset against Lessee's next rental installment to Lessor, whichever is applicable.

### 7.5 Alterations and Additions.

(a) Lessee shall not, without Lessor's prior written consent, make any alterations, improvements, additions or Utility Installments in, on or about the Premises, except for nonstructural alterations not exceeding $25,000 per occurrence or $100,000 in cumulative costs during the term of this Lease. In any event whether or not in excess of $25,000 per occurrence or $100,000 in cumulative cost, Lessee shall make no change or alteration to the exterior of the Premises nor the exterior of the building(s) in which the Premises is located without Lessor's prior written consent. As used in this paragraph 7.5 the term "Utility Installation" shall mean carpeting, window coverings, air lines, power panels, electrical distribution systems, lighting fixtures, space heaters, air conditioning, plumbing, and fencing. Lessor may require that Lessee remove any or all of said alterations, improvements, additions or Utility Installations at the expiration of the term, and restore the Premises to their prior condition. Lessor may require Lessee to provide Lessor, at Lessee's sole cost and expense, performance and labor and material payment bonds, each naming the Lessor as an additional obligee and each in an amount equal to 100% of the estimated cost of such improvements, to insure Lessor against any liability for mechanics' and materialmen's liens and to insure completion of the work. Should Lessee make any prohibited alterations, improvements, additions or Utility Installations without the prior approval of Lessor, Lessor may require that Lessee remove any or all of the same at Lessee's expense.

(b) Any alterations, improvements, additions or Utility Installations in or about the Premises that Lessee shall desire to make and which requires the consent of Lessor shall be presented to Lessor in written form with proposed detailed plans. Lessor shall not unreasonably withhold its consent. If Lessor shall give its consent, the consent shall be deemed conditioned upon Lessee acquiring a permit to do so from appropriate governmental agencies, the furnishing of a copy thereof to Lessor prior to the commencement of the work, the compliance by Lessee with said detailed plans and all conditions of said permit, and completion of such alterations, improvements, additions or utility installations in a reasonably prompt and expeditious manner free and clear of mechanic's and materialmen's liens.

(c)  Lessee shall pay, when due, all claims for labor or materials furnished to or for Lessee at or for use in the Premises, which claims are or may be secured by any mechanics' or materialmen's lien against the Premises or any interest therein.  Lessee shall give Lessor not less than ten (10) days notice prior to the commencement of any work in the Premises. If Lessee shall, in good faith, contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend itself and Lessor against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof against the Lessor or the Premises, upon the condition that if Lessor shall require, Lessee shall furnish to Lessor a surety bond satisfactory to Lessor in an amount equal to such contested lien claim or demand indemnifying Lessor against liability for the same and holding the Premises free from the effect of such lien or claim.  In addition, Lessor may require Lessee to pay Lessor's attorneys' fees and costs in participating in such action if Lessor shall decide it is to its best interest to do so.

8.  INSURANCE; INDEMNITY.

8.1  Liability Insurance.  Lessee shall, at Lessee's expense, obtain and keep in force during the term of this Lease a policy of Combined Single Limit, Bodily Injury and Property Damage insurance insuring Lessor, Lessee and Lessor's managing agent for the Premises, if any, against any liability arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto.  Such insurance shall be a combined (personal injury and property damage) single limit policy in an amount not less than $3,000,000 per occurrence.  The policy shall insure performance by Lessee and Lessor of all contractual liabilities under this Lease, including, but not limited to, the indemnity provisions set forth in this paragraph 8 and shall contain cross-liability endorsements.  The limits of said insurance shall not, however, limit the liability of either Lessor or Lessee under this Lease.

8.2  Property Insurance.

(a)  Lessee shall obtain and keep in force during the term of this Lease a policy or policies of insurance containing the Special Form All Risks coverage and Flood Insurance coverage for loss or damage to all buildings and improvements on the Premises, including all chill and freezer units, in the amount of the full replacement value thereof, as the same may exist from time to time.  The said policy shall also have an Agreed Amount Endorsement which shall ensure 100% replacement cost coverage in the event of a partial loss.  Lessee shall have the right to set the deductible amount of the said

-11-

policies and Lessee shall be solely liable for any such
deductible amounts. Subject to the provisions of paragraph
9.2, said insurance shall provide for payment of loss
thereunder to Lessor or to Lessor's mortgagee.

The Lessee shall, in addition, obtain and keep in
force during the term of this Lease a policy of business
interruption insurance, with loss payable to Lessor, which
insurance shall provide for, among other things, the payment of
the Base Rent, Master Ground Lease Rent, real estate taxes,
gross excise taxes and insurance costs during any period (not
less than one (1) year) that the Premises is destroyed or
rendered inaccessible, in whole or in part, by any risks
covered by the insurance policies required hereunder.

(b) All of Lessee's fixtures, equipment and tenant
improvements shall be insured by Lessee, and not Lessor.

8.3 Insurance Policies. Insurance required under
this paragraph 8 shall be in companies authorized to do
business in Hawaii and holding a "General Policyholders Rating"
of at least A, or such other higher rating as may be required
by a lender having a lien on the Premises, as set forth in the
most current issue of "Best's Insurance Guide". Lessee shall
deliver to Lessor certificates evidencing the existence and
amounts of such insurance with loss payable clauses as required
by this paragraph 8. Each such policy shall contain an
endorsement providing that it shall not be cancellable or
subject to reduction of coverage or other modification except
after thirty (30) days prior written notice to Lessor. Lessee
shall, at least ten (10) days prior to the expiration of such
policies, furnish Lessor with renewals or "binders" thereof, or
Lessor may, after providing Lessee with five (5) calendar days
written notice, order such insurance and charge the cost
thereof to Lessee, which amount shall be payable by Lessee upon
demand. Lessee shall not do or permit to be done anything
which shall invalidate the insurance policies referred to in
this paragraph 8.

8.4 Lessor as Additional Insured. Except as
otherwise provided herein, Lessee shall obtain an endorsement
naming Lessor as an additional insured under all of the
insurance policies required under this paragraph 8 to be
obtained by Lessee.

8.5 Indemnity.

(a) Lessee shall indemnify and hold harmless Lessor
from and against any and all claims arising from Lessee's use
of the Premises or from the conduct of Lessee's business or
from any activity, work or things done, permitted or suffered

-12-

by Lessee in or about the Premises and shall further indemnify and hold harmless Lessor from and against any and all claims arising from any breach or default in the performance of any obligation on Lessee's part to be performed under the terms of this Lease, or arising from any negligence of Lessee, or any of Lessee's agents, contractors, customers or employees, and from and against all costs, attorneys' fees, expenses and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon; and in case any action or proceeding be brought against Lessor by reason of any such claim, Lessee upon notice from Lessor shall defend the same at Lessee's expense by counsel satisfactory to Lessor. Except as otherwise provided in this Lease, Lessee, as a material part of the consideration to Lessor, hereby assumes all risk of damage to property or injury to persons, in, upon or about the Premises arising from any cause.

(b) Lessor shall indemnify and hold harmless Lessee from and against any and all claims arising from Lessor's title to the Premises or from the conduct of Lessor's business or from any activity, work or things done, permitted or suffered by Lessor in or about the Premises and shall further indemnify and hold harmless Lessee from and against any and all claims arising from any breach or default in the performance of any obligation on Lessor's part to be performed under the terms of this Lease, or arising from any negligence of Lessor, or any of Lessor's agents, contractors, customers or employees, and from and against all costs, attorneys' fees, expenses and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon.

8.6 _Waiver of Subrogation_. The parties release each other, and their respective authorized representatives, from any claims for damage to any person or to the Premises and the improvements thereon, and to the fixtures, personal property, the Lessee's improvements, and alterations of either the Lessor or the Lessee in or on the Premises that are caused by or result from the risks insured against under any insurance policies required to be obtained by Lessee under this paragraph 8, but only up to the amount of the applicable insurance limit.

Lessor and Lessee shall cause each insurance policy obtained by it pursuant to this paragraph 8 to provide that the insurance company waives all right of recovery by way of subrogation against either party in connection with any damage covered by said policy.

9. DAMAGE OR DESTRUCTION.

   9.1 Definitions.

      (a) "Premises Partial Damage" shall herein mean
damage or destruction to the Premises to the extent that the
cost of repair is less than 50% of the then replacement cost of
the Premises. "Premises Building Partial Damage" shall herein
mean damage or destruction to the building of which the
Premises are a part to the extent that the cost of repair is
less than 50% of the then replacement cost of such building as
a whole.

      (b) "Premises Total Destruction" shall herein mean
damage or destruction to the Premises to the extent that the
cost of repair is 50% or more of the then replacement cost of
the Premises. "Premises Building Total Destruction" shall
herein mean damage or destruction to the building of which the
Premises are a part to the extent that the cost of repair is
50% or more of the then replacement cost of such building as a
whole.

      (c) "Insured Loss" shall herein mean damage or
destruction which was caused by an event required to be covered
by the insurance described in paragraph 8.

   9.2 Insured Loss. If at any time during the term of
this Lease there is damage which is an Insured Loss,
irrespective of whether said damage falls into the
classification of Premises Partial Damage, Premises Building
Partial Damage, Premises Total Destruction or Premises Building
Total Destruction, then Lessor, shall, at Lessor's expense,
either construct a new building or repair such damage (but not
Lessee's fixtures, equipment or tenant improvements) as soon as
reasonably possible and this Lease shall continue in full force
and effect.

   9.3 Uninsured Loss. If at any time during the term
of this Lease there is damage which is not an Insured Loss
irrespective of whether said damage falls within the
classification of Premises Partial Damage, Premises Building
Partial Damage, Premises Total Destruction or Premises Building
Total Destruction (unless caused by a negligent or willful act
of Lessee, in which event Lessee shall make the repairs at
Lessee's expenses), Lessor may at Lessor's option either (i)
construct a new building or repair such damage (but not
Lessee's fixtures, equipment or tenant improvements) as soon as
reasonably possible at Lessor's expense, in which event this
Lease shall continue in full force and effect, or (ii) give

-14-

written notice to Lessee within thirty (30) days after the date of the occurrence of such damage of Lessor's intention to cancel and terminate this Lease, as of the date of the occurrence of such damage.

### 9.4 Damage Near End of Term.

(a) Notwithstanding paragraph 9.2, if at any time during the last six months of the term of this Lease there is damage, whether or not an Insured Loss, which falls within the classification of Premises Partial Damage or Premises Building Partial Damage, Lessor may at Lessor's option cancel and terminate this Lease as of the date of occurrence of such damage by giving written notice to Lessee of Lessor's election to do so within 30 days after the date of occurrence of such damage, and Lessee may at Lessee's option cancel its renewal, if any of the Lease, as of the date of occurrence..

(b) Notwithstanding paragraph 9.4(a), in the event that Lessee has an option to extend or renew this Lease, and the time within which said option may be exercised has not yet expired, Lessee shall exercise such option, if it is to be exercised at all, no later than 20 days after the occurrence of an Insured Loss falling within the classification of the Premises Partial Damage or Premises Building Partial Damage during the last six months of the term of this Lease. If Lessee duly exercises such option during said 20-day period, Lessor shall, at Lessor's expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option during said 20-day period, then Lessor may at Lessor's option terminate and cancel this Lease as of the expiration of said 20-day period, by giving written notice to Lessee of Lessor's election to do so within 10 days after the expiration of said 20-day period, nothwithstanding any term or provision in the grant of option to the contrary.

### 9.5 Abatement of Rent; Lessee's Remedies.

(a) In the event of damage described in paragraphs 9.2 or 9.3, and Lessor repairs or restores the Premises pursuant to the provisions of this paragraph 9, the rent payable hereunder for the period during which such damage, repair or restoration continues shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired. Except as otherwise provided in this Lease and except for abatement of rent, if any, Lessee shall have no claim against Lessor for any damage suffered by reason of any such damage, destruction, repair or restoration.

-15-

(b)  If Lessor shall be obligated to repair or restore the Premises under the provisions of this paragraph 9 and shall not commence such repair or restoration within 90 days after the damage or casualty occurs, Lessee may at Lessee's option cancel and terminate this Lease by giving Lessor written notice of Lessee's election to do so at any time prior to the commencement of such repair or restoration.  In such event this Lease shall terminate as of the date of such notice.

9.6  Termination -- Advance Payments.  Upon termination of this Lease pursuant to this paragraph 9, any advance rent and any other advance payments made by Lessee to Lessor shall be prorated in accordance with the actual time of occupancy by Lessee, and all advance payments for periods not covered by Lessee's occupancy period shall be returned to Lessee.  Lessor shall, in addition, promptly return to Lessee so much of Lessee's security deposit as has not theretofore been applied by Lessor.

## 10.  ASSIGNMENT AND SUBLETTING.

10.1  Lessor's Consent Required.  Lessee may sublet any or all of the Premises subject to the provisions of this paragraph 10.  Lessee shall not voluntarily or by operation of law assign, transfer, mortgage, sublet, or otherwise transfer or encumber all or any part of Lessee's interest in this Lease or in the Premises, without Lessor's prior written consent, which consent shall not be unreasonably withheld.  Any attempted assignment, transfer, mortgage, encumbrance or subletting without such consent shall be void, and shall constitute a breach of this Lease.  Notwithstanding any provision hereof to the contrary, Lessee shall be permitted to assign this Lease to any affiliate of Lessee without Lessor's consent.

10.2  Corporate or Partnership Lessee.  Any change in ownership of the majority of shares of the stock of Lessee (if Lessee is a corporation), as such majority ownership existed as of the date of this Lease, or any change in the identity of a majority of the general partners of Lessee (if Lessee is a partnership), as the identity of such majority existed as of the date of this Lease, shall (except with respect to any affiliate of Lessee) be deemed to be an assignment or transfer of this Lease within the meaning of paragraph 10.1.

10.3  No Release of Lessee.  Regardless of Lessor's consent, no subletting or assignment shall release Lessee of Lessee's obligation or alter the primary liability of Lessee to pay the rent and to perform all other obligations to be performed by Lessee hereunder. The acceptance of rent by Lessor

from any other person shall not be deemed to be a waiver by Lessor of any provision hereof. Consent to one assignment or subletting shall not be deemed consent to any subsequent assignment or subletting. In the event of default by any assignee of Lessee or any successor of Lessee, in the performance of any of the terms hereof, Lessor may, following notice of such default by Lessee to Lessee, proceed directly against Lessee without the necessity of exhausting remedies against said assignee. Lessor may consent to subsequent amendments or modifications to this Lease (including increases in the monthly rent due under this Lease) with assignees of Lessee provided that Lessee is given written notice of said action and consents to same in writing, in which event any such action shall not relieve Lessee of its liability under this Lease, as modified or amended.

10.4 Attorney's Fees. In the event Lessee shall assign this Lease or sublet the Premises or request the consent of Lessor to any assignment or subletting or if Lessee shall request the consent of Lessor for any act Lessee proposes to do then Lessee shall also pay all of Lessor's attorneys' fees incurred in connection therewith, such attorneys' fees not to exceed $500.00 for each such request; provided, however, that Lessee shall not be required to pay Lessor a consent fee or attorney's fee with regard to any assignment of the Lease to any of Lessee's affiliates.

11. DEFAULTS; REMEDIES.

11.1 Defaults. The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Lessee:

(a) The vacating or abandonment of the Premises by Lessee.

(b) The failure by Lessee to make any payment of rent or any other payment required to be made by Lessee hereunder, as and when due, where such failure shall continue for a period of five (5) business days after Lessee's receipt from Lessor of a written notice of said default.

(c) The failure by Lessee to observe or perform any of the covenants, conditions or provisions of this Lease to be observed or performed by Lessee, other than described in subparagraph (b) above, where such failure shall continue for a period of thirty (30) calendar days after Lessee's receipt from Lessor of a written notice of said default.

-17-

(d)   (i)   The making by Lessee of any general arrangement or assignment for the benefit of creditors; (ii) the seeking or entering of any order for relief by or against Lessee under the Federal Bankruptcy Reform Act of 1978, as amended, or any successor law, or the bankruptcy or seeking of protection under any provision of the Federal Bankruptcy Act, or the assignment of any of Lessee's property for the benefit of any of Lessee's creditors; (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days.

(e)   The discovery by Lessor that any financial statement given to Lessor by Lessee or any guarantor of Lessee's obligation hereunder was materially false.

11.2  _Remedies_.   In the event of any such default or breach by Lessee, Lessor may at any time thereafter, with or without notice or demand and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such default or breach:

(a)   Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession of the Premises to Lessor.   In such event Lessor shall be entitled to recover from Lessee all damages incurred by Lessor by reason of the Lessee's default including, but not limited to, the cost of recovering possession of the Premises; expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorney's fees, and any real estate commission actually paid; and the worth at the time of award by the court having jurisdiction thereof of the amount by which the unpaid rent for the balance of the term after the time of such award exceeds the amount of such rental loss for the same period that Lessee proves could be reasonably avoided.

(b)   Maintain Lessee's right to possession in which case this Lease shall continue in effect whether or not Lessee shall have abandoned the Premises.   In such event Lessor shall be entitled to enforce all of Lessor's rights and remedies under this Lease, including the right to recover the rent as it becomes due hereunder, subject to Lessor's duty, if any, to mitigate damages.

(c) Pursue any other remedy now or hereafter available to Lessor under the laws or judicial decisions of the state wherein the Premises are located.

11.3  Interest on Unpaid Sums.  In addition to the late charges specified in this Lease, unpaid installments of rent and other unpaid monetary obligations of Lessee under the terms of this Lease shall bear interest from the thirtieth (30th) day after the date due at the rate of twelve percent (12%) per annum or the maximum rate then allowable by law, whichever is less.

11.4  Default by Lessor.  Lessor shall not be in default unless Lessor fails to perform obligations required of Lessor within thirty (30) days after written notice by Lessee to Lessor; provided, however, that if the nature of Lessor's obligation is such that more than thirty (30) days are required for performance then Lessor shall not be in default if Lessor commences performance within such 30-day period and thereafter diligently prosecutes the same to completion.

11.5  Late Charges.  Lessee hereby acknowledges that late payment by Lessee to Lessor of rent and other sums due hereunder will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain.  Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed on Lessor by the terms of any mortgage covering the Premises.  Accordingly, if any installment of rent or any other sum due from Lessee shall not be received by Lessor or Lessor's designee within the later of (i) ten (10) days after receipt by Lessee of an invoice from Lessor describing the rent or other sum due from Lessee or (ii) ten (10) days after such amount shall be due, then Lessee shall pay to Lessor a late charge equal to four percent (4%) of such overdue amount.  Lessor shall be obligated to forward said invoice to Lessee after such amount shall be due or within five (5) days before such amount shall be due.  The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of late payment by Lessee.  Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's default with respect to such overdue amount, nor prevent Lessor from exercising any of the other rights and remedies granted hereunder.  In the event that a late charge is payable hereunder, whether or not collected, for three (3) consecutive installments of rent, then at Lessor's option, rent shall automatically become due and payable quarterly in advance, rather than monthly, notwithstanding paragraph 4 or any other provision of this Lease to the contrary.

## 12. CONDEMNATION.

If the Premises or any portion thereof are taken under the power of eminent domain, or sold under the threat of the exercise of said power (all of which are herein called "condemnation"), this Lease shall terminate as to the part so taken as of the date of the condemning authority takes title or possession, whichever first occurs. If more than twenty-five percent (25%) of the floor area of the buildings on the Premises, or more than fifty percent (50%) of the land area of the Premises which is not occupied by any building, is taken by condemnation, Lessee may, at Lessee's option, to be exercised in writing only within ten (10) days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within ten (10) days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the rent shall be reduced in the proportion that the floor area of the buildings on the Premises taken bears to the total floor area of the buildings on the Premises. No reduction of rent shall occur if the only area taken is that which does not have a building located thereon. Any award for the taking of all or any part of the Premises under the power of eminent domain or any payment made under threat of the exercise of such power shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold or for the taking of the fee, or as serverance damages; provided, however, that Lessee shall be entitled from the condemning authority and not from Lessor, to any award for loss of or damage to Lessee's trade fixtures and removable personal property. In the event that this Lease is not terminated by reason of such condemnation, Lessor shall, to the extent of serverance damages received by Lessor in connection with such condemnation, repair any damage to the Premises caused by such condemnation except to the extent that Lessee has been reimbursed therefor by the condemning authority. Lessee shall pay any amount in excess of such serverance damages required to complete such repair.

## 13. ESTOPPEL CERTIFICATE.

(a) Lessee shall at any time upon not less than ten (10) days' prior written notice from Lessor execute, acknowledge and deliver to Lessor a statement in writing (i) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified,

is in full force and effect) and the date to which the rent
and other charges are paid in advance, if any, and (ii)
acknowledging that there are not, to Lessee's knowledge, any
uncured defaults on the part of Lessor hereunder, or
specifying such defaults if any are claimed.  Any such
statement may be conclusively relied upon by any prospective
purchaser or encumbrancer of the Premises.

(b)  Lessee's failure to deliver such statement
within such time shall be conclusive upon Lessee (i) that this
Lease is in full force and effect, without modification except
as may be represented by Lessor, (ii) that there are no
uncured defaults in Lessor's performance, and (iii) that not
more than one month's rent has been paid in advance.

(c)  If Lessor desires to finance, refinance, or sell
the Premises, or any part thereof, Lessee hereby agrees to
deliver to any lender or purchaser designated by Lessor such
financial statements of Lessee as may be reasonably required
by such lender or purchaser.  Such statements shall include
the past three years' financial statements of Lessee.  All
such financial statements shall be received by Lessor and such
lender or purchaser in confidence and shall be used only for
the purposes herein set forth.

14.  LESSOR'S LIABILITY.

In the event of any transfer of Lessor's title or
interest in or to the Premises, Lessor herein named (and in
case of any subsequent transfers then the transferor) shall be
relieved from and after the date of such transfer of all
liability as respects Lessor's obligations thereafter to be
performed, provided that any funds in the hands of Lessor or
the then transferor at the time of such transfer, in which
Lessee has an interest, shall be delivered to the transferee.
The obligations contained in this Lease to be performed by
Lessor shall, subject as aforesaid, be binding on Lessor's
successors and assigns, only during their respective periods
of ownership.

15.  SEVERABILITY.

The invalidity of any provision of this Lease as
determined by a court of competent jurisdiction, shall in no
way affect the validity of any other provision hereof.

16.  TIME OF ESSENCE.

Time is of the essence of this Lease.

17. ADDITIONAL RENT.

        Any monetary obligations of Lessee to Lessor under
the terms of this Lease shall be deemed to be rent.

18. INCORPORATION OF PRIOR AGREEMENTS; AMENDMENTS.

        This Lease contains all agreements of the parties
with respect to any matter mentioned herein.  No prior
agreement or understanding pertaining to any such matter shall
be effective.  This Lease may be modified in writing only,
signed by the parties in interest at the time of the
modification.

19. NOTICES.

        Any notice required or permitted to be given
hereunder shall be in writing and may be given by personal
delivery or by certified mail or by facsimile transmission,
and shall be deemed sufficiently given if addressed to Lessee,
Lessor or Guarantor at the respective addresses noted below.
Either party may by notice to the other specify a different
address for notice purposes except that upon Lessee's taking
possession of the Premises, the Premises shall constitute
Lessee's address for notice purposes.  A copy of all notices
required or permitted to be given to Lessor hereunder shall be
concurrently transmitted to such party or parties at such
addresses as Lessor may from time to time hereafter designate
by notice to Lessee.

                If to Lessor, to:

                GSH AND K PROPERTIES,
                99-128 Aiea Heights Drive, Suite 605
                Aiea, Hawaii  96701
                Attention:  Mr. Glenn S. Haraguchi
                Telecopier:  (808) 488-0533

                If to Lessee, to:

                GROCERS SPECIALTY COMPANY,
                2601 South Eastern Avenue
                Commerce, California 90040
                Attention:  Mr. David Fitton
                Telecopier:  (213) 726-2336

20. WAIVERS.

        No waiver by Lessor of any provision hereof shall be
deemed a waiver of any other provision hereof or of any

                            -22-

subsequent breach by Lessee of the same or any other provision. No failure by Lessor to exercise any option, right or remedy available under this Lease shall preclude Lessor from subsequently exercising such option, right or remedy. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to or approval of any subsequent act by Lessee. The acceptance of rent hereunder by Lessor shall not constitute an accord and satisfaction or a waiver of any preceding breach by Lessee of any provision hereof, regardless of Lessor's knowledge of such preceding breach at the time of acceptance of such rent.

21. HOLDING OVER.

If Lessee, with Lessor's consent, remains in possession of the Premises or any part thereof after the expiration of the term hereof, such occupancy shall be a tenancy at sufferance upon all the provisions of this Lease pertaining to the obligations of Lessee, except that (a) during the period of such holdover the rent due from Lessee shall increase to one and a half (1 1/2) times the rent due under this Lease immediately prior to the expiration of this Lease, and (b) all options and rights of first refusal, if any, granted under the terms of this Lease shall be deemed terminated and be of no further effect during said tenancy.

22. CUMULATIVE REMEDIES.

No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

23. COVENANTS AND CONDITIONS.

Each provision of this Lease performable by Lessee shall be deemed both a covenant and a condition.

24. BINDING EFFECT; CHOICE OF LAW.

Subject to any provisions hereof restricting assignment or subletting by Lessee and subject to the provisions of paragraph 14, this Lease shall bind the parties and their respective heirs, personal representatives, successors and assigns. This Lease shall be governed by the laws of the State of Hawaii.

25. SUBORDINATION.

(a)  This Lease, at Lessor's option, shall be
subordinate to any ground lease, mortgage, deed of trust, or
any other hypothecation or security now or hereafter placed
upon the real property of which the Premises are a part and to
any and all advances made on the security thereof and to all
renewals, modifications, consolidations, replacements and
extensions thereof.  Notwithstanding such subordination,
Lessee's right to quiet possession of the Premises shall not
be disturbed if Lessee is not in default and so long as Lessee
shall pay the rent and observe and perform all of the
provisions of this Lease, unless this Lease is otherwise
terminated pursuant to its terms.  If any mortgagee, trustee
or ground lessor shall elect to have this Lease prior to the
lien of its mortgage, deed of trust or ground lease, and shall
give written notice thereof to Lessee, this Lease shall be
deemed prior to such mortgage, deed of trust, or ground lease,
whether this Lease is dated prior or subsequent to the date of
said mortgage, deed of trust or ground lease or the date of
recording thereof.

(b)  Lessee agrees to execute any document reasonably
required to effectuate an attornment, a subordination or to
make this Lease prior to the lien of any mortgage, deed of
trust or ground lease, as the case may be.  In the event that
Lessee shall unreasonably fail to execute such documents
within ten (10) days after written demand, Lessor may execute
such documents on behalf of Lessee as Lessee's
attorney-in-fact.  Lessee does hereby make, constitute and
irrevocably appoint Lessor as Lessee's attorney-in-fact and in
Lessee's name, place and stead, to execute such documents in
accordance with this paragraph 25(b).

## 26.  ATTORNEY'S FEES.

If either party herein brings an action to enforce
the terms hereof or declare rights hereunder, or is required
to defend any such action, the prevailing party in any such
action, on trial or appeal, shall be entitled to all of his
attorney's fees with respect to that particular action to be
paid by the losing party.

## 27.  LESSOR'S ACCESS.

Subject to paragraph 7.4 of this Lease, Lessor and
its agents shall have the right to enter from time to time the
Premises at reasonable times for the purpose of inspecting the
same, showing the same to prospective purchasers, lenders, or
lessees, and making such alterations, repairs, improvements or
additions to the Premises or to the building of which they are
a part as Lessor may deem necessary or desirable.  Lessor may
at any time or times during the term of this Lease place on or

about the Premises any ordinary "For Sale" or "For Lease" signs for the Premises, all without rebate of rent or liability to Lessee.

28. AUCTIONS.

Lessee shall not conduct, nor permit to be conducted, either voluntarily or involuntarily, any auction upon the Premises without first having obtained Lessor's prior written consent.

29. SIGNS AND PARKING.

Lessee shall not place any sign upon the Premises without Lessor's prior written consent. Lessee shall have exclusive right to and use of all parking on the Premises for the term of the Lease, as extended.

30. MERGER.

The voluntary or other surrender of this Lease by Lessee, or a mutual cancellation thereof, or a termination by Lessor, shall not work a merger, and shall, at the option of Lessor, terminate all or any existing subtenancies or may, at the option of Lessor, operate as an assignment to Lessor of any or all of such subtenancies.

31. ABANDONMENT.

If Lessor has reason to believe that Lessee has abandoned the Premises, Lessor shall give Lessee written notice of its intention to exercise its default remedies as provided for in paragraph 11. If Lessee fails to respond to such notice within twenty (20) calendar days after the date such notice is sent to Lessee, Lessor may at once, without any further notice to or consent of Lessee, change the locks to the Premises and lock Lessee out of the Premises until such time as Lessee's default under this Lease is cured, without any liability for damages to Lessee or for trespass or for any damage, loss or theft to the Premises or any contents or personal property stored within the Premises. This right shall be in addition to Lessor's default remedies provided for in paragraph 11.

32. QUIET POSSESSION.

Upon Lessee paying the rent for the Premises and observing and performing all of the covenants, conditions and provisions on Lessee's part to be observed and performed hereunder, Lessee shall have quiet possession of the Premises

for the entire term hereof subject to all of the provisions of this Lease.

## 33. SECURITY MEASURES.

Lessee hereby acknowledges that the rental payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of Lessee, its agents and customers from acts of third parties.

## 34. EASEMENTS.

Lessor reserves to itself the right, from time to time, to grant such easements, rights and dedications that Lessor deems necessary or desirable, so long as such easements, rights and dedications do not unreasonably interfere with the use of the Premises by Lessee. Lessee shall execute any documents reasonably necessary to effectuate the foregoing upon the request of Lessor and failure to do so shall constitute a breach of this Lease.

## 35. AUTHORITY.

If Lessee is a corporation, trust, or general or limited partnership, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of said entity. If Lessee is a corporation, trust or partnership, Lessee shall, within thirty (30) days after execution of this Lease, deliver to Lessor evidence of such authority satisfactory to Lessor.

## 36. CONFLICT.

(a) Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

(b) The headings of sections and subsections herein are inserted only for convenience and reference and shall in no way define, limit or describe the scope or intent of any provisions of this Lease.

(c) Any conflict between the provisions of any addendum to this Lease and the provisions of this Lease shall be controlled by the provisions of the addendum.

-26-

(d) Lessee acknowledges that it has received a copy of the Master Ground Lease and has had full and fair opportunity to review the terms and conditions of said Master Ground Lease and to obtain advice of counsel concerning same. Any conflict between the provisions of this Lease and the Master Ground Lease shall be controlled by the provisions of the Master Ground Lease.

37. ADDENDUM.

All addendum or addenda attached hereto shall constitute a part of this Lease.

38. GOVERNING LAW. This Lease shall be governed by and construed in accordance with the laws of the State of Hawaii.

IN WITNESS WHEREOF, each of the parties has caused to be signed by its duly authorized officers and/or partners this Lease as of the date first above written.

GSH AND K PROPERTIES,
a Hawaii general partnership

By _____
Its GENERAL PARTNER

By _____
Its General Partner

"LESSOR"

GROCERS SPECIALTY COMPANY,
a California corporation

By _____
Its President

By _____
Its Vice-President

"LESSEE"

STATE OF ~~HAWAII~~ *California* )
                         ) SS.
CITY AND COUNTY OF ~~HONOLULU~~ )

        On this _4th_ day of _January_, 19_8_,
before me appeared _____ and _____
to me personaly known, who, being by me duly sworn, did say
that they are the general partners of GSH AND K PROPERTIES, a
Hawaii general partnership, and that said instrument was
signed and sealed in behalf of said partnership by authority
of its partners and the said _President_
and _Vice President_ acknowledged said instrument to
be the free act and deed of said partnership.

                            _Linda Poole_
                            Notary Public, State of ~~Hawaii~~
                            *California*

                            My commission expires: _____

OFFICIAL SEAL
LINDA POOLE
NOTARY PUBLIC-CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Expires July 30, 1993

STATE OF _California_ )
                     ) SS.
COUNTY OF _Los Angeles_ )

        On this _4th_ day of _January_, 19_8_,
before me appeared _____ _____
and _____ to me personally known,
who, being by me duly sworn, did say that they are the
_President_ and _Vice President_
respectively, of GROCERS SPECIALTY COMPANY, a California
corporation, and that the seal affixed to the foregoing
instrument is the corporate seal of said corporation and that
said instrument was signed and sealed in behalf of said
corporation by authority of its Board of Directors, and the
said _President_ and
_Vice President_ acknowledged said instrument
to be the free act and deed of said corporation.

                            _Linda Poole_
                            Notary Public,
                            State of _California_

                            My commission expires: _____

OFFICIAL SEAL
LINDA POOLE
NOTARY PUBLIC-CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Expires July 30, 1993

EXHIBIT "A"

All of that certain parcel of land situate at
Moanalua, Honolulu, City and County of Honolulu, State of
Hawaii, described as follows:

Lot 65, area 35,000.0 square feet,

Lot 66, area 35,000.0 square feet, and

Lot 67, area 35,000.0 square feet,

as shown on Map 2, filed in the Office of the Assistant
Registrar of the Land Court of the State of Hawaii with Land
Court Consolidation No. 42 of the Trustees under the Will and
of the Estate of Samuel M. Damon, deceased;

Being the land(s) described in Transfer Certificate
of Title No. 43,325 issued to the TRUSTEES UNDER THE WILL AND
OF THE ESTATE OF SAMUEL M. DAMON, DECEASED.

SUBJECT, HOWEVER, to:

1.    Unrecorded Lease to Hawaiian Electric Company,
Inc., dated January 27, 1938, re: electric light and power
pole and wire lines on strips of land 50 feet wide, for a term
commencing January 31, 1938, and expiring January 1, 1966,
thereafter from year to year until terminated.

2.    Easement "F" (10 feet wide) for storm drain
purposes on Map 3, as set forth by Land Court Order No. 11475,
filed as aforesaid on September 12, 1952.

3.    An easement over said Easement "F" in favor of
the City and County of Honolulu dated December 26, 1968 filed
as aforesaid as Document No. 469119; Consent thereto being
given by the TRUSTEES UNDER THE WILL AND OF THE ESTATE OF
SAMUEL M. DAMON, deceased, by instrument dated December 24,
1970, filed as aforesaid as Document no. 523103.

4.    Terms, agreements, reservations, covenants,
conditions and provisions contained in that certain Indenture
of Lease dated February 20, 1973 by and between the TRUSTEES
UNDER THE WILL AND OF THE ESTATE OF SAMUEL M. DAMON, DECEASED,
as Lessors, and SEAIR CORPORATION, a Hawaii corporation, as
Lessee, for a term of 50 years beginning on January 1, 1973
and ending on December 31, 2022, filed in the said Office of
the Assistant Registrar of the Land Court as Document No.

692444; By mesne assignments said Lease was assigned to GSH
AND K PROPERTIES, a Hawaii general partnership, by Assignment
of Lease dated _____, filed in the said
Office of the Assistant Registrar of the Land Court as
Document No. _____, with consent thereto by the
TRUSTEES UNDER THE WILL AND OF THE ESTATE OF SAMUEL M. DAMON,
DECEASED, filed in the said Office of the Assistant Registrar
of the Land Court as Document No. _____.

    5. That certain Mortgage dated _____,
by GSH AND K PROPERTIES, a Hawaii general partnership, as
Mortgagor, in favor of GECC FINANCIAL CORPORATION, as
Mortgagee, filed in said Office of the Assistant Registrar of
the Land Court as Document No. _____.

    TOGETHER WITH all buildings, structures, built-in
furniture, attached fixtures, built-in appliances, water
heater, electrical and/or gas and plumbing fixutres, storage
tanks, chill and freezer units, and all other leasehold
improvements constructed thereon and affixed thereto.

<u>END OF EXHIBIT "A"</u>

# AMENDMENT TO LEASE

THIS AMENDMENT TO LEASE entered into this _Fins r_ day of _July_, 1992, by and between GSH AND K PROPERTIES, a Hawaii general partnership, whose principal place of business and post office address is 99-128 Aiea Heights Drive, Suite 605, Aiea, Hawaii 96701, hereinafter referred to as "Lessor", and GROCERS SPECIALTY COMPANY, a California corporation, whose principal place of business and post office address is 2601 South Eastern Avenue, Commerce California 90040, hereinafter referred to as "Lessee",

## W I T N E S S E T H:

Whereas, Lessor and Lessee entered into that certain Lease dated February 1, 1990, hereinafter referred to as the "Lease", whereby Lessee leased from Lessor that certain warehouse facility located at 2911 and 2915 Kaihikapu Street, Honolulu, Hawaii, hereinafter referred to as the "Property", for a term commencing February 1, 1990 and ending December 31, 1992; and,

Whereas, under Paragraphs 3.2 and 4.3 of the Lease, Lessee has the right to extend the term of the Lease for an additional five (5) years subject to the terms and conditions set forth therein; and,

Whereas, in lieu of Lessee's aforesaid right to extend the Lease term for an additional five (5) years, Lessor and Lessee mutually desire to extend the term of the Lease for a period of three (3) years commencing January 1, 1993 and ending December 31, 1995, subject to the terms and conditions set forth in this Amendment of Lease.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, Lessor and Lessee mutually agree as follows:

1. <u>Extension of Term of Lease</u>. The Lease is hereby amended by deleting in its entirety Paragraph 3.2 of the Lease and substituting in its place a new Paragraph 3.2 to read as follows:

"3.2 <u>Extension of Term of Lease</u>.

(a) At the end of the Original Term of the Lease on December 31, 1992, the Lease shall be extended for an additional term of three (3) years commencing on January 1, 1993 and ending on December 31, 1995.

(b) Notwithstanding any other provision contained in the Lease, Lessee shall have no right to further extend the term of the Lease beyond the three-year extension period.

(c)  At any time during the first twelve (12) months of the extension period of the Lease, Lessee shall have the right to terminate this Lease, as extended hereby, by delivering to Lessor, at least twelve (12) months in advance of the termination date designated by Lessee, written notice of its intention to terminate this Lease. If Lessee fails to deliver to Lessor on or before December 31, 1993 written notice of its intention to terminate the Lease, Lessee shall be deemed to have waived any and all right to terminate the Lease prior to the expiration of the three-year extension period. Nothing contained in this Paragraph shall in any manner be construed as giving Lessee the right to terminate the Lease prior to the expiration of the Original Term ending on December 31, 1992.

·  (d)  In the event that Lessee exercises its right to terminate this Lease, as extended hereby, pursuant to the provisions of Subparagraph 3.2(c) above, Lessee shall pay to Lessor, as liquidated damages and not as a penalty, a termination fee equal to the gross rent which Lessee would have paid to Lessor for the four-month period following the termination date designated in the notice of termination.  As used herein, the term "gross rent" shall include the monthly Base Rent, the monthly Master Ground Lease Rent, real property taxes, general excise taxes and all other charges and assessments which are chargeable to Lessee under the terms of the Lease. Lessee shall pay to Lessor one-half (1/2) of the termination fee on the date of Lessee's written notice of termination to Lessor and the balance of the termination fee on or before the termination date."

2.  Base Rent During Extension Period.  The Lease is hereby amended by deleting in its entirety Paragraph 4.3 of the Lease and substituting in its place a new Paragraph 4.3 to read as follows:

"4.3  Base Rent During Extension Period.

During the three-year extension period from January 1, 1993 to December 31, 1995, Lessee shall pay to Lessor monthly Base Rent of $37,429.00.  In addition to the Base Rent, Lessee shall pay all other additional monthly rents, including the Master Ground Lease Rent, taxes, assessments and charges, as provided under the Lease."

3.  Terms of Original Lease.  Except as modified by this Amendment to Lease, all other provisions of the Lease shall remain in full force and effect and shall apply with equal force to the three-year extension period of this Lease.

2

IN WITNESS WHEREOF, each of the parties has caused to be signed by its duly authorized officers and/or partners this Amendment to Lease as of the date first above written.

GSH AND K PROPERTIES,
a Hawaii general partnership

By _____
Its General Partner

By _____
Its General Partner

"LESSOR"


GROCERS SPECIALTY, COMPANY,
a California corporation

By _____
Its        Gerald F. Friedler
           President

By _____
Its        D. A. Woodward
           Secretary-Treasurer

"LESSEE"

STATE OF HAWAII                     )
                                    )
CITY AND COUNTY OF HONOLULU         )  SS.

On this _23th_ day of _July_____, 19 _91_,
before me appeared _Glenn S Horaguchi_
and _Katsumi Koyama_____, to me personally
known, who, being by me duly sworn, did say that they are the
general partners of GSH AND K PROPERTIES, a Hawaii general
partnership, and that said instrument was signed in behalf of said
partnership by authority of its partners, and the said general
partners acknowledged said instrument to be the free act and deed
of said partnership.

_____
Notary Public, State of Hawaii
My Commission Expires: _April 15/1994_


STATE OF _California_____         )
                                    )
COUNTY OF _Los Angeles_____       )  SS.

On this _7th_ day of _Aucust_____, 19 _92_,
before me appeared _Gerald F. Friedler * * * * * * * * *_
and _D. A. Woodward * * * * * * * * * *_, to me personally
known, who, being by me duly sworn, did say that they are the
_President * * * * *_ and _Secretary-Treasurer_ of GROCERS
SPECIALTY COMPANY, a California corporation, and that the seal
affixed to the foregoing instrument is the corporate seal of said
corporation and that said instrument was signed and sealed in
behalf of said corporation by authority of its Board of Directors,
and the said officers acknowledged said instrument to be the free
act and deed of said corporation.

_____
Notary Public, State of _California_
My Commission Expires: _10-19-94_



OFFICIAL NOTARY SEAL
KAREN R METT
Notary Public — California
LOS ANGELES COUNTY
My Comm. Exp.   OCT 19, 1994

4

# SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE entered into this _____ day of _____, 1995, by and between GSH AND K PROPERTIES, a Hawaii general partnership, whose principal place of business and post office address is 99-128 Aiea Heights Drive, Suite 605, Aiea, Hawaii 96701, hereinafter referred to as "Lessor", and GROCERS SPECIALTY COMPANY, a California corporation, whose principal place of business and post office address is 2601 South Eastern Avenue, Commerce California 90040, hereinafter referred to as "Lessee",

## W I T N E S S E T H:

Whereas, Lessor and Lessee entered into that certain Lease dated February 1, 1990, hereinafter referred to as the "Lease", whereby Lessee leased from Lessor that certain warehouse facility located at 2911 and 2915 Kaihikapu Street, Honolulu, Hawaii, hereinafter referred to as the "Property", for a term commencing February 1, 1990 and ending December 31, 1992; and,

Whereas, pursuant to that certain Amendment to Lease dated July 1, 1992, Lessor and Lessee, agreed to extend the term of the Lease for a period of three (3) years commencing January 1, 1993 and ending December 31, 1995, hereinafter referred to as the "First Extension Period", subject to the terms and conditions set forth in said Amendment to Lease.

Whereas, Lessor and Lessee now desire to further amend the Lease by extending the term of the Lease for an additional period of seven (7) years, commencing January 1, 1996 and ending December 31, 2002, subject to the terms and conditions set forth in this Second Amendment to Lease.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, Lessor and Lessee mutually agree as follows:

1. <u>Extension of Term of Lease</u>. The term of the Lease is hereby extended for a period of seven (7) years, beginning January 1, 1996 and ending December 31, 2002, hereinafter referred to as the "Second Extension Period".

Notwithstanding any other provision contained in the Lease, as amended, Lessee shall have no right to further extend the term of the Lease beyond the Second Extension Period.

2. <u>Earlier Termination of Lease</u>. The Lease may be terminated by either party at any time after April 1, 1997 provided that the terminating party delivers to the other party, at least fifteen (15) months in advance of the termination date designated by said terminating party, written notice of its intention to terminate the Lease.

3. <u>Base Rent During Second Extension Period</u>. During the Second Extension Period, Lessee shall pay to Lessor monthly Base Rent within the meaning of Paragraph 4.1 of the Lease based on the following schedule:

| Monthly Base Rent | Period |
|---|---|
| $30,866.50 per month | For the period from January 1, 1996, to December 31, 1996 |
| $33,054.00 per month | For the period from January 1, 1997, to December 31, 1997 |
| $35,241.50 per month | For the period from January 1, 1998, to December 31, 1998 |
| $30,866.50 per month | For the period from January 1, 1999, to December 31, 1999 |
| $33,054.00 per month | For the period from January 1, 2000, to December 31, 2000 |
| $35,241.50 per month | For the period from January 1, 2001, to December 31, 2001 |
| $37,429.00 per month | For the period from January 1, 2002, to December 31, 2002 |

In addition to the Base Rent, Lessee shall pay all other additional monthly rents, including the Master Ground Lease Rent, taxes, assessments and charges, all as provided under the Lease, as amended hereby.

4. <u>Lessee's Payment of Master Ground Lease Rent During Second Extension Period</u>. During the Second Extension Period, Lessee shall pay to Lessor, as additional rent, the following monthly amounts in satisfaction of Lessee's obligation to pay the monthly rent due under the Master Ground Lease as provided under Paragraph 4.2 of the Lease, notwithstanding the actual monthly rent due under said Master Ground Lease:

| Monthly Ground Lease Rent | Period |
|---|---|
| $30,187.50 per month | For the period from January 1, 1996, to December 31, 1996 |
| $30,187.50 per month | For the period from January 1, 1997, to December 31, 1997 |
| $30,187.50 per month | For the period from January 1, 1998, to December 31, 1998 |

2

| $38,937.50 per month | For the period from January 1, 1999, to December 31, 1999 |
| $38,937.50 per month | For the period from January 1, 2000, to December 31, 2000 |
| $38,937.50 per month | For the period from January 1, 2001, to December 31, 2001 |
| $38,937.50 per month | For the period from January 1, 2002, to December 31, 2002" |

5. <u>Agency Disclosure</u>. Stephen B. Metter of MW Commercial Realty, Inc. has represented the Lessee in the negotiation of this Second Amendment to Lease.

6. <u>Broker Commission</u>. Lessor and Lessee shall pay equally to MW Commercial Realty, Inc. a total brokerage commission of $50,000.00. Lessee shall pay its share of the brokerage commission in full upon the execution of this Second Amendment to Lease by all parties. Lessor shall pay its share of the aforesaid brokerage commission as follows: $5,000.00 upon the full execution of this Second Amendment to Lease by all parties and $5,000.00 following each 30-day period thereafter until fully paid. No interest shall accrue on Lessor's unpaid portion of the brokerage commission.

7. <u>Terms of Original Lease</u>. Except as modified by the Amendment to Lease and this Second Amendment to Lease, all other provisions of the Lease shall remain in full force and effect and shall apply with equal force to the Second Extension Period of this Lease.

IN WITNESS WHEREOF, each of the parties has caused to be signed by its duly authorized officers and/or partners this Second Amendment to Lease as of the date first above written.

GSH AND K PROPERTIES,
a Hawaii general partnership

By _____
Its General Partner

By _____
Its General Partner

"LESSOR"

3

GROCERS SPECIALTY, COMPANY,
a California corporation

By _____
　　Its _____CFO_____

By _____
　　Its _____

　　　　　"LESSEE"

4

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of _California_

County of _Los Angeles_

On _March 20, 1995_ before me, _Mary Kay Harlin_,
         Date                              Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared _Dan Banc_,
                          Name(s) of Signer(s)

☒ personally known to me – OR – ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

MARY KAY HARLIN
COMM. #1050686
Notary Public — California
LOS ANGELES COUNTY
My Comm. Expires FEB 1, 1999

_Mary Kay Harlin_
Signature of Notary Public

—————————— OPTIONAL ——————————
*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

## Description of Attached Document

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

## Capacity(ies) Claimed by Signer(s)

Signer's Name: _____

☐ Individual
☐ Corporate Officer
   Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney-in-Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer Is Representing:

_____
_____

Signer's Name: _____

☐ Individual
☐ Corporate Officer
   Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney-in-Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer Is Representing:

_____
_____

© 1994 National Notary Association • 8236 Remmet Ave., P.O. Box 7184 • Canoga Park, CA 91309-7184          Prod. No. 5907          Reorder: Call Toll-Free 1-800-876-6827

STATE OF HAWAII                    )
                                   )
CITY AND COUNTY OF HONOLULU        )  SS.


        On this _9th_ day of ____March_____, 19 _95_,
before me appeared ____KATSUMI  KAZAMA_____
and _____GLENN  S.  HARAGUCHI_____, to me personally
known, who, being by me duly sworn, did say that they are the
general partners of GSH AND K PROPERTIES, a Hawaii general
partnership, and that said instrument was signed in behalf of said
partnership by authority of its partners, and the said general
partners acknowledged said instrument to be the free act and deed
of said partnership.

        C.S.                       _____
                                   Notary Public, State of Hawaii
                                   My Commission Expires: _8/12/97_



STATE OF _____           )
                                   )
COUNTY OF _____          )  SS.


        On this _____ day of _____, 19____,
before me appeared _____
and _____, to me personally
known, who, being by me duly sworn, did say that they are the
_____ and _____ of GROCERS
SPECIALTY COMPANY, a California corporation, and that the seal
affixed to the foregoing instrument is the corporate seal of said
corporation and that said instrument was signed and sealed in
behalf of said corporation by authority of its Board of Directors,
and the said officers acknowledged said instrument to be the free
act and deed of said corporation.


                                   _____
                                   Notary Public, State of _____
                                   My Commission Expires:_____


                        5

*Exhibit 7*

## SUBLEASE

This Sublease, dated as of _____, 1996 ("Sublease"), is executed by and between GROCERS SPECIALTY COMPANY, a California corporation ("Sublandlord"), and HAWAIIAN GROCERY STORES, LIMITED, a Hawaii corporation ("Subtenant"), with reference to the following facts:

A. Pursuant to that certain Indenture (as amended, the "Ground Lease") dated as of February 20, 1973, between Trustees under the Will and of the Estate of Samuel M. Damon, Deceased ("Ground Landlord"), as landlord, and Seair Corporation, a Hawaii corporation, as tenant ("Original Ground Tenant"), Ground Landlord leased to Original Ground Tenant certain property described therein. A copy of the Ground Lease and all amendments thereto is attached hereto as Exhibit "B".

B. Pursuant to that certain Lease dated as of February 1, 1990, between GSH and K Properties, a Hawaii general partnership (now known as GSH and K Investment Group), the assignee of the interests of Original Ground Tenant under the Ground Lease ("Master Landlord"), as landlord, and Sublandlord, as tenant ("Original Master Lease"), that certain Amendment to Lease dated as of July 1, 1992, between Master Landlord and Sublandlord ("First Amendment"), and that certain Second Amendment to Lease undated and between Master Landlord and Sublandlord ("Second Amendment"; together with the Original Master Lease and the First Amendment, the "Master Lease"), Sublandlord is subleasing from Master Landlord certain land described in Exhibit "A" attached thereto and hereto, and certain buildings, improvements, structures and appurtenances described in the Master Lease (collectively, the "Premises"). A copy of the Master Lease and all amendments thereto is attached hereto as Exhibit "C".

B. Sublandlord desires to sublease to Subtenant, and Subtenant desires to sublease from Sublandlord, the Premises.

In consideration of the foregoing, and of the covenants and conditions set forth herein, Sublandlord and Subtenant hereby agree as follows:

1. Defined Terms. As used in this Sublease, the following capitalized terms have the following meanings:

"Commencement Date" means the date so defined in Section 3.1.

"Conditions to Sublease" means the conditions so defined in Section 2.

-1-

"Required Consents" means, collectively, all consents and other authorizations that are legally required with respect to this Sublease.

2. **Sublease of Premises.** Subject to the terms and conditions of this Sublease, Sublandlord hereby subleases to the Subtenant, and Subtenant hereby subleases from Sublandlord, the Premises.

3. **Term and Possession.**

3.1 **Commencement.** The term of this Sublease shall commence on the date of this Sublease (the "Commencement Date").

3.2 **Expiration.** Unless sooner terminated in accordance with its terms, the term of this Sublease shall expire on the last day prior to the expiration of the term of the Master Lease (the "Expiration Date").

3.3 **Partial Months.** Rent and other charges for any partial month during the term of this Sublease shall be prorated based on the total number of days in such month and the number of days of the term that falls within such month.

4. **Rents and Charges.** During the term of this Sublease, Subtenant shall pay to Sublandlord, without offset or deduction, an amount equal to each amount due under the Master Lease, at least 7 days prior to the date such amount comes due under the Master Lease, including, without limitation, (1) the "Base Rent" due under Section 3 of the Second Amendment, and (2) the additional rent due under Section 4 of the Second Amendment. In addition, concurrently with the execution of this Sublease, Subtenant shall deliver to Sublandlord a security deposit in the amount of the security deposit which Sublandlord has paid under the Master Lease. Subtenant shall also be responsible for payment of any general excise tax applicable to payments due under this Agreement, under the Master Lease, and under the Ground Lease.

5. **Incorporation of Master Lease.**

5.1 The Master Lease is incorporated herein by this reference (subject to the limitations contained herein), with the following exceptions: (a) Sections 3.3 and 3.4 of the Original Master Lease; and (b) Sections 5 and 6 of the Second ⟶ ula Amendment. Such provisions of the Master Lease incorporated herein are sometimes referred to herein as the "Incorporated Provisions."

5.2 The rights and obligations of Sublandlord and Subtenant under this Sublease shall be governed by the Incorporated Provisions of the Master Lease; provided that the

following terms, as used in the Incorporated Provisions of the Master Lease, shall have the following meanings:

(a) "Lessor" shall mean "Sublandlord";

(b) "Lessee" shall mean "Subtenant"; and

(c) "Lease" shall mean "Sublease";

and provided further that, in the event of any conflict between any such incorporated provision and any other provision of this Sublease, the latter provision shall control.

5.3 This Sublease is and shall at all times be subject and subordinate to the Master Lease. The Sublease shall be deemed automatically terminated concurrently with any termination of the Master Lease. Subtenant shall not do anything, or permit anything to be done, in connection with Subtenant's use or occupancy of the Premises which would violate any covenants or agreements contained in the Master Lease. Master Landlord (under the Master Lease) or Sublandlord may enforce directly against Subtenant, each in its own capacity, any of the rights granted to Master Landlord pursuant to the Incorporated Provisions of the Master Lease, except as expressly modified by this Sublease. Sublandlord may not grant to Subtenant, and nothing in this Sublease shall be construed to grant, any greater rights than Sublandlord has received as tenant from Master Landlord pursuant to the Master Lease. Subtenant does not have any greater rights against Sublandlord with respect to this Sublease or the Premises than Sublandlord has as tenant against Master Landlord with respect to the Master Lease and the Premises.

5.4 During the term of this Sublease, and thereafter for obligations that arose during the term of this Sublease, Subtenant hereby expressly assumes and agrees to perform and comply with, for the benefit of both Sublandlord and Master Landlord, every obligation of Sublandlord with respect to the Premises under the Incorporated Provisions of the Master Lease, but only to the extent that performance by Subtenant of Sublandlord's obligations is permitted by Master Landlord. Subtenant hereby agrees to defend, indemnify and hold Sublandlord harmless from all claims, demands, causes of action, liabilities, losses, costs and expenses (including without limitation costs of suit and reasonable attorneys' fees) arising from or in connection with any failure by Subtenant to perform any obligation of Subtenant under any incorporated provision of the Master Lease or assumed by Subtenant hereunder.

5.5 All waivers of claims against and exculpations of "Landlord" under the Master Lease shall run in favor of both Sublandlord and Master Landlord. All waivers of claims against and exculpations of "Tenant" under the Incorporated Provisions

-3-

of the Master Lease shall constitute rights of Subtenant under this Sublease.

5.6  All rights of "Landlord" under the Master Lease shall constitute rights of both Sublandlord and Master Landlord under this Sublease.  All rights of "Tenant" under the Incorporated Provisions of the Master Lease with respect to the Premises shall constitute rights of Subtenant under this Sublease.

5.7  To the extent that Master Landlord agrees from time to time to accept payments and/or communications directly from Subtenant, Subtenant agrees to pay Base Rent and Additional Charges directly to Master Landlord rather than to Sublandlord and/or to otherwise deal directly with Master Landlord with respect to the Premises, and Sublandlord hereby appoints Subtenant as its limited agent to make such payments and deliver such communications on its behalf as tenant under the Master Lease; provided that the foregoing appointment shall terminate automatically in the event that (a) Master Landlord delivers a notice of default under the Master Lease, (b) such notice results from a breach by Subtenant of its obligations hereunder, and (c) Subtenant fails to cure the noticed default on or before the last business day prior to the expiration of the applicable cure period under the Master Lease.

5.8  All notices required to be given by Subtenant under the Incorporated Provisions of the Master Lease shall be given to both Sublandlord and Master Landlord at least 7 days prior to the date provided in the Incorporated Provisions, except that (a) Subtenant shall give to Sublandlord at least 30 days prior to the date required under the incorporated provision set forth in Section 2 of the Second Amendment any notice of termination of this Sublease together with a written statement that "WE HEREBY REQUEST THAT GROCERS SPECIALTY COMPANY GIVE TO GSH AND K INVESTMENT GROUP A WRITTEN TERMINATION OF THE MASTER LEASE PURSUANT TO SECTION 2 OF THE UNDATED SECOND AMENDMENT TO LEASE BETWEEN GSH AND K PROPERTIES (NOW KNOWN AS GSH AND K INVESTMENT GROUP) AND GROCERS SPECIALTY COMPANY," and (b) Sublandlord may give to Subtenant any notice of termination of this Sublease pursuant to the incorporated provision set forth in Section 2 of the Second Amendment on or before the date 30 days after receipt by Sublandlord of any termination notice from Master Landlord pursuant to Section 2 of the Second Amendment.

5.9  In the event that Sublandlord receives any notice or other written communication from Master Landlord at any time with respect to the Master Lease or the Premises, Sublandlord shall promptly deliver a copy of such notice or other communication to Subtenant.

5.10  All actions of Subtenant that require the consent of "Landlord" under the Incorporated Provisions of the

Master Lease shall require the consent of both Sublandlord and Master Landlord. In the event that Subtenant desires to obtain Master Landlord's consent with respect to any matter relating to Subtenant's occupancy of the Premises, and in the event that Sublandlord's consent with respect to such matter has been obtained, Subtenant may require Sublandlord, at Sublandlord's option, either (a) to request Master Landlord's consent, at Sublandlord's sole expense, with respect to such matter, or (b) if acceptable to Master Landlord, to permit Subtenant to deal directly with Master Landlord in requesting such consent. Except for the foregoing obligation of Sublandlord, Sublandlord shall have no liability to Subtenant for any refusal of Master Landlord to grant any such consent.

5.11 Sublandlord shall not be required to provide repairs, maintenance, utilities and services, to carry insurance, or to perform the other duties and obligations of the landlord pursuant to the Incorporated Provisions of the Master Lease; rather, Sublandlord's sole obligations shall be to pass along to Subtenant the benefit of Master Landlord's performance of such duties and obligations to the extent that the same are made available to Sublandlord by Master Landlord. Any Master Lease provisions with respect to rent abatements (whether in connection with a destruction of the Premises or otherwise) shall only entitle Subtenant to a Base Rent abatement hereunder for any portion of the Premises, and during any period, for which Sublandlord actually receives a rent abatement under the Master Lease.

5.12 Any additional charges under the Master Lease resulting from Subtenant's abnormal use of such services or otherwise attributable to Subtenant's use of the Premises shall, notwithstanding any other provision of this Sublease, be promptly paid by Subtenant to Sublandlord upon demand.

5.13 Notwithstanding the Incorporated Provisions of the Master Lease, Sublandlord shall have no obligation to restore or rebuild any portion of the Premises after any destruction or taking by eminent domain.

5.14 In the event that Master Landlord defaults with respect to any of its obligations in connection with the Premises, Subtenant may require Sublandlord, at Sublandlord's option, either (a) to promptly take appropriate measures, at Subtenant's sole expense, to enforce such obligation(s) or (b) if legally effective, to appoint Subtenant as Sublandlord's attorney-in-fact for the express purpose of enforcing such obligation(s). Any recovery obtained against Master Landlord in connection with any such default shall, to the extent that it relates to the Premises and the term of this Sublease, be the property of Subtenant. Except for the foregoing, Sublandlord shall have no liability to Subtenant for any breach of the Master Lease by Master Landlord unless such breach results from unreasonable acts or omissions of Sublandlord.

5.15 During the term of this Sublease, and so long as Subtenant is not in default hereunder, (a) Sublandlord shall not exercise any right of Sublandlord to terminate the Master Lease with respect to the Premises without Subtenant's prior written consent and (b) Sublandlord shall perform any obligations of Tenant under the Master Lease that are not to be performed by Subtenant under the terms of this Sublease.

6. <u>Use</u>. The Premises shall be used only for the purposes permitted under the Master Lease.

7. <u>Insurance</u>. During the term of this Sublease, Subtenant shall secure and maintain, at its sole expense, commercial general liability insurance in an amount required by the Master Lease, but in no event less than $5,000,000 combined single limit, covering liabilities arising from Subtenant's leasing of, and operations in, the Premises, and all indemnity obligations of Subtenant under this Sublease. In addition, Subtenant shall maintain in effect at all times product liability coverage (including, to the extent applicable to Subtenant's use, coverage for liabilities arising with respect to the consumption of food and beverages sold by Subtenant) in an amount no less than $5,000,000 combined single limit. Subtenant's liability insurance shall name as additional insureds Ground Landlord, Master Landlord, Sublandlord and all other persons reasonably designated by Sublandlord from time to time, and shall contain cross-liability indorsements and shall cover liabilities based on doctrines of strict liability. Policies for such insurance shall be in form and substance and with an insurer reasonably acceptable to Sublandlord, shall require at least 15 days' prior written notice to Sublandlord for any termination or material alteration during the term of this Sublease, and shall waive any right of subrogation against Sublandlord. Subtenant shall, upon Sublandlord's request from time to time, provide Sublandlord with reasonable evidence that such policies are in effect. The obligations of Subtenant under this paragraph are in addition to the obligations of Subtenant under the Incorporated Provisions regarding insurance, and Subtenant shall perform all of its obligations thereunder.

8. <u>Assignment and Subletting</u>. Subtenant shall be obligated to fulfill all of the consent requirements, and all other obligations of Sublandlord to Master Landlord, which may arise under the Master Lease as a result of any assignment, subletting, licensing or similar activity by Subtenant. Independent of and in addition to any provisions of the Master Lease, including without limitation the obligation to obtain the Master Landlord's consent to any sublease or assignment, it is understood and agreed that Subtenant shall not assign this Sublease or any interest therein, shall not sublet the Premises or any portion thereof or any right or privilege appurtenant thereto, and shall not suffer or permit any other person (other

-6-

than agents, servants or associates of the Subtenant) to occupy or use the Premises or any portion thereof, without the prior written consent of Sublandlord, which may be granted or withheld by Sublandlord in its sole and absolute discretion. Any assignment or subletting by Subtenant without such prior written consent shall be void and shall, at the option of Sublandlord, terminate this Sublease. The provisions of this Article shall also apply to assignments and subleases by sub-subtenants, sub-sub-subtenants, and so on. Any transfer (or sequence of transfers resulting, in the aggregate, in the transfer) of 50% or more of the beneficial ownership of Subtenant (or of any other assignee or subtenant to whom this Article applies) shall constitute an assignment for purposes of this Article.

9. Conditions to Sublease.

9.1 Notwithstanding anything to the contrary contained herein, this Sublease shall not be effective until each of the following conditions (the "Conditions to Sublease") have been fulfilled:

(a) Sublandlord and Subtenant shall have obtained all consents and other authorizations of their respective directors that are legally required in order to enter into this Sublease (the "Required Consents").

(b) Subtenant shall have paid to Sublandlord the security deposit described in Section 4, above, and rent and all other amounts owing from the Commencement Date through the last day of the month during which the Commencement Date occurs.

9.2 Sublandlord and Subtenant shall cooperate with each other and use reasonable efforts to fulfill all of the Conditions to Sublease as soon as possible, and in any event prior to the Commencement Date.

10. AS IS. Subtenant acknowledges that Sublandlord has made no representation or warranty, express or implied, with respect to the Master Lease or the Premises. Subtenant agrees to accept the Premises strictly in an "AS IS" condition, without any express or implied warranty as to the safety, condition, compliance with laws or regulations, or fitness for use of the Premises or any fixtures or appurtenances therein or any common areas to be used in connection therewith. It is understood and agreed, notwithstanding any other provision of this Sublease or the Master Lease, that neither Sublandlord nor Master Landlord shall have any responsibility to make any alterations, additions or repairs to the Premises in connection with this Sublease, nor to bear any cost incident to any such alteration, addition or repair which may be requested or undertaken by Subtenant.

11. <u>Defaults and Remedies</u>.

11.1 <u>Defaults</u>. The occurrence of any of the following shall constitute a material default and breach of this Sublease by Subtenant:

11.1.1 The occurrence of any of the events specified in Article 11.1 of the Master Lease; provided that, for purposes of this Section <u>11.1</u>, each reference to Landlord shall be deemed to be a reference to Sublandlord, each reference to Tenant shall be deemed to be a reference to Subtenant, and each reference to the Master Lease shall be deemed to be a reference to this Sublease.

11.1.2 Any default by Subtenant under this Sublease, subject to the same cure provisions, if any, set forth in the Master Lease with respect to defaults of the applicable type.

11.1.3 Any default by Subtenant under that certain promissory note dated as of even date herewith in the stated principal amount of $5,300,000.00 made by Subtenant to the order of Sublandlord, which default permits Sublandlord to accelerate or which default automatically accelerates the principal balance of such note.

11.2 <u>Remedies</u>. In the event of any such default by Subtenant, Sublandlord shall have, in addition to all other rights and remedies set forth in this Sublease or available at law or in equity, the same rights and remedies against Subtenant as Master Landlord has against Sublandlord as tenant under the Incorporated Provisions of the Master Lease.

12. <u>Notices</u>. All notices, demands, approvals and other communications provided for in this Sublease shall be in writing and be delivered to the appropriate party at its address as follows:

If to Sublandlord:

Grocers Specialty Company
2601 South Eastern Avenue
Commerce, California 90040
Attention: President

If to Subtenant:

Hawaiian Grocery Stores, Limited
2915 Kaihikapu Street
Honolulu, Hawaii 96819
Attention: President

Addresses for notice may be changed from time to time by written notice to all other parties. All communications shall be effective when actually received; provided, however, that nonreceipt of any communication as the result of a change of address of which the sending party was not notified or as the result of a refusal to accept delivery shall be deemed receipt of such communication.

13. <u>Further Assurances</u>. Each party hereto shall execute, acknowledge and deliver to each other party all documents, and shall take all actions, reasonably required by such other party from time to time to confirm or effect the matters set forth herein, or otherwise to carry out the purposes of this Sublease.

14. <u>Attorneys' Fees</u>. In the event that any litigation shall be commenced concerning this Sublease by any party hereto, the party prevailing in such litigation shall be entitled to recover, in addition to such other relief as may be granted, its reasonable costs and expenses, including without limitation reasonable attorneys' fees and court costs, whether or not taxable, as awarded by a court of competent jurisdiction.

15. <u>No Third Parties Benefited</u>. This Sublease is made for the purpose of setting forth certain rights and obligations of Sublandlord and Subtenant, and no other person shall have any rights hereunder or by reason hereof.

16. <u>Miscellaneous</u>. This Sublease shall bind, and shall inure to the benefit of, the successors and assigns of the parties. This document may be executed in counterparts with the same force and effect as if the parties had executed one instrument, and each such counterpart shall constitute an original hereof. No provision of this Sublease that is held to be inoperative, unenforceable or invalid shall affect the remaining provisions, and to this end all provisions hereof are hereby declared to be severable. Time is of the essence of this Sublease. This Sublease shall be governed by the laws of the State of Hawaii.

IN WITNESS WHEREOF, Sublandlord and Subtenant have executed this Sublease as of the date first written above.

"Sublandlord":

GROCERS SPECIALTY COMPANY,
a California corporation

By: _____

  Its: _____


"Subtenant":

HAWAIIAN GROCERY STORES, LIMITED,
a Hawaii corporation

By: _____
     Richard H. Loeffler, President

3\3\00063001.L93

EXHIBIT "A"

(<u>Premises</u>)

EXHIBIT "B"

<u>(Ground Lease)</u>

EXHIBIT "C"

(Master Lease)

TITLE OF DOCUMENT:          CONSENT (regarding sublease and
                            change of ownership)

PROPERTY DESCRIPTION:       Lots 65, 66 and 67, as shown on
                            Map 2, Land Court Consolidation
                            No. 42.

DOCUMENT AFFECTED:          Document No. 692,444

TRANSFER CERTIFICATE        TCT No. 43,325
    OF TITLE:

3\8\2006390.L53

1. A Lease dated February 1, 1990, was entered into between (a) GSH AND K PROPERTIES, a Hawaii General Partnership, now known as GSH and K Investment Group ("Lessor"), and (b) Grocers Specialty Company, a California corporation ("Lessee"). The Lease was amended by (i) an Amendment to Lease dated July 1, 1992, and (ii) a Second Amendment to Lease dated _____, 1995 (notarized March 9, 1995). The Lease, as amended, shall be referred to herein as the "Lease." The leased property is located at 2911 and 2915 Kaihikapu Street, Honolulu, Oahu, Hawaii.

2. Pursuant to Sections 10.1 and 10.2 of the Lease, the Lessor's prior written consent (which consent shall not be unreasonably withheld) is required if there is an "assignment", which term is deemed to include (a) any sublease, and (b) in the case of a corporate lessee, a change in the ownership of a majority of the shares of stock of the Lessee.

3. The Lessee will, concurrently with the consummation of the transaction described in Paragraph 4 below, sublease the Lease to Hawaiian Grocery Stores, Limited, a Hawaii corporation ("HGS"), which throughout the term of the Lease has occupied the premises.

4. Concurrently with the sublease described in Paragraph 3 above, Lessee proposes to sell all of the outstanding common stock of HGS to an unrelated party named RHL Management Group, Inc., a Delaware corporation. Lessee will retain ownership of (a) a redeemable preferred stock of HGS which stock has some voting rights, including the right to approve certain types of corporate transactions, and (b) a warrant to purchase up to 20% of the common stock of HGS.

5. Pursuant of Sections 10.1 and 10.2 of the Lease, the Lessor hereby (a) consents to the Lessee's sublease to EGS as described in Paragraph 3 above, (b) consents to the ownership change of HGS as described in Paragraph 4 above arising out of the change of ownership and voting control of HGS, including without limitation the subsequent redemption of the preferred stock and the subsequent exercise of the warrant described in Paragraph 4 above, and (c) agrees that upon consummation of such sublease as described in Paragraph 3 above and such change of ownership as described in Paragraph 4 above, including without limitation the subsequent redemption of the preferred stock and the subsequent exercise of the warrant described in Paragraph 4 above, the Lease will be otherwise unchanged and in full force and effect.

6.  Except as to the matters expressly set forth in this Consent, this Consent shall not otherwise authorize nor be deemed to authorize any further or other assignment of the Lease.

Date: _May 22_____, 1996

GSH AND K INVESTMENT GROUP

By: _____

Its: _GENERAL PARTNER_____

STATE OF HAWAII       )
                         )   SS.

CITY AND COUNTY OF HONOLULU  )

        On this <u>22ND</u> day of <u>   MAY   </u>, 1996, before me personally appeared <u>   KATSUMI KAZAMA   </u>, to me personally known, who, being by me duly sworn, did say that he is the <u>GENERAL PARTNER</u> of GSH AND K INVESTMENT GROUP (the "Group"), that the foregoing instrument was signed in the name of and on behalf of said Group, and said individual acknowledged that he executed the same as his free act and deed and as the free act and deed of said Group.

                                               _____
                                             Notary Public
                                             State of Hawaii

                                             My commission expires: 4-29-97

3\8\Z00639&D.L&S

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | | |
|---|---|---|
| HAWAIIAN GROCERY STORES, LIMITED, a Hawaii corporation, | ) ) ) | CIVIL NO. 99-0424-02 DDD (Declaratory Judgment, Interpleader and Damages) |
| Plaintiff, | ) ) | SUMMONS |
| vs. | ) ) | |
| GSH AND K INVESTMENT GROUP, fka GSH and K Properties, a Hawaii general partnership; KATSUMI KAZAMA, and THE ESTATE OF HARUKO KAZAMA, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**SUMMONS**

STATE OF HAWAII

To the above-named Defendant(s):

     You are hereby summoned and required to serve upon ALSTON HUNT FLOYD & ING, attorneys for Plaintiff, whose address is 18th Floor, Pacific Tower, 1001 Bishop Street, Honolulu, Hawaii 96813, an answer to the First Amended Complaint which is herewith served upon you, within twenty (20) days after service of this Summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the First Amended Complaint.

     This Summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m. on premises not open to the general public, unless a judge of the above-entitled court permits, in writing on this Summons, personal delivery during those hours.

A failure to obey this Summons may result in an entry of default and default judgment against the disobeying person or party.

DATED: Honolulu, Hawai'i, _____ MAR 22 1999

_____
F. OTAKE
CLERK OF THE ABOVE-ENTITLED COURT

SEAL
FIRST CIRCUIT COURT

109119-1 / 4405 - 8

1ST CIRCUIT COURT
STATE OF HAWAII
FILED

1999 MAY 12 PH 2: 12

N. ANAYA
CLERK

Of Counsel:
ALSTON HUNT FLOYD & ING
Attorneys At Law
A Law Corporation

LOUISE K. Y. ING     2394-0
PAUL M. IGUCHI     6047-0
18th Floor, Pacific Tower
1001 Bishop Street
Honolulu, Hawai'i 96813
Telephone: (808) 524-1800

Attorneys for Plaintiff
HAWAIIAN GROCERY STORES,
LIMITED, a Hawaii corporation

## IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

## STATE OF HAWAI'I

| | |
|---|---|
| HAWAIIAN GROCERY STORES, LIMITED, a Hawaii corporation, ) ) ) | CIVIL NO. 99-0424-02 DDD (Declaratory Judgment) |
| Plaintiff, ) ) | **PLAINTIFF'S SUPPLEMENTAL SETTLEMENT CONFERENCE STATEMENT; EXHIBITS "1-5"; CERTIFICATE OF SERVICE** |
| vs. ) ) | |
| GSH AND K INVESTMENT GROUP, fka GSH and K Properties, a Hawaii general partnership; KATSUMI KAZAMA, and THE ESTATE OF HARUKO KAZAMA, ) ) ) ) | DATE: May 21, 1999 TIME: 8:45 a.m. JUDGE: Dexter D. Del Rosario |
| Defendants, ) ) | No Trial Date Set |
| and ) ) | |
| GSH AND K INVESTMENT GROUP, a Hawaii general partnership, ) ) ) | |
| Defendant/ Third-Party Plaintiff, ) ) ) | |
| vs. ) ) | |
| GROCERS SPECIALTY COMPANY, a California corporation, ) ) ) | |
| Third-Party Defendant. ) ) | |

**EXHIBIT "B"**

## PLAINTIFF'S SUPPLEMENTAL
## SETTLEMENT CONFERENCE STATEMENT

Plaintiff Hawaiian Grocery Stores, Limited, a Hawaii corporation ("HGS")

hereby files its Supplemental Settlement Conference Statement in accordance with

Rule 12.1 of the Rules of the Circuit Courts of the State of Hawai`i and the Settlement

Conference held on April 22, 1999.[1]

**I.  GSH&K's Waiver of Increased Rent Due to the Poor Condition of the Premises and the Depressed Market and Economic Conditions Prevents It From Now Claiming Increased Rent from January 1, 1996.**

**A.  FACTUAL BACKGROUND**

**1.  Introduction.**

This lawsuit arises from the efforts of Defendant/Third-Party Plaintiff GSH

and K Investment Group, fka GSH and K Properties ("GSH&K") to nullify HGS'

valid exercise of a lease termination provision. GSH&K incorrectly claims that HGS failed to

comply with the notice requirements of the Lease dated February 1, 1990, between

GSH&K, as Lessor and Third-Party Defendant Grocers Specialty Company ("Grocers"),

as amended.[2] GSH&K further seeks to place economic pressure on HGS by

demanding payment of increased rent which GSH&K previously waived in consideration

---

[1] At the April 22, 1999 Settlement Conference, this Court instructed counsel for both HGS and GSH and K Investment Group to submit supplemental statements addressing three disputed issues: (1) the alleged shortage of rent payments due to GSH&K, (2) the Lease/Sublease termination date, and (3) the computation of claimed damages.

[2] The Lease was amended by Amendment to Lease dated July 1, 1992 and an undated Second Amendment to Lease ("Second Amendment"), notarized March 9, 1995 (The Lease and amendments shall be collectively referred to as "Lease")

of HGS' agreement to remain at the Premises[3] despite: (1) the poor condition of the Premises, and (2) the maturation of HGS' right to terminate the Lease upon 15 months advance notice.[4]

In reliance on GSH&K's waiver of increased rent, HGS continued to remain at the Premises and chose not to terminate the Lease until it gave notice on April 27, 1998. GSH&K accepted HGS' monthly payment of the unincreased rent without objection until December 16, 1998, eight months after HGS notified GSH&K of its termination of the Lease and soon after GSH&K's attorney was informed of the termination notice. GSH&K now seeks to collect the waived rent increases, and has filed a summary possession lawsuit with the District Court of the First Circuit, Honolulu Division, State of Hawaii, seeking possession of the Premises and recovery of damages.

## 2. Chronology of Relevant Events.

| Date | Event |
|------|-------|
| February 1, 1990 | GSH&K leases the Premises to Grocers Specialty Company ("Grocers"). *See Exhibit A to the First Amended Complaint.* |
| July 1, 1992 | GSH&K and Grocers amend the Lease by an Amendment to Lease dated July 1, 1992. *See Exhibit B to the First Amended Complaint.* |
| March 9, 1995 | GSH&K and Grocers execute a Second Amendment To Lease which is notarized March 9, 1995. *See Exhibit C to the First Amended Complaint.* |

---

[3]The subject premises is located at 2911 and 2915 Kaihikapu Street, Honolulu, Hawaii ("the Premises").

[4]The tenant's right to terminate the Lease upon 15 months' written notice could be exercised on or after April 1, 1997. *See Second Amendment To Lease, paragraph 2.*

| | |
|---|---|
| October 4, 1995 | Throughout the mid-1990's, Hawaii's commercial leasing market suffered due to Hawaii's depressed economic conditions. As a landlord, GSH&K recognized the downward market trend which led to decreased rental values. On or after October 4, 1995, GSH&K received and accepted a written proposal from the Estate of Samuel Mills Damon ("Damon Estate"), its ground lessor advising GSH&K that the ground lease rent increases scheduled for either November 1, 1995 or January 1, 1996 would be deferred for a period of one year.[5] *See Exhibit 1, hereto attached which is a copy of the Damon Estate's October 4, 1995 letter.* |
| May - June 1996 | In or around June 1996, RHL Management Group, Inc. acquired all of the common stock of HGS, and at the same time, the newly-acquired HGS entered into a written Sublease of the Premises with Grocers. |
| May 22, 1996 | GSH&K consented to the Sublease and the change of HGS' common stock ownership. *See Exhibit E to the First Amended Complaint.* |
| May 22, 1996 - present | Since RHL Limited's acquisition of HGS to the present, HGS has paid its rent directly to GSH&K and dealt directly with GSH&K for other purposes, as if GSH&K were its landlord. Members of the Katsumi Kazama ("Mr. Kazama") family, purporting to be representatives of GSH&K, visited HGS' Premises on at least a monthly basis to collect rent directly from HGS. *See the Original Declaration of Richard Loeffler In Opposition To Defendant and* |

---

[5]The letter recognized the flat commercial leasing market, stating:

> Ongoing studies and evaluation of the industrial and commercial leasehold marketplace clearly indicate that while the fee value of the land that you lease from the Estate has remained fairly constant over the past 3 years, real property tax assessments have decreased significantly, as much as 20% in many cases. **It is also apparent that although rates for warehouse space have declined by as much as 30%, vacancy rates continue to increase.** This can be attributed to the high cost of land which has caused many wholesalers/retailers to forego traditional warehousing in Hawaii, competition from the State of Hawaii itself and the advent of the large warehouse/retailer such as Costco and K-Mart. (emphasis added)

GSH&K no doubt recognized the difficult market for commercial properties and the value in maintaining a tenant of HGS's size and strength.

4

*Third-Party Plaintiff GSH and K Investment Group's and Defendant Katsumi Kazama's Motion For Order Directing Payment of All Amounts Due Under Lease To Defendant and Third-Party Plaintiff GSH and K Investment Group Filed March 9, 1999, filed April 7, 1999 ("Loeffler Declaration"), page 2, ¶¶ 2 and 3, attached hereto as Exhibit 4.*

| | |
|---|---|
| May 22, 1996 | Beginning in the same period, Mr. Kazama instructed HGS to make its rent checks payable directly to him, individually, rather than to GSH&K as a partnership. Mr. Kazama then deposited HGS' rent checks into a joint personal account in the names of his wife, the late Haruko Kazama, and himself. *See Declaration of Bruce Barber filed March 30, 1999 ("Barber Declaration"), page 3, ¶ 6, attached hereto as Exhibit 5.* |
| May 22, 1996 - present | The Premises suffer from various structural and environmental problems including roof leaks, peeling paint and a lack of drainage. *See Loeffler Declaration, page 3, ¶ 7.* The problems have caused water damage in the warehouse, flooding, and the existence of unsanitary conditions in and around the building. *Id.* The problems are of particular concern because HGS operates a food storage and distribution business at the Premises. *Id.* |
| April 2, 1997 | Paragraph 2 of the Second Amendment To Lease provides that at any time after April 1, 1997, either party to the Lease could terminate the Lease upon 15 months advance written notice. |
| 1997-1998 | On at least four occasions in 1997 and 1998, HGS' president, Richard Loeffler, or Chief Financial Officer, Bruce Barber, had discussions with Mr. Kazama and his son, Wally Kazama, purporting to be representatives of GSH&K, in which GSH&K agreed not to collect increased rent due to the poor condition of the Premises and the deflated market and economic conditions. *See Loeffler Declaration, pp. 3-4, ¶¶ 6-10, attached hereto as Exhibit 4.* Rather than reducing rent as HGS had requested, Mr. Kazama and Wally Kazama agreed to allow HGS to continue paying the same rent that Grocers had paid at the time of the HGS common stock acquisition in 1996.[6] *Id.* |

---

[6]The Second Amendment of Lease provides in paragraph 3 that monthly base rent for each of the Premises' two parcels would be adjusted annually between January 1, 1996 and December 31, 2002, and that monthly ground rent would increase effective January 1, 1999. Upon information and belief, GSH&K also agreed to waive that part of the rent increase that began in 1996 and accrued before the acquisition of HGS' common stock in May 1996.

| | |
|---|---|
| April 1998 | HGS, through Mr. Loeffler, Mr. Barber and another HGS officer, discussed with Mr. Kazama economic conditions and real property values and again suggested to Mr. Kazama that GSH&K and HGS renegotiate a reduced rent. *Id., ¶ 10.* Mr. Kazama insisted that HGS should just keep on paying the un-increased rent and that the increased rent in the Second Amendment was "a formality." *Id.* HGS followed Mr. Kazama's instructions and continued to pay such rent directly to GSH&K, and otherwise dealt directly with GSH&K, as Grocers' limited agent, as provided under paragraph 5.7 of the Sublease. *Id., p. 2, ¶ 2.* |
| April 27, 1998 | Because of the poor condition of the Premises and the very above-market level of the existing rent HGS was paying GSH&K, HGS, continuing to act as Grocers' limited agent, notified GSH&K of its desire to terminate the Lease 15 months from the notice date ("termination notice"), as required under the Second Amendment to Lease. *Id., p. 4, ¶11.* |
| May 19, 1998 | GSH&K began marketing the Premises and posted "for lease" signs on the Premises. |
| post May 1998 | In reliance on GSH&K's lack of objection to the termination notice as well as GSH&K's marketing of the Premises, HGS searched for and located a new premises to lease, entered into a lease of such premises, and otherwise made plans to vacate the Premises by July 31, 1999. |
| Dec. 16, 1998. | Approximately eight months after HGS' termination notice, GSH&K first notified HGS of its demand for the increased rent, attempting to revoke its prior waiver of rent increases. By letter dated December 16, 1998, GSH&K first notified HGS of its claim that the termination notice was ineffective allegedly because HGS was not a party to the Second Amendment To Lease. The December 16, 1998 notice enclosed a demand letter to Grocers seeking rent increases from January 1, 1996 through December 31, 1998, of $108,817.68, and notifying HGS that effective January 1, 1999, total monthly rent would increase to $72,712.73 per month. *See Barber Declaration, page 4, ¶ 9, attached hereto as Exhibit 5.* GSH&K has since produced a demand notice to Grocers, correspondence to HGS and bills to HGS that were supposedly sent in 1997 and 1998, but which HGS does not have a record of receiving. *Id.* |

B.   **ARGUMENT**

    1.   **GSH&K Orally Modified the Lease/Sublease By Its Waiver of Increased Base Rent Payments.**

       A written contract can subsequently be orally modified if all of the requisites of a valid and enforceable agreement are met, including the requisite that the modification be supported by new consideration. *See Honolulu Federal Sav. and Loan Ass'n v. Murphy*, 7 Haw.App. 196, 204-205, 766 P.2d 1207 (1988). Absent a statute preventing oral modifications, a written contract can always be orally modified, even if its express terms prohibit modification except in writing. *See Certified Corp. v. Hawaii Teamsters and Allied Workers, Local 996, IBT*, 597 F.2d 1269 (9th Cir. 1979). Modifications include waivers of contractual obligations by acts and conduct. *See Wilart Associates v. Kapiolani Plaza, Ltd.*, 7 Haw.App. 354, 359-360, 766 P.2d 1207 (1988).

       By its waiver of the increased rent, GSH&K orally modified the terms of the Lease as incorporated in the Sublease. As consideration for the waiver of increased rent, HGS' agreed to remain at the Premises and not exercise its right of termination of the Lease. GSH&K's failure to demand the increased rent from January 1, 1996 through December 16, 1998 evidenced its consent to the modification. This Court should honor the terms of the Lease/Sublease, as orally modified, and find that GSH&K waived any claim to rent increases.

    2.   **Equitable Estoppel Allows This Court's Enforcement of the Oral Modification of the Lease, Despite the Statute of Frauds.**

       In its Supplemental Settlement Conference Statement filed May 10, 1999, GSH&K argues that Haw.Rev.Stat. §656-1(4) requires a written agreement to waive the

increase in monthly rent. *See* GSH&K's Statement, p. 14. Although Haw.Rev.Stat. §656-1(4) requires a signed writing for an action to be brought and maintained "[u]pon any contract for the sale of lands, tenements, or hereditaments, or of any interest in or concerning them," the Hawaii Supreme Court has qualified this requirement by enforcing oral contracts through equitable estoppel to avoid injustice and unconscionable injury. *See McIntosh v. Murphy*, 52 Haw. 29, 469 P.2d 177, rehearing denied, 52 Haw. 112 (1970). In *Perreira v. Perreira*, 50 Haw. 641, 642-43, 447 P.2d 667 (1968), the Hawaii Supreme Court announced that, "[a]n oral contract with respect to interest in land becomes enforceable, in spite of the Statute of Frauds, if there has been part performance. The acts constituting part performance must be pursuant to the contract, with the knowledge and consent of the other party, and must be such that to allow the other party to repudiate would be a fraud upon the plaintiff." (citations omitted).

In electing not to exercise its right to terminate the Lease until more than one year from the date the right matured, HGS partly performed pursuant to GSH&K's oral modification of the Lease. By HGS' continued payment and GSH&K's continued acceptance of the unincreased rent, GSH&K is estopped from denying that HGS was acting in accordance with the oral modification of the Lease. In the interest of justice, this Court should estop GSH&K from asserting the defense of the Statute of Frauds.

> **3. By GSH&K's Express Waiver of the Increased Rent, and its Failure to Demand Increased Rent until December 16, 1998 (For Rent Increases Allegedly Due Beginning January 1, 1996), GSH&K Is Now Estopped from Demanding Such Increased Rents.**

The Hawaii Supreme Court has defined "waiver" as, "the intentional relinquishment of a known right, or such conduct as warrants an inference of such surrender, and it is not essential to its application that prejudice results to the party in whose favor the waiver operates." *Wilart Associates v. Kapiolani Plaza, Ltd., supra* at 359 (citations omitted). "While waiver and estoppel are often so similar in application as to be convertible, and are generally spoken of as belonging to the same family, in other cases they are initially so distinctly distinguishable that no application of the principles underlying estoppels need enter in to constitute waiver, although waiver effectuates an estoppel *per se*. In other words, waiver can be created without first bringing in the elements necessary to create estoppel, but when waiver is established, it is of itself an estoppel." *Hawaiian Trust Co. v. Welsh*, 34 Haw. 390, 399 (1937).

The Hawaii Supreme Court has stated that "one invoking equitable estoppel must show that he or she has detrimentally relied on the representation or conduct of the person sought to be estopped, and that such reliance was reasonable." *Waugh v. University of Hawai'i*, 63 Haw. 117, 129, 621 P.2d 957, 967 (1981) (citations omitted). Further, "It must be shown that party claiming estoppel has changed his position to detriment in reliance on such representation." *National Alfalfa Dehydrating and Milling Company v. 4010 Washington, Inc.*, 434 S.W.2d 757, 764 (1969). "Delay, if accompanied by justifiable reliance is one element of estoppel." *Owens v. Doyle*, 152 Conn. 199, 207, 205 A.2d 495, 499 (1964).

By its words and actions, GSH&K repeatedly represented to HGS that it would waive any rent increases, thereby inducing HGS not to exercise its right to terminate the Lease. It was not until after HGS notified GSH&K of its termination of the

Lease that GSH&K formally demanded the increased rent. GSH&K should not be allowed now to deny that it waived any right to increased rent.

In support of its argument that it did not waive its right to receive the increased monthly rent, GSH&K cites *Green v. Millman Bros., Inc.*, 7 Mich App 450, 151 N.W.2d 860 (1967). *Green*, however, is distinguishable from this case and, in fact, supports HGS' estoppel claim. *Green* involved a dispute between a landlord (shopping center owner) and tenant regarding an oral agreement to reduce monthly rent. *Id.* at 862. The tenant claimed that the oral agreement extended through the remainder of the lease, while the landlord contended that the reduction in rent was only for one year. *Id.* In ruling against the tenant, the Court found that the tenant's agreement to continue its tenancy despite its indicated desire to vacate was insufficient consideration for the subsequent oral agreement for reduced rent because, "the defendant covenanted not only to pay the stipulated rental but also to 'operate 100% Of the leased premises during the entire term of this lease.'" *Id.* at 863-64. In ruling against the tenant, the Court reasoned that "to hold that the failure to carry out a party's threat to breach a contract in writing, barring unforeseen or extraordinary circumstances, is valid consideration for oral concessions made by the other party to prevent such breach, would destroy the stability of written contracts in this State." *Id.*

In this action, HGS did not offer not to "breach a contract" if GSH&K agreed to a rent reduction. Rather, in consideration for GSH&K's waiver of rent increases, HGS refrained from exercising its valid contractual right to terminate the Lease upon 15 months notice. Likewise, *Green* recognized that forebearance from exercising a valid contractual right would be adequate consideration for estoppel to be applied. In distinguishing the tenant's proffered case of *Minor-Dietiker v. Mary Jane*

10

*Stores of Michigan, Inc.*, 2 Mich.App. 585, 141, N.W.2d 342 (1966), the *Green* Court stated:

> In *Minor-Dietiker*, supra, although the lessee had covenanted to pay stipulated rentals during the term of the lease, **it had not made a covenant to remain in actual occupancy. Therefore, the lessee's subsequent refraining from vacating, at the behest of the lessor, formed the necessary consideration for the oral agreement to reduce the monthly rental.** The lessee in agreeing to remain in the premises was forbearing from doing that which it had every right to do, even though it might have had a continuing liability for the payment of rent.

*Id.* at 863-64. (emphasis added). *Green* further noted:

> Where the covenant is twofold, to pay rent and to occupy, the subsequent agreement to remain in occupancy cannot form the consideration for an oral agreement to reduce rental because the lessee is already obligated contractually to remain. **However, if the covenant is to pay the stipulated rent only, the decision of the lessee to remain in occupancy may be a distinct advantage to the lessor and would provide the necessary consideration for an agreement to reduce the rental.**

*Id.* (emphasis added).

Although HGS covenanted to pay stipulated rental and to occupy the Premises, it preserved its right to terminate the Lease. If HGS elected to exercise this termination provision, it would terminate its obligation both to pay rent and to occupy the Premises. Thus, the decision of HGS to remain in occupancy was a distinct advantage to GSH&K and provided the necessary consideration for the agreement not to increase the monthly rent.

11

## II. HGS' April 27, 1998 Notice to GSH&K Terminates the Lease on July 31, 1999.

By its termination notice, HGS, as limited agent of Grocers, exercised the right under paragraph 2[7] of the Second Amendment and paragraphs 5.1, 5.2 and 5.3 and 5.7[8] of the Sublease to terminate the Lease upon fifteen months advance written notice, or effective July 31, 1999. *See Exhibits C and D to the First Amended Complaint which are copies of the Second Amendment and Sublease; Exhibit 1 to the Barber Declaration which is a copy of the termination letter.* By letter dated December 16, 1998, *nearly eight months after HGS' giving of termination notice*, GSH&K first notified HGS of its claim that the termination notice was ineffective because HGS was

---

[7]Paragraph 2 states:

> 2.    Earlier Termination of Lease.  The Lease may be terminated by either party at any time after April 1, 1997 provided that the terminating party delivers to the other party, at least fifteen (15) months in advance of the termination date designated by said terminating party, written notice of its intention to terminate the Lease.

[8]Paragraphs 5.7 provides:

> 5.7    To the extent that Master Landlord agrees from time to time to accept payments and/or communications directly from Subtenant, Subtenant agrees to pay Base Rent and Additional Charges directly to Master Landlord rather than to Sublandlord and/or to otherwise deal directly with Master Landlord with respect to the Premises, and **Sublandlord hereby appoints Subtenant as its limited agent to make such payments and deliver such communications on its behalf as tenant under the Master Lease;** provided that the foregoing appointment shall terminate automatically in the event that (a) Master Landlord delivers a notice of default under the Master Lease, (b) such notice results from a breach by Subtenant of its obligations hereunder, and (c) Subtenant fails to cure the noticed default on or before the last business day prior to the expiration of the applicable cure period under the Master Lease. (emphasis added).

not a party to the Second Amendment of Lease.  *See Exhibit 2 to the Barber*

*Declaration.*  GSH&K incorrectly claims that the notice should have come from Grocers.

A.      **Termination Notice Satisfies Lease/Sublease requirements.**

GSH&K's sole objection in its December 16, 1998 letter is to not receiving

the required notice from Grocers rather than HGS, citing Section 5.8 of the Sublease.

GSH&K's argument is simply form over content.  Paragraph 5.7 of the Sublease (and

not paragraph 5.8) is the only paragraph that applies to termination of the Lease.

Paragraph 5.8 describes the procedure for termination of the Sublease, while

paragraph 5.7 allows HGS, as agent for Grocers, to terminate the Lease not the

Sublease.  HGS' Termination Notice satisfied the requirements for termination of the

Lease for the following reasons:[9]

First, Section 5 of the Sublease incorporates the Lease into the Sublease,

including paragraph two of the Second Amendment of Lease regarding the early

termination of the Lease.  Pursuant to this incorporation, HGS has a right to terminate

the Sublease with Grocers, while Grocers continues to have a right to terminate the

Lease with GSH&K.

Second, the parties contemplated a pass-through of obligations and

performance from HGS to GSH&K.  Consequently, the parties included Section 5.7 in

the Sublease whereby if GSH&K elects, it can deal directly with HGS, and HGS can

---

[9]The Hawaii Supreme Court has noted that the goal when interpreting
contractual provisions is to determine the intention of the parties, which is to be
gathered from the whole instrument, but if this cannot be discovered and there exists
ambiguity, then the contract must be construed against the covenanter, for he or she
might have expressed himself or herself more clearly."  *Pancakes of Hawaii, Inc. v.
Pomare Properties Corp.*, 85 Haw. 300, 944 P.2d 97 (1997).

deal directly with GSH&K. Under Section 5.7, Grocers appointed HGS as its agent to make payments directly and deliver communications on its behalf as tenant under the Lease to GSH&K, to the extent GSH&K accepts payment and/or communications directly from HGS.

Third, GSH&K consented to accept payments directly and communicate directly with HGS. Therefore, HGS could also provide direct notice to GSH&K on behalf of Grocers, including the notice to terminate the Lease. In fact, HGS' notice of termination provides notice of the termination of the Lease and not the Sublease. Once the Lease is terminated, the Sublease automatically terminates. *See* Section 5.3 of the Sublease which states in part: "The Sublease shall be deemed automatically terminated concurrently with any termination of the Master Lease." As GSH&K consented to the Sublease, it consented to this provision.

Fourth, Section 5.8 of the Sublease was made for the benefit of Grocers and HGS, not GSH&K and relates only to termination of the Sublease. It requires HGS to provide Sublease termination notice first to Grocers, with a request that Grocers send a termination notice to GSH&K. HGS' termination notice terminated the Lease, and not just the Sublease. Thus, HGS was not required to notify Grocers as GSH&K argues. The specific provision in the Lease for termination of the Lease should govern over the notice provision in the Sublease for termination of the Sublease.

**C.    GSH&K and HGS' Mutual Course of Conduct Further Establishes the Privity of Contract Between the Two.**

Landlords and subtenants may establish privity of contract by the Landlord's affirmative acts and conduct. In fact, at least one court has found that, "[a] contract of substitution (of tenants) may be created . . . by mutual course of conduct

14

indicating consent, as well as by express words. What course of conduct or what acts are sufficient to cause such contract to be implied is generally for the jury." *Block v. Brown*, 199 Ga.App. 127, 129, 404 S.E.2d 288, 290 (1991), which further noted: "'If the lessee of real estate having only a usufruct *sublets or assigns* the lease to another, the landlord may, by affirmative acts, elect to treat the sublessee or assignee occupying the premises as his immediate tenant.'"

GSH&K treated HGS as its "immediate tenant." GSH&K communicated directly with HGS on all lease matters, including the negotiation and waiver of increased rent payments. Further, GSH&K collected its monthly rent directly from HGS, picking up rent checks from HGS and instructing HGS to make payments payable to Mr. Kazama. By their mutual course of conduct indicating consent, as well as the express language Section 5.7 of the Sublease, GSH&K treated HGS as its immediate tenant and should be estopped from now disputing that it properly received HGS' termination notice.

### D. GSH&K's Recognition of the Lease as Terminated.

In response to HGS' April 27, 1998 termination notice, GSH&K almost immediately hired a broker, began showing the Premises to prospective tenants, distributed hundreds of brochures advertising the Premises' immediate availability, and to HGS' dismay, posted signs on the Premises advertising the Premises for lease. At least one of the brochures advertising the Premises, noted:

> "COMMENTS ... ● Hard to find Freezer and Chill space ●
> Lots of Docks and Yard area for staging ● **Available First
> or Second Quarter of 1999** ● Subdividable and Open to
> Offers" (emphasis added)

A copy of the brochure is attached as Exhibit 2, hereto. The posting of "for lease" signs on the Premises gave the erroneous impression that HGS was not viable and was going out of business.

"[A] lease may be terminated by express agreement or by implied agreement (sometimes called termination by *operation of law*), termination by estoppel, or acceptance of surrender. [ ] A surrender by operation of law arises from a condition of fact that is voluntarily assumed and that is incompatible with the existence of a landlord-tenant relationship." *Provident Mutual Life Insurance Company v. Tachtronic Instruments, Inc.*, 394 N.W.2d 161,164 (Minn.App 1986).

GSH&K's marketing of the Premises and representation that the Premises would be "available" in the "first or second quarter of 1999" indicate GSH&K's understanding and agreement that HGS properly exercised the termination provision of the Lease. Such conduct evidenced GSH&K's intent to treat the Lease as terminated.

### E.    HGS' Detrimental Reliance On GSH&K's Lack of Objection.

"The doctrine [of waiver] is contractual in nature, requiring a showing either of consideration or of detrimental reliance." *Doss v. Epic Health Care Management Company v. Boatmen's Bank of Southern Missouri*, 901 S.W.2d 216, 221 (1995). "It is elementary that for a waiver to occur, there must be an intentional relinquishment of a known right; and if there has been no actual intention to waive, there can be no waiver unless one party has acted in such a manner as to be estopped from denying waiver where he has misled other party to his prejudice." *National Alfalfa Dehydrating and Milling Company,* supra at 764.

In reliance on GSH&K's lack of objection to the notice, on GSH&K's efforts to re-lease the Premises, and on the representations of GSH&K's broker that he

would be leasing the Premises, HGS searched for and located new premises to lease, entered into a lease of such premises, and otherwise made plans to vacate the Premises by July 31, 1999. GSH&K should be estopped from now denying the validity of the termination notice, as HGS acted in reliance of GSH&K's representations to its prejudice.

GSH&K, in its Supplemental Settlement Conference Statement filed May 10, 1999 ("GSH&K's Statement"), quotes *Broida v. Hayashi*, 51 Haw. 493, 499, 464 P.2d 285 (1970) for the proposition that, "estoppel by conduct is not present where the truth is known to both parties or where they have equal means of knowledge." *See GSH&K's Statement*, p. 10. However, as the above facts show, estoppel is appropriate as HGS had no knowledge that GSH&K would contest the sufficiency of HGS' termination notice, especially in light of GSH&K's marketing efforts and its lack of objection to the termination notice for eight months. In reliance on GSH&K's concealment of its objection to HGS' termination notice, HGS actively sought and obtained its new location. Thus under *Broida*, this Court should estop GSH&K from objecting to the sufficiency of HGS' termination notice.

## III. HGS' Damages For GSH&K's Marketing Efforts, Contamination of the Property, and Constructive Eviction.

HGS has been damaged by the unreasonable manner in which GSH&K marketed the Premises, the contamination of the Premises, and the poor condition of the Premises. Recently, HGS obtained a report from an environmental consultant indicating the existence of contamination of the Premises from various sources, including E. Coli bacteria (See Exhibit 3, attached hereto which is result from testing

17

performed by Asbestos Analysis Laboratories created on February 18, 1999). The Premises has experienced numerous continuing problems including the backup and accumulation of water and septic tank deficiencies which have caused flooding and unsanitary conditions. HGS is currently testing for additional potential contamination, including the presence of lead, asbestos and other contaminants. The contamination and accumulation of water is of tremendous concern to HGS because it operates a food storage and distribution facility on the Premises.

"The tenant's damages [for a landlord's constructive eviction/substantial interference with the tenant's possession] are measured in the same way as in cases of the landlord's failure to deliver possession or the landlord's actual eviction of the tenant; the tenant is entitled to recover as general damages the excess, if any, of the fair rental value of the premises over the contract rent; the tenant is also entitled to recover foreseeable special damages caused by the landlord's breach." *Powell on Real Property*, Tenant's Rights & Remedies, §16B.03[3], 16B-38.10 - 16B-38.11 (Vol 2 1998) (citations omitted). Tenants may also claim lost profits which can be established with reasonable certainty. *See Goldman v. Alkek*, 850 S.W.2d 568 (Tex.Ct.App. 1993)

In *Goldman*, the landlord entered into a commercial lease with the tenant, with the condition that the tenant would build a convenience store and install fuel pumps on the property. *Id.* at 570. The parties agreed that rent would be a minimum of $750 per month, plus additional rent based upon a percentage of gross sales. *Id.* The Landlord sued the tenant, claiming failure to pay percentage rentals on gross sales. *Id.* The tenant countersued, asserting violations of Texas' Deceptive Trade Practices Act based upon the landlord's violation of the lease's warranty of quiet enjoyment by

demanding increased rent. *Id.* The Court, found in favor of the tenant, and awarded lost profit damages due to the tenant's abandonment of his plans for further development of the site. *Id.* at 573.

In awarding lost profits, the Court stated: "To recover lost profits, sufficient evidence must be produced to enable the jury to determine the net amount of lost profits with reasonable certainty." *Id.* at 574-575. The Court relied upon the testimony of a convenience store owner/wholesale distributor who estimated the tenant's lost profits based upon the distributor's own sales to the tenant, information the tenant provided on the tenant's inside sales and the distributor's experience in the convenience store business. *Id.* at 575.

Until the extent of the contamination is determined, HGS can only provide its best estimate of the extent of its potential liability, both from its employees as well as its customers. HGS has already received increased medical claims from its employees which it attributes to the contamination. Further, HGS has suffered an ongoing loss of sales as a result of GSH&K's unreasonable marketing practices beginning in May 19, 1998. A comparison of HGS' sales shows a loss of revenue and decrease in sales after GSH&K's marketing efforts began in May 1998:

| Time Period | Average Monthly Revenue from Sales |
|---|---|
| Five months before May 19,1998: | $2,152,578. |
| Five months after May 19, 1998: | $2,023,271 |
| Difference: | $   129,307/month |

| Eleven months before May 19, 1998: | $2,192,323 |
| Eleven months after May 19, 1998: | $2,033,081 |
| Difference: | $ 159,242/month |

DATED:  Honolulu, Hawai`i, May 12, 1999.

_____

LOUISE K. Y. ING
PAUL M. IGUCHI
Attorneys for Plaintiff
HAWAIIAN GROCERY STORES, LIMITED

20

# ESTATE OF SAMUEL MILLS DAMON

October 4, 1995

Mr. Kazumi Kazama
Managing General Partner
GSH & K Properties
99-128 Aiea Heights Dr., #605
Aiea, HI 96701

> Re: Mapunapuna Rent Increases Due 11/1/95 & 1/1/96
> Lots 65, 66 & 67, TMK: 1-1-05-65

Dear Mr. Kazama:

Ongoing studies and evaluation of the industrial and commercial leasehold marketplace clearly indicate that while the fee value of the land that you lease from the Estate has remained fairly constant over the past 3 years, real property tax assessments have decreased significantly, as much as 20% in many cases. It is also apparent that although rates for warehouse space have declined by as much as 30%, vacancy rates continue to increase. This can be attributed to the high cost of land which has caused many wholesalers/retailers to forego traditional warehousing in Hawaii, competition from the State of Hawaii itself and the advent of the large warehouse/retailer such as Costco and K-Mart.

As most of you have been directly affected by the loss of warehouse tenants, the lack of construction work and the depressed economic conditions in general, the Trustees have concluded that an increase in land rent at this time would not be appropriate. Kindly be advised, therefore, that the rent increases scheduled for either November 1, 1995 or January 1, 1996 will be deferred for a period of one year while the Trustees continue to evaluate the situation. It is now anticipated that any increase to be deferred will be amortized in equal installments over the then remaining 6 years of the known rental period. While we clearly understand that a one year deferral makes planning ahead very difficult, these are uncertain times for the Estate as well and it is hoped that such a concession will help you in this prolonged recession.

Kindly indicate your understanding and agreement, in the space provided below, that this deferral of the rent increase shall not be construed to be a waiver of the rent increase or an amendment of the provisions of either the Master Lease or the Letter of Agreement providing for current rents and shall not be used as a basis for any subsequent negotiations of rent or determination of land values.

OCT-06-95 FRI 15:41          8084879933                              P. 04

EXHIBIT 1

If we do not receive your agreement to the provisions of the deferral on or before October 16, 1995, we shall assume that you have chosen to accept the increase in rent as scheduled. If you have any questions concerning this matter, please feel free to call me at 536-3717.

Very truly yours,

ESTATE OF SAMUEL MILLS DAMON

James M. Whitman
Executive Secretary


Accepted    and    agreed    to    this

6 day of _____ oct _____ , 1995


_____
Lessee

HAWAIIAN GROCERY STORES, LTD.
LEASE RENT ~ 2915 KAIHIKAPU STREET

PER SECOND AMENDMENT TO LEASE WITH GSH & K PROPERTIES:

| PERIOD | MONTHLY BASE RENT | MONTHLY GROUND LEASE | MONTHLY SUBTOTAL | MONTHLY GENERAL EXCISE | MONTHLY TOTAL PAYMENT | ANNUAL TOTAL PAYMENT |
|---|---|---|---|---|---|---|
| 1/1/96 TO 12/31/96 | 30,866.50 | 30,187.50 | 61,054.00 | 2,544.12 | 63,598.12 | 763,177.44 |
| 1/1/97 TO 12/31/97 | 33,054.00 | 30,187.50 | 63,241.50 | 2,635.27 | 65,876.77 | 790,521.28 |
| 1/1/98 TO 12/31/98 | 35,241.50 | 30,187.50 | 65,429.00 | 2,726.43 | 68,155.43 | 817,865.12 |
| 1/1/99 TO 12/31/99 | 30,866.50 | 38,937.50 | 69,804.00 | 2,908.73 | 72,712.73 | 872,552.79 |
| 1/1/2000 TO 12/31/2000 | 33,054.00 | 38,937.50 | 71,991.50 | 2,999.89 | 74,991.39 | 899,896.63 |
| 1/1/2001 TO 12/31/2001 | 35,241.50 | 38,937.50 | 74,179.00 | 3,091.04 | 77,270.04 | 927,240.47 |
| 1/1/2002 TO 12/31/2002 | 37,429.00 | 38,937.50 | 76,366.50 | 3,182.19 | 79,548.69 | 954,584.30 |




EXHIBIT 2

# SOFOS REALTY
## C O R P O R A T I O N

600 Kapiolani Blvd. Suite 200
Honolulu, Hawaii 96813

Bulk Rate
U.S. Postage
**PAID**
Honolulu, HI
Permit No. 59

Richard Loeffler
Hawaiian Grocery Stores Ltd
PO Box 29969
Honolulu HI 96820



# HAWAIIAN GROCERY BUILDINGS
## 2911-2915 Kaihikapu Street
### FOR LEASE

VIEW FROM KAIHIKAPU STREET • DRY STORE LEFT • DOCKING CENTER • OFFICE RIGHT

HI CUBE DRY STORAGE

DOCKING • 6 CONTAINER SPACES

**LOCATION...** Mapunapuna Industrial
**ADDRESS...** 2911-2915 Kaihikapu St.
**ZONING...** I-1
**SQ. FOOTAGE...** 105,000 Sq. Ft.
Damon Estate Leasehold land Area
**TERM...** Flexible till 2012
**CAM...** $0.20 per sq. ft. per month (est)

**COMMENTS...**
Approx 30,115 sf Dry Warehouse space @ — $0.75/sf
Approx 21,790 sf Freezer space @ — $1.25/sf
Approx 6,745 sf chill space @ — $1.10/sf
Approx 4,845 sf Office space @ — $0.85/sf
Approx 7,280 sf Covered Staging @ — $0.25/sf

• **Hard to find Freezer and Chill space** • **Lots of Docks and Yard area for staging**
• **Available First or Second Quarter of 1999** • **Subdividable and Open to Offers**

350 feet

Dry Warehouse
28 hhi cube
90' X275'
(24,750 SF)

Parking

Office

Open Shed

Covered Staging
(8 docks)

Hi cube Freezer
104' X 90'
28' high
(11,000 SF)

300 feet
2911-2915 KAIHIKAPU STREET
(APPROXIMATE SCALE)

Office
3120 SF

Parking

Lo cube
Chill
11' high
(6,745 SF)

Lo cube
Freezer
11' high
(4,345 SF)

Hi cube
Freezer
17' high
(6,435 SF)

300 feet



## FOR COMMERCIAL
### Real Estate

**Michael E. "Skip" Schuman** of Sofos Realty can help you with your commercial real estate needs. If you need help with leasing, management, and sales of commercial and industrial properties, from retail to office to industrial warehouse space...

call Michael E. "Skip" Schuman, Vice President of Sofos Realty Corporation at (808) 522-5960.

# SOFOS REALTY
## C O R P O R A T I O N

Call M.E. "Skip" Schuman
at Sofos Realty today!
**808.522.5960**

Fax: 808.532.1935

## LABORATORY RESULTS

Sixteen samples were submitted for a multitude of analyses from FSI Air to AAL. Patrick Michaels of AAL received the samples. The samples were labeled as to the location from which they were taken and addition information was provided as to the nature of the testing requested for each sample. Asbestos Analysis Laboratories performed all of the requested testing to the extent possible. AAL was assisted in this effort through work performed by Truesdale Laboratories, Inc. of Tustin who performed certain of the tests and EMS Laboratories in Pasadena who performed other tests as necessary. The test result summaries are shown in the table below. The actual laboratory reports and Chains-of-Custody are attached as appendix A.

### TABLE 1.0    COMPREHENSIVE TABLE OF LABORATORY RESULTS

| *Sample # & Location | *Requested Tests | PLM Results (Asbestos) | ‡TBM Results (Asbestos) | Pesticides and PCB's | ‡Lead | Bacteriologic al Tests | ¶Petroleum Residues |
|---|---|---|---|---|---|---|---|
| 1. Drinking water from kitchen sink | Lead, Pesticides, Bacteria, | N/A | N/A | N.D. | N.D. | PASSED | N/A |
| 2. Paint outside of Old Chill Room Next to Old office | Lead | N/A | N/A | N/A | 1810ppm | N/A | N/A |
| 3. Paint on Cross Roof Bar Inside Chill Room #3 Next to Fan Aisle 1300 | Lead | N/A | N/A | N/A | 3900ppm | N/A | N/A |
| 4. Brown Paint or Rust on Cross Bar Inside Chill Room #3 Next to Fan Aisle# 1300 | Lead & Asbestos | N.D. | N/A | N/A | 800ppm | N/A | N/A |
| 5. Fan Dust on Cross Bar on Aisle #1300 Room #3 Chill Next to Blower | Asbestos | N.D. | N/A | N/A | N/A | N/A | N/A |
| 6. Water Fountain Outside Loading Dock | Lead, Bacteria, Pesticides | N/A | N/A | N.D. | N.D. | FAILED E. Coli | N/A |
| 7. Soil Under Gas Tank | Petroleum Contaminants | N/A | N/A | N/A | N/A | N/A | 3.85% |

* These samples and locations are those provided by FSI Air Incorporated

† Other tests may have been requested, however, these are the only tests that we were able to run on the samples provided

‡ EMS Laboratories reporting

¶ Truesdale Laboratories reporting

ASBESTOS ANALYSIS LABORATORIES, 11225 VENTURA BLVD., SUITE 3, STUDIO CITY, CALIFORNIA 91604-3565 (818) 761-4712 (213) 851-5119 FAX (818) 506-9547 PAGER (818) 328 3328 E-MAIL AALABS@AOL.COM

EXHIBIT 3

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 8. On Top of Roof (Old Office) | Asbestos, Lead | N.D. | N/A | N/A | 740ppm | N/A | N/A |
| 9. Soil From Aisle on Frozen Going Out to Ewa side | Lead, Petroleum Traces | N/A | N/A | N/A | 740ppm | N/A | 0.50% |
| 10. Water from Back of Grocery Warehouse | Bacteria, Petroleum Residues, Lead, Asbestos | N/A | N.D | N/A | N.D (<0.014 mg/l) | 4000 Colonies per ML. | 2.5 mg/l |
| 11. Inside Manhole Under Trailer Next to Old Office | Bacteria, Contamination | N/A | N/A | N/A | N/A | N/A | N/A |
| 12. Inside Old Office Roof Tile, Behind Sandra | Asbestos, Lead | N.D. | N/A | N/A | 60ppm | N/A | N/A |
| 13. Soil From Next to Manhole on Parking Lot Taken From Water Valve Shut of Hole | Lead, Asbestos, Petroleum Residues | N.D. | N/A | N/A | 168ppm | N/A | 0.33% |
| 14. Soil From Back of Grocery Warehouse | Asbestos, Lead Petroleum Residues | N.D. | N/A | N/A | 216ppm | N/A | 0.73% |
| 15. Black Stuff on Aisle #1502 on Roof in Chill Room #3 | Asbestos, Lead | N.D. | N/A | N/A | 240ppm | N/A | N/A |
| 16. Manhole in Front of Warehouse on Clifton's Parking Stall | Bacteria, Contamination | N/A | N/A | N/A | N/A | | N/A |

KEY:
N.D. = None Detected,
N/A = Not Analyzed,
    ppm = Parts Per Million,
      mg/l = Milligrams Per Liter,
      % = Percent by Weight
        ML = Milliliter

Presented by Registered Environmental Assessor

_____

(Patrick Michaels)

ASBESTOS ANALYSIS LABORATORIES. 11236 VENTURA BLVD., SUITE S. STUDIO CITY, CALIFORNIA 91604 3565 (818) 761-4712 (213) 851-4109 FAX (818) 505-3547 PAGER (818) 328-2328 E-MAIL AAL-LBS@AOL.COM

2-17-99

FIRST CIRCUIT COURT
STATE OF HAWAII
FILED

1999 APR -7  AM 11: 06

F. UTANE
CLERK

Of Counsel:
ALSTON HUNT FLOYD & ING
Attorneys At Law
A Law Corporation

LOUISE K. Y. ING     2394-0
PAUL M. IGUCHI     6047-0
18th Floor, Pacific Tower
1001 Bishop Street
Honolulu, Hawai'i 96813
Telephone:  (808) 524-1800

Attorneys for Plaintiff

## IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

## STATE OF HAWAI'I

| | |
|---|---|
| HAWAIIAN GROCERY STORES, LIMITED, a Hawaii corporation,           ) | CIVIL NO. 99-0424-02 DDD (Declaratory Judgment) |
|       Plaintiff,           ) | **ORIGINAL** DECLARATION OF RICHARD LOEFFLER IN OPPOSITION |
|      vs.           ) | TO DEFENDANT AND THIRD-PARTY PLAINTIFF GSH AND K INVESTMENT GROUP'S AND DEFENDANT |
| GSH AND K INVESTMENT GROUP, fka GSH and K Properties, a Hawaii general partnership; KATSUMI KAZAMA, and THE ESTATE OF HARUKO KAZAMA,    ) | KATSUMI KAZAMA'S MOTION FOR ORDER DIRECTING PAYMENT OF ALL AMOUNTS DUE UNDER LEASE TO DEFENDANT AND THIRD-PARTY |
|       Defendants,           ) | PLAINTIFF GSH ANDK INVESTMENT GROUP FILED MARCH 9, 1999 |
|     and           ) | DATE:     April 7, 1999 |
| GSH AND K INVESTMENT GROUP, a Hawaii general partnership,    ) | TIME:     2:30 p.m. JUDGE:   Dexter D. Del Rosario |
|      Defendant/           Third-Party Plaintiff,    ) | (No trial date set) |
|      vs.           ) | |
| GROCERS SPECIALTY COMPANY, a California corporation,    ) | |
|      Third-Party Defendant.    ) | |

(CERTIFICATE OF SERVICE ATTACHED)

**EXHIBIT 4**

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | | |
|---|---|---|
| HAWAIIAN GROCERY STORES,<br>LIMITED, a Hawaii corporation, | ) | CIVIL NO. 99-0424-02 DDD<br>(Declaratory Judgment) |
| | ) | |
| Plaintiff, | ) | **DECLARATION OF RICHARD**<br>**LOEFFLER** |
| | ) | |
| vs. | ) | |
| | ) | |
| GSH AND K INVESTMENT GROUP, fka | ) | |
| GSH and K Properties, a Hawaii general | ) | |
| partnership; KATSUMI KAZAMA, and THE | ) | |
| ESTATE OF HARUKO KAZAMA, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| GSH AND K INVESTMENT GROUP, | ) | |
| a Hawaii general partnership, | ) | |
| | ) | |
| Defendant/ | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| GROCERS SPECIALTY COMPANY, | ) | |
| a California corporation, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## DECLARATION OF RICHARD LOEFFLER

I, RICHARD LOEFFLER, declare as follows:

1.    I am the Chief Executive Officer of Hawaiian Grocery Stores, Limited ("HGS")

and have been since it was acquired by my company RHL Limited in June, 1996.

I make this declaration based on personal knowledge.  I make this declaration in

reply to Defendant GSH and K's Reply Memorandum, filed April 1, 1999 ("Reply

1

Memorandum") and to the Declarations of Lynn S. H. Hiromoto and Katsumi Kazama attached to it.

2.      Paragraph 5.7 of the Sublease between Grocers and HGS, which is attached as Exhibit D to the First Amended Complaint and which was consented to by GSH and K, authorizes HGS to pay rent to and communicate directly with GSH and K, to the extent GSH and K "agrees from time to time to accept such rent and/or communications directly from Subtenant." The same paragraph also appointed HGS as Grocers' "limited agent to make such payments and deliver such communications on its behalf as tenant under the Master Lease." Since my company, RHL Limited, acquired the common stock of HGS, Katsumi Kazama or his son Wally have personally come to HGS every month to pick up GSH and K's rent check directly from HGS, even though Grocers Specialty Company ("Grocers") was technically GSH and K's lessee and HGS was technically Grocers' subtenant. In addition, since the stock acquisition, HGS has communicated directly with GSH and K on all lease matters.

3.      I understand from Grocers Specialty that even before the stock of HGS was sold to RHL, HGS paid rent directly to GSH and K.

4.      I also understand from Grocers Specialty that even before RHL's acquisition of HGS stock, HGS had not been paying increased rent, despite the provisions of the Second Amendment to Lease, which is attached as Exhibit C to the First Amended Complaint, specifying increased monthly rent beginning January 1, 1996.

5. After RHL's acquisition of HGS' common stock in June 1996, HGS continued paying the same rent HGS had been paying pre-acquisition, without any objection from either Katsumi or Wally Kazama.

6. During 1997 and 1998, I had various conversations with the two Kazamas in which they approved HGS' continued payment of unincreased monthly rent of $62,854 per month.

7. The first conversation occurred after I wrote GSH and K in or about Spring, 1997, about roof leaks in the Premises. Katsumi Kazama brought his family to the Premises to inspect the leaks. I had a conversation with Katsumi Kazama in my office in which he stated that GSH and K wanted to make HGS happy and would do anything possible to keep us happy, even including fixing the roof of the Premises to prevent water damage in the warehouse. I responded that fixing the roof was an obligation of GSH and K's, not a favor, and that if he really wanted to make me happy, he would reduce the rent, the economy being what it was. I also pointed out to him other problems on the Premises, such as flooding, lack of drainage, peeling paint and unsanitary conditions in a building used for food storage. Mr. Kazama told me that rather than his reducing the rent, HGS could keep on paying the rent HGS currently was paying, which was less than that provided under the Second Amendment to Lease.

8. My chief financial officer Bruce Barber informed me that in Summer, 1997, when I was out of the office, Wally Kazama mentioned the rent increase to Mr. Barber as "a formality." Mr. Barber said he would look into it, but HGS continued paying unincreased rent without protest from GSH and K and even though Wally or Katsumi Kazama continued to come by personally to pick up HGS' rent check.

3

9. In February or March 1998, when Wally Kazama came to HGS to pick up the rent check, I started a conversation with him about the poor economic conditions and suggested we renegotiate rent because the rental rate was way out of line with market rates. Wally responded that GSH and K wanted to make HGS happy and told me to have HGS keep paying the unincreased rent it had been paying. I then mentioned again that for the amount HGS was paying, the property was in miserable condition. Wally replied that GSH and K would look into it but in the meantime, HGS should keep paying the unincreased rent it had been paying and repeated that GSH and K wanted to make us happy.

10. In April 1998, about one week before HGS sent GSH and K its April 27, 1998 rent termination notice, Mr. Barber, another HGS officer and I had lunch with the two Kazamas. Katsumi Kazama reiterated in front of all of us that the rent increase in the Second Amendment was just a formality and that GSH and K wanted to do everything possible to make HGS happy, even if GSH and K had to take out loans to finance repairs to the Premises. We discussed economic conditions and real property values and I again suggested that the parties should renegotiate a reduced rent. Katsumi Kazama repeated that HGS should just keep on paying the unincreased rent and that the increased rent in the Second Amendment was "a formality."

11. Because of the poor condition of the Premises and the extremely above-market level of the existing rent HGS was paying GSH and K, I finally decided that HGS, continuing to act as Grocers' limited agent, should notify GSH and K of its desire to terminate the Grocers/GSH and K lease 15 months from the notice date, as required under the Second Amendment to Lease.

4

12. HGS stayed as long as it did in the Premises because of GSH and K's assurances that rent would not be increased as provided under the Second Amendment to Lease.

13. I do not recall ever receiving (a) any rent invoices from GSH and K, including the invoices attached to GSH and K's Reply Memorandum, filed April 1, 1999, nor (b) any of the unsigned letters also attached as exhibits to the Reply Memorandum. I have checked with Mr. Barber about these items, and he does not have a clear recollection about whether the letters were received and whether rent invoices were regularly received. Because such letters and invoices would have caught the attention of both of us, I suspect that the documents may have been prepared after the fact or may never have been sent.

14. Recently, after filing its Complaint in this suit, HGS obtained a report from an environmental consultant we had engaged, indicating the existence of contamination of the Premises by various sources, including E. Coli. bacteria. In addition, I have had continuing concerns about the fitness of the Premises because of backup and accumulation of water and septic tank deficiencies which have caused flooding, unsanitary conditions, the presence of lead, the possible presence of asbestos, and related problems.

15. The contamination and accumulation of water is of concern to me because HGS operates a food storage facility on the Premises. Therefore, I instructed HGS'

5

attorneys to amend the Complaint in this suit to include constructive eviction and

other claims arising from the contamination noted in the report and from our own

observations.  HGS is seeking to be relieved of its duty to pay the full amount of the

$62,854 monthly rent it had been paying before suit and has been setting aside

since filing of suit because of the unfit condition of the Premises.

     I declare under penalty of law that the foregoing is true and correct.

     Executed on April 5, 1999, in Honolulu, Hawai`i.

RICHARD LOEFFLER

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date I caused a true and correct copy of the foregoing to be served on the following by having said copies hand delivered, addressed as follows:

> DAVID H. C. LEE, ESQ.
> P. O. Box 90427
> Honolulu, Hawai`i  96835-0427
>
> Attorney for Defendants and Third-Party Plaintiff
> GSH and K INVESTMENT GROUP, fka GSH and K Properties; and
> KATSUMI KAZAMA
>
> STANLEY M. MORISHIGE, ESQ.
> 1220 Pauahi Tower
> 1001 Bishop Street
> Honolulu, Hawai`i 96813
>
> Attorney for AMY IMAGUCHI, Special Administrator for the Estate of
> Haruko Kazama, Deceased

DATED: Honolulu, Hawai`i, April 7, 1999.

LOUISE K. Y. ING
PAUL M. IGUCHI
Attorneys for Plaintiff

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| HAWAIIAN GROCERY STORES, LIMITED, a Hawaii corporation, | ) ) ) CIVIL NO. 99-0424-02 DDD (Declaratory Judgment) |
| Plaintiff, | ) ) DECLARATION OF BRUCE BARBER; EXHIBITS 1-3 |
| vs. | ) ) |
| GSH AND K INVESTMENT GROUP, fka GSH and K Properties, a Hawaii general partnership; KATSUMI KAZAMA, and THE ESTATE OF HARUKO KAZAMA, | ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| GSH AND K INVESTMENT GROUP, a Hawaii general partnership, | ) ) ) |
| Defendant/ Third-Party Plaintiff, | ) ) ) |
| vs. | ) ) |
| GROCERS SPECIALTY COMPANY, a California corporation, | ) ) ) |
| Third-Party Defendant. | ) ) |

DECLARATION OF BRUCE BARBER

I, Bruce Barber, declare as follows:

1.     I am the Chief Financial Officer of Hawaiian Grocery Stores,

Limited ("HGS") and have been since June, 1996. I make this declaration based on

personal knowledge. In particular, I have personal knowledge about all

111492-1 / 4405 - 8

EXHIBIT 5

correspondence and communications between HGS and GSH and K Investment

Group, fka GSH and K Properties ("GSH&K"), Mr. Katsumi Kazama ("Kazama") and Mr.

Wally Kazama because I participated in the communications stated below and have

reviewed all relevant correspondence which are part of HGS' files on the leased

premises and are attached hereto as exhibits.

2.     GSH&K is the landlord of premises located at 2911 and 2915

Kaihikapu Street, Honolulu, Hawai`i ("the Premises"). GSH&K's relationship with HGS

arises from a Lease dated February 1, 1990, between GSH&K, as Lessor, and Grocers

Specialty Company ("Grocers"), as Lessee. The Lease was subsequently amended by

an Amendment to Lease dated July 1, 1992, and an undated Second Amendment to

Lease, which was notarized March 9, 1995. In or around June 1996, RHL Management

Group, Inc. acquired all of the common stock of HGS, and at the same time, the newly-

acquired HGS entered into a written Sublease of the Premises with Grocers.

3.     GSH&K consented to the Sublease and the change of HGS'

common stock ownership by way of a Consent dated May 22, 1996. Thereafter, HGS

continued to pay its rent directly to GSH&K and to deal with GSH&K directly for all other

purposes, as if GSH&K were its landlord.

4.     The Second Amendment of Lease provides in paragraph 3 that

monthly base rent for each of the Premises' two parcels would be adjusted annually

between January 1, 1996 and December 31, 2002, and that monthly ground rent would

increase annually, beginning January 1, 1996.

5.     Part of the rent increase that began in 1996 and accrued before the

acquisition of HGS' common stock by RHL in May 1996, was never paid by Grocers nor

2

the pre-acquisition HGS. I was given to understand by Grocers that GSH&K agreed to waive such increase.

6.    In or around mid-1997 to the present, members of the Kazama family, purporting to be representatives of GSH&K, visited HGS' Premises on at least a monthly basis to collect rent directly from HGS. Beginning in the same period, Kazama instructed HGS to make its rent check payable directly to Katsumi Kazama, rather than to GSH&K as a partnership. Kazama then deposited HGS' rent checks into a joint personal account in the names of his wife, the late Haruko Kazama, and himself.

7.    At various times in 1997 and 1998, representatives of HGS, including myself, had various discussions with Kazama and his son Wally Kazama, purporting to be representatives of GSH&K, in which GSH&K agreed not to collect increased rent due to the poor condition of the Premises and poor market and economic conditions, and to allow HGS to pay the same rent that Grocers had paid at the time of the HGS common stock acquisition in 1996. HGS continued to pay such rent directly to GSH&K or Kazama, as instructed by Kazama, and otherwise to deal directly with GSH&K, such as regarding the condition and repair of the Premises and amount of rent to be paid.

8.    By written notice dated April 27, 1998, addressed to GSH&K, HGS exercised its right under paragraph 2 of the Second Amendment and paragraphs 5.1, 5.2 and 5.3 of the Sublease to terminate the Lease upon fifteen months advance written notice, or effective July 31, 1999. Attached hereto as Exhibit 1 is a true and correct copy of that notice. Until just recently, GSH&K did not object to the termination notice and began advertising the Premises for lease. It was not until nearly eight

months later, by letter dated December 12, 1998, that GSH&K's attorney notified HGS of the claim that the termination notice was ineffective.

9.     Out of the blue, by letter dated December 16, 1998, GSH&K wrote HGS enclosing a demand letter to Grocers seeking rent increases from January 1, 1996 through December 31, 1998, of $108,817.68, and notifying HGS that effective January 1, 1999, total monthly rent would increase to $72,712.73 per month. This was the first notice HGS received that GSH&K was purporting to revoke its prior waiver of rent increases. GSH&K has since produced a demand notice to Grocers, correspondence to HGS and bills to HGS that were supposedly sent in 1997 and 1998, but which HGS never received. Attached hereto as Exhibit 2 is a true and correct copy of the December 16, 1998 letter HGS received.

10.     At my instruction and by letter from HGS' counsel dated December 28, 1998, HGS informed GSH&K that GSH&K had waived any right to (a) claim the termination notice was ineffective by dealing directly with HGS throughout the term of the Sublease and failing to object to the notice in a timely manner and (b) claim any rent increase for 1996 through 1998, by agreeing in 1997 and 1998 not to require HGS to pay increased rent. Attached hereto as Exhibit 3 is a true and correct copy of the December 28, 1998 letter.

11.     Thereafter, GSH&K has continued to correspond with HGS and with CERTIFIED GROCERS OF CALIFORNIA, LTD., who on information and belief is the parent corporation of Grocers, reiterating its new-found position that its lease relationship is with Grocers, that increased rent is due from 1996, and that HGS' notice of termination is ineffective

111492-1 / 4405 - 8

4

15.     On March 22, 1999, HGS filed a First Amended Complaint for
Declaratory Relief, Interpleader and Damages filed March 22, 1999 ("Complaint"),
disputing GSH&K's claim for payment of full rent under the Lease and petitioning this
Court to (1) enter a declaratory judgment in its favor as to disputed rent increase for
1996 through the present, and (2) order the Clerk of the Court to accept into the registry
of this Court monthly rental amounts pending this Court's determination.

16.     HGS and GSH&K have not executed a written instrument or
otherwise entered into an agreement that HGS' monthly rent could be withheld or
deducted.

I declare under penalty of law that the foregoing is true and correct.

Executed on March 30, 1999, in Honolulu, Hawai`i.

BRUCE BARBER



**HAWAIIAN GROCERY STORES, LTD.**
P.O. BOX 29968 HONOLULU, HAWAII 96820-2380
PHONE (808) 833-5121 FAX (808) 833-5028

April 27, 1998

GSH and K Properties
99-128 Aiea Heights Drive
Suite 605
Aiea, Hawaii 96701
Attention Mr. Glenn S. Haraguchi

Re:  Notice of Termination

Gentlemen:

We currently occupy property located at 2911 and 2915 Kaihikapu Street, pursuant to Lease dated February 1, 1990, by and between GSH and K Properties, as Lessor, and Grocers Specialty Company, as Lessee, as amended by that certain First Amendment to Lease dated July 1, 1992, and Second Amendment to Lease executed in March 1995 (collectively, the "Lease")

Pursuant to paragraph 2 of the Second Amendment to Lease, this letter constitutes fifteen (15) months prior written notice of our election to terminate the Lease with an effective termination date July 31, 1999

If you have any questions, please feel free to contact me.

Very truly yours,

HAWAIIAN GROCERY STORES, LTD.

By _____

Its _____

# EXHIBIT   1

DAVID H. C. LEE
ATTORNEY AT LAW

POST OFFICE BOX 90427
HONOLULU, HAWAI'I 96835-0427
TELEPHONE(808)-737-1503
FAX(808)-734-3501

December 16, 1998

Hawaiian Grocery Stores, Ltd
P. O. Box 29969
Honolulu, Hawaii 96820-2369

2915 Kaihikapu Street
Honolulu, Hawaii 96819

    Re: <u>Lease for 2911 and 2925 Kaihikapu Street</u>

Gentlemen:

    Enclosed for your attention and appropriate action are a copy of a demand letter dated December 16, 1998 to Grocers Specialty Company for $108,817.68 and copies of enclosures setting out the paragraphs of the Second Amendment and the Lease referred to in the demand letter.

    You are hereby also notified that effective January 1, 1999, the monthly amount due for base rent, ground lease rent and the Hawaii General Excise Tax thereon is $72,712.73. The amount was arrived at as follows:

| 1999 | | |
|------|------|------|
| Base Rent | $30,866.50 | |
| Ground Lease | 38,937.50 | |
| | | |
| Subtotal | $69,804.00 | |
| GET at 4.167% | 2,908.73 | |
| | | |
| Amount Due | $72,712.73 | |

    I also believe that Grocers Specialty Company would have to be current on its obligations in order to be able to exercise any right to terminate the Lease between my client, GSH and K Investment Group and Grocers Specialty Company.

    Very truly yours,

David H. C. Lee

DHCL:
Copy: GSH and Investment Group
Enclosures

**EXHIBIT 2**

Hawaiian Grocery Stores, Ltd.
Page 2
December 16, 1998


Certified Mail
No. Z 159 094 100
Return Receipt
P.O. Box 29969
Honolulu, Hawaii 96820-2369

# DAVID H. C. LEE
### ATTORNEY AT LAW

POST OFFICE BOX 90427
HONOLULU, HAWAI'I 96835-0427
TELEPHONE(808)-737-1503
FAX(808)-734-3501

December 16, 1998

Grocers Specialty Company
Atten: President
2601 S. Eastern Avenue
Los Angeles, California 90040

> Re: Lease 2911 and 2915 Kaihikapu
> Street, Honolulu, HI 96819

Ladies/Gentlemen:

This office represents GSH and K INVESTMENT GROUP which leases the above referenced premises to you under a Lease dated February 1, 1990, an Amendment to Lease dated July 1, 1992 and a Second Amendment to Lease undated but executed by the parties on March 20, 1995 and March 9, 1995. The premises are occupied by Hawaiian Grocery Stores, Limited, under a sublease from you dated May 28, 1996.

Under Paragraph 3 of the said Second Amendment to Lease and Paragraph 4.7 of the said Lease, copies of which are enclosed herewith, the amounts due for monthly base rent, ground lease rent and the Hawaii General Excise Tax thereon in 1996, 1997 and 1998 are as follows:

| 1996 | Base Rent | $30,866.50 |
|------|-----------|------------|
|      | Ground Lease | 30,187.50 |
|      | Subtotal | $61,054.00 |
|      | GET at 4.167% | 2,544.12 |
|      | Amount Due | $63,598.12 |
| 1997 | Base Rent | $33,054.00 |
|      | Ground Lease | 30,187.50 |
|      | Subtotal | $63,241.50 |
|      | GET at 4.167% | 2,635.27 |
|      | Amount Due | $65,876.77 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Warning:

This is an attempt to collect a debt and any information obtained will be used for that purpose.

Notice:

The amount of the debt in this demand is $108,817.68, plus interest at twelve percent (12%) per annum on the amount of each underpayment of the agreed upon rent from thirtieth (30th) after the due date for payment of the agreed upon rent together with late charges equal to four percent (4%) of each underpayment of the agreed upon rent, constituting this debt. The name and address of the creditor is GSH & K INVESTMENT GROUP, 99-128 Aiea Heights Drive, Suite 605, Aiea, Hawaii 96701. Unless you dispute the debt within thirty (30) days of receipt of this notice, I will assume that the debt is valid. If you dispute the debt in writing within thirty (30) days, I will send you a verification of the debt.
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| 1998 | Base Rent | $35,241.50 |
|---|---|---|
|  | Ground Lease | 30,187.50 |
|  | Subtotal | $65,429.00 |
|  | GET at 4.167% | 2,726.43 |
|  | Amount Due | $68,155.43 |

However, despite notice, your subtenant, Hawaiian Grocery Stores, Ltd. has not paid the monthly amounts due and has instead paid the sum of $62,854.06 per month to and including the month of December 1998. As a result, there is a balance due of $744.06 per month or $8,928.72 for 1996, $3,022.71 per month or $36,272.52 for 1997 and $5,301.37 per month or $63,616.44 for 1998. For the years 1996, 1997 and 1998, the total due is $108,817.68.

Demand is hereby made upon you for payment of $108,817.68 plus interest at 12% per annum on each underpayment of a rental installment from the 30th day after the due date (Paragraph 11.3) and late charges equal to 4% of each underpayment (Paragraph 11.5), to GSH and K INVESTMENT GROUP in care of this office within thirty (30) days from the date of receipt of this demand. If payment is not received in accordance with the foregoing demand, then action will be filed against you, without any further notice, for the recovery $108,817.68, further amounts as may become due and owing, interest, late charges, court costs and attorneys' fees.

Very truly yours,

David H. C. Lee

DHCL:
Copy: Katsumi Kazama
Enclosures

Certified Mail
No. Z 159 094 099
Return Receipt

3. <u>Base Rent During Second Extension Period</u>. During the Second Extension Period, Lessee shall pay to Lessor monthly Base Rent within the meaning of Paragraph 4.1 of the Lease based on the following schedule:

| <u>Monthly Base Rent</u> | <u>Period</u> |
|---|---|
| $30,866.50 per month | For the period from January 1, 1996, to December 31, 1996 |
| $33,054.00 per month | For the period from January 1, 1997, to December 31, 1997 |
| $35,241.50 per month | For the period from January 1, 1998, to December 31, 1998 |
| $30,866.50 per month | For the period from January 1, 1999, to December 31, 1999 |
| $33,054.00 per month | For the period from January 1, 2000, to December 31, 2000 |
| $35,241.50 per month | For the period from January 1, 2001, to December 31, 2001 |
| $37,429.00 per month | For the period from January 1, 2002, to December 31, 2002 |

In addition to the Base Rent, Lessee shall pay all other additional monthly rents, including the Master Ground Lease Rent, taxes, assessments and charges, all as provided under the Lease, as amended hereby.

4. <u>Lessee's Payment of Master Ground Lease Rent During Second Extension Period</u>. During the Second Extension Period, Lessee shall pay to Lessor, as additional rent, the following monthly amounts in satisfaction of Lessee's obligation to pay the monthly rent due under the Master Ground Lease as provided under Paragraph 4.2 of the Lease, notwithstanding the actual monthly rent due under said Master Ground Lease:

| Monthly<br><u>Ground Lease Rent</u> | <u>Period</u> |
|---|---|
| $30,187.50 per month | For the period from January 1, 1996, to December 31, 1996 |
| $30,187.50 per month | For the period from January 1, 1997, to December 31, 1997 |
| $30,187.50 per month | For the period from January 1, 1998, to December 31, 1998 |

2

| $38,937.50 per month | For the period from January 1, 1999, to December 31, 1999 |
| $38,937.50 per month | For the period from January 1, 2000, to December 31, 2000 |
| $38,937.50 per month | For the period from January 1, 2001, to December 31, 2001 |
| $38,937.50 per month | For the period from January 1, 2002, to December 31, 2002" |

5. **Agency Disclosure**. Stephen B. Metter of MW Commercial Realty, Inc. has represented the Lessee in the negotiation of this Second Amendment to Lease.

6. **Broker Commission**. Lessor and Lessee shall pay equally to MW Commercial Realty, Inc. a total brokerage commission of $50,000.00. Lessee shall pay its share of the brokerage commission in full upon the execution of this Second Amendment to Lease by all parties. Lessor shall pay its share of the aforesaid brokerage commission as follows: $5,000.00 upon the full execution of this Second Amendment to Lease by all parties and $5,000.00 following each 30-day period thereafter until fully paid. No interest shall accrue on Lessor's unpaid portion of the brokerage commission.

7. **Terms of Original Lease**. Except as modified by the Amendment to Lease and this Second Amendment to Lease, all other provisions of the Lease shall remain in full force and effect and shall apply with equal force to the Second Extension Period of this Lease.

IN WITNESS WHEREOF, each of the parties has caused to be signed by its duly authorized officers and/or partners this Second Amendment to Lease as of the date first above written.

GSH AND K PROPERTIES,
a Hawaii general partnership

By _____
Its General Partner

By _____
Its General Partner

"LESSOR"

3

4.7  Tax on Lease Rentals.  All of the rent provideu
for in this Lease, including without limitation the monthly
Base Rent and the Master Ground Lease Rent, shall be net above
taxes, assessments and charges of any kind otherwise payable by
Lessee; and Lessee shall also pay (in addition to such rent,
taxes, assessments and charges) an amount which, when added to
the rental payments and other reimbursements reserved under
this Lease, shall yield to Lessor after the deduction of all
Hawaii general excise and use taxes and any other taxes imposed
under any other law on account of the receipt, actual or
constructive, by Lessor of the rental payments, reimbursement
of real property taxes, payment or reimbursement of general
excise and use taxes and any other tax attributable to the
Premises or this Lease (but excluding any local, state or
federal tax relating to Lessor's income), a net amount equal to
that which Lessor would have realized from such payments and
reimbursements had no such taxes been imposed.  During such
time as the Hawaii General Excise and Use Tax remains at its
present rate of four percent (4%) and no other taxes are
imposed upon the receipt by Lessor of the rental payments and
other reimbursements due hereunder, such additional amount will
be equal to 4.167% of the rental payments and reimbursements
reserved under this Lease.

4.8  Real Property Taxes.

(a)  Payment of Taxes.  Lessee shall pay the real
property tax, as defined in paragraph 4.8(b), applicable to the
Premises during the term of this Lease.  All such payments
shall be made at least ten (10) days prior to the delinquency
date of such payment.  Lessee shall promptly furnish Lessor
with satisfactory evidence that such taxes have been paid.  If
any such taxes paid by Lessee shall cover any period of time
prior to or after the expiration of the term hereof, Lessee's
share of such taxes shall be equitably prorated to cover only
the period of time within the tax fiscal year during which this
Lease shall be in effect, and Lessor shall reimburse Lessee to
the extent required.  If Lessee shall fail to pay any such
taxes, Lessor shall have the right to pay the same, in which
case Lessee shall repay such amount to Lessor with Lessee's
next rent installment together with interest at 12% per annum
or the maximum rate then allowable by law, whichever is less.

Lessee's obligations under this Paragraph to pay the
real property taxes shall apply only to the real property taxes
which are assessed against the Premises (which is described in
the attached Exhibit "A") and shall not apply to any other real
property taxes which may be assessed against any other
properties owned by Lessor.  Lessor agrees that Lessee shall
have the right, at its sole expense, to contest any increase in

-5-

(c)  Pursue any other remedy now or hereafter available to Lessor under the laws or judicial decisions of the state wherein the Premises are located.

11.3  Interest on Unpaid Sums.  In addition to the late charges specified in this Lease, unpaid installments of rent and other unpaid monetary obligations of Lessee under the terms of this Lease shall bear interest from the thirtieth (30th) day after the date due at the rate of twelve percent (12%) per annum or the maximum rate then allowable by law, whichever is less.

11.4  Default by Lessor.  Lessor shall not be in default unless Lessor fails to perform obligations required of Lessor within thirty (30) days after written notice by Lessee to Lessor; provided, however, that if the nature of Lessor's obligation is such that more than thirty (30) days are required for performance then Lessor shall not be in default if Lessor commences performance within such 30-day period and thereafter diligently prosecutes the same to completion.

11.5  Late Charges.  Lessee hereby acknowledges that late payment by Lessee to Lessor of rent and other sums due hereunder will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain.  Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed on Lessor by the terms of any mortgage covering the Premises.  Accordingly, if any installment of rent or any other sum due from Lessee shall not be received by Lessor or Lessor's designee within the later of (i) ten (10) days after receipt by Lessee of an invoice from Lessor describing the rent or other sum due from Lessee or (ii) ten (10) days after such amount shall be due, then Lessee shall pay to Lessor a late charge equal to four percent (4%) of such overdue amount.  Lessor shall be obligated to forward said invoice to Lessee after such amount shall be due or within five (5) days before such amount shall be due.  The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of late payment by Lessee.  Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's default with respect to such overdue amount, nor prevent Lessor from exercising any of the other rights and remedies granted hereunder.  In the event that a late charge is payable hereunder, whether or not collected, for three (3) consecutive installments of rent, then at Lessor's option, rent shall automatically become due and payable quarterly in advance, rather than monthly, notwithstanding paragraph 4 or any other provision of this Lease to the contrary.



Alston
Hunt
Floyd
&Ing

---

attorneys at Law
Law Corporation

---

Paul Alston
Carol Y. Asai-Sato
en Godbey Carson
de Lynne Ching
hannon L. Clark
Paul F. Donsbach
helby Anne Floyd
Troy T. Fukuhara
oseph A. Gomes
ea Oksoon Hong
Neil F. Hulbert
William S. Hunt
Paul M. Iguchi
Scott M. Imaye
Louise K.Y. Ing
Susan Jameson
Villiam M. Kaneko
verett S. Kaneshige
Jason H. Kim
Corianne W. Lau
licia M. Leonhard
avid A. Nakashima
uce S. Noborikawa
radford L. Tannen
ilyn Chung Ushijima
Joseph P. Viola
Richard A. Yanagi

---

of Counsel
ries H. Dannenberg
William M. Tam
ruce H. Wakuzawa

---

th Floor Pacific Tower
1001 Bishop Street
onolulu Hawaii 96813
Tel: (808) 524-1800
Fax: (808) 524-4591
-mail: info@ahfi.com
www.ahfi.com

December 28, 1998

*BY CERTIFIED MAIL*
*RETURN RECEIPT REQUESTED*
*AND REGULAR MAIL*

David H. C. Lee, Esq.
Suite 1220, Pauahi Tower
1001 Bishop Street
Honolulu, Hawaii 96813

RE: <u>Lease for 2911 and 2925 Kaihikapu Street</u>

Dear Mr. Lee:

We represent Hawaiian Grocery Stores, Ltd. ("HGS"), your client's tenant at the above-referenced property. This responds to your letters of December 12 and 16, 1998. Your client's belated attempt to challenge HGS' proper and timely lease termination notice is not only groundless, but exposes your client to liability for damages. Please consider this letter as notice that HGS is disputing the debt claimed by your client in your December 16, 1998 letter concerning rent increases for 1996 through 1998.

Section 2 of the Second Amendment to Lease gives HGS, as tenant, the unequivocal right to terminate the lease with your client upon 15 months prior written notice. HGS duly gave your client 15 months written notice of termination nearly eight months ago--a notice which went unchallenged by your client until just recently. Moreover, your client not only knew that HGS had signed a new lease but proceeded to advertise the Kaihikapu Street premises for rental--all without lodging any objection with HGS about its termination notice or about the amount of rent it was paying.

The lack of objection is understandable. The Second Amendment places no conditions on the tenant's right to terminate other than requiring 15 months advance notice and that the notice be in writing. Your client bargained for 15 months advance time to find another tenant and maintain its cash flow. We note that your client is advertising the Kaihikapu

**EXHIBIT 3**

Street premises for rental at almost the identical rent currently being paid by HGS, and consequently, is receiving the benefit of its bargain for 15 months advance notice. Moreover, HGS has potential grounds for terminating the lease on less than 15 months notice. It is well known that soils contamination is rampant in the area where HGS' premises are located. Moreover, there are other environmental concerns that are causing us concern. Such conditions are all the more troubling to HGS because of the food products it stores.

Your client's belated objection to the termination notice on the grounds that HGS is not a party to the amendment is frivolous and smacks of bad faith. Since HGS was assigned the lease by Grocers Specialty Company over two and one-half years ago, it has been paying rent directly to your client, who accepted the rent fully aware of HGS' status as assignee. Further, your client makes a personal visit to the offices of HGS on the first business day of each month to collect the rent payment check. The checks are written on the account of HGS. Your client is therefore estopped from claiming HGS is not a party to the lease.

Your client's December 16, 1998 demand for payment of rent increases from 1996 through 1998 is also frivolous and in bad faith. HGS' president had discussions in 1996 and April 1998 with your client's representative, Mr. Kazama, in the presence of other HGS officers, in which Mr. Kazama consented to keep rents at the same level as they were in 1996, due to market conditions. Indeed, in 1998, HGS requested a rent reduction of your client, due to market conditions, which Mr. Kazama refused, stating that HGS should just pay on time the rent it was currently paying. HGS did so. Your client's reversal of its position and its demand that HGS not only pay retroactive rent increases, as well as pay rent increases from January 1, 1999, appear to be in retaliation for HGS' exercise of a contractual right to terminate its lease. Moreover, nowhere in the Second Amendment nor Lease is there any provision conditioning the 15-month termination notice on the tenant not being in default.

If your client persists in its present position, HGS will have no choice but to take protective action, including but not limited to the following:

1. Filing a counterclaim seeking damages from your client which HGS incurred in reliance on its proper exercise of the lease termination provision. Such damages include but are not limited to (a) expenses incurred in seeking new premises; (b) expenses it incurred in negotiating a new lease; (c) any damages it must pay to terminate the new lease, if the lease must be terminated; and (d) punitive damages for tortious or bad faith breach of contract.

2. Paying amounts alleged to be due for rent increases from 1996 through 1998, as well as rent due from January 1, 1999 forward, into this firm's client trust account--or if suit is filed, into a rent trust fund under Haw. Rev. Stat. § 666-21, until all rent disputes are resolved.

In light of the foregoing, we urge your client to reverse its ill-considered position. We look forward to hearing from you.

Sincerely,

LOUISE K. Y. ING
BRUCE S. NOBORIKAWA
103293-2 / 4405-1

cc: Client

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date I caused a true and correct copy of the foregoing to be served on the following by having said copy deposited in the United States mail or hand delivered by messenger as indicated below:

DAVID H. C. LEE, ESQ.                          **FAXED AND MAILED**
P. O. Box 90427
Honolulu, Hawai`i  96835-0427

Attorney for Defendants
GSH and K INVESTMENT GROUP, fka GSH and K Properties; and
KATSUMI KAZAMA

GEORGE W. ASHFORD, JR., ESQ.                   **MAILED**
1050 Auloa Road
Kailua, Hawai`i  96734

Attorney for Third-Party Defendant
GROCERS SPECIALTY COMPANY

STANLEY M. MORISHIGE, ESQ.                     **HAND DELIVERED**
1220 Pauahi Tower
1001 Bishop Street
Honolulu, Hawai`i 96813

Attorney for Defendant
The Estate of Haruko Kazama, Deceased

DATED: Honolulu, Hawai`i, May 12, 1999.

LOUISE K. Y. ING
PAUL M. IGUCHI
Attorneys for Plaintiff

Of Counsel:
ALSTON HUNT FLOYD & ING
Attorneys At Law
A Law Corporation

LOUISE K. Y. ING    2394-0
PAUL M. IGUCHI    6047-0
18th Floor, Pacific Tower
1001 Bishop Street
Honolulu, Hawai'i 96813
Telephone: (808) 524-1800

Attorneys for Plaintiff
HAWAIIAN GROCERY STORES,
LIMITED, a Hawaii corporation

FIRST CIRCUIT COURT
STATE OF HAWAII
FILED

1999 JUN -3 AM 11: 26

E. UJAKE
CLERK

## IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

## STATE OF HAWAI'I

| | |
|---|---|
| HAWAIIAN GROCERY STORES, LIMITED, a Hawaii corporation,    )<br><br>    Plaintiff,    )<br><br>    vs.    )<br><br>GSH AND K INVESTMENT GROUP, fka GSH and K Properties, a Hawaii general partnership; KATSUMI KAZAMA, and THE ESTATE OF HARUKO KAZAMA,    )<br><br>    Defendants,    )<br><br>    and    )<br><br>GSH AND K INVESTMENT GROUP, a Hawaii general partnership,    )<br><br>    Defendant/<br>    Third-Party Plaintiff,    )<br><br>    vs.    ) | CIVIL NO. 99-0424-02 DDD<br>(Declaratory Judgment)<br><br>**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER DENYING DEFENDANT AND THIRD-PARTY PLAINTIFF GSH AND K INVESTMENT GROUP'S AND DEFENDANT KATSUMI KAZAMA'S MOTION FOR ORDER DIRECTING PAYMENT OF ALL AMOUNTS DUE UNDER LEASE TO DEFENDANT AND THIRD-PARTY PLAINTIFF GSH AND K INVESTMENT GROUP FILED MARCH 9, 1999, AND ORDERING RENT TRUST FUND**<br><br>DATE:    May 21, 1999<br>TIME:    8:45 a.m.<br>JUDGE:    Dexter D. Del Rosario<br><br>No Trial Date Set |

116013-1 / 4405 - 8

# EXHIBIT "C"

GROCERS SPECIALTY COMPANY,        )
a California corporation,          )
                                  )
         Third-Party Defendant.   )
                                  )
_____   )

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER DENYING DEFENDANT AND THIRD-PARTY PLAINTIFF GSH AND K INVESTMENT GROUP'S AND DEFENDANT KATSUMI KAZAMA'S MOTION FOR ORDER DIRECTING PAYMENT OF ALL AMOUNTS DUE UNDER LEASE TO DEFENDANT AND THIRD-PARTY PLAINTIFF GSH AND K INVESTMENT GROUP FILED MARCH 9, 1999, AND ORDERING RENT TRUST FUND

Defendant and Third-Party Plaintiff GSH and K Investment Group, fka

GSH and K Properties' ("GSH&K") and Defendant Katsumi Kazama's (collectively

hereinafter referred to as "Defendants") Motion for Order Directing Payment of All

Amounts Due under Lease to GSH&K, filed March 9, 1999 ("Defendants' Motion") was

heard by this Court on Friday, May 21, 1999, at 8:45 a.m.   The Honorable Dexter D.

Del Rosario presided over the proceedings.  Louise K. Y. Ing and Paul M. Iguchi

appeared on behalf of Plaintiff Hawaiian Grocery Stores, Limited ("HGS").  David H. C.

Lee appeared on behalf of Defendants.  There were no other appearances.

After due consideration of the supporting and opposing memoranda,

declarations and exhibits and the various arguments of counsel, and based upon the

pleadings and records of this action, this Court makes the following Findings of Fact,

Conclusions of Law, and Order Denying Defendant and Third-Party Plaintiff GSH and K

Investment Group's and Defendant Katsumi Kazama's Motion For Order Directing

Payment of All Amounts Due under Lease to Defendant and Third-Party Plaintiff GSH

and K Investment Group Filed March 9, 1999, And Ordering Rent Trust Fund:

### FINDINGS OF FACT

THIS COURT HEREBY FINDS that:

1.     This lawsuit involves issues over disputed rent increases and the amount of monthly rent payments owed to GSH&K under a Lease dated February 1, 1990, between GSH&K, as Lessor, and Grocers Specialty Company ("Grocers"), as Lessee, as amended by an Amendment to Lease dated July 1, 1992, and an undated Second Amendment to Lease, which was notarized March 9, 1995 (collectively referred to as "the Lease"), including a dispute over whether there was a waiver of monthly rent increases by GSH&K.

2.     This lawsuit further involves disputed claims of environmental contamination in and around the subject premises located at 2911 and 2915 Kaihikapu Street, Honolulu, Hawaii ("Premises"), raising disputes about the extent to which GSH&K is owed monthly rent, if at all, and whether there has been a constructive eviction.

3.     HGS has requested the creation of a rent trust fund pursuant to Haw.Rev.Stat. § 666-21.

### CONCLUSIONS OF LAW

THIS COURT HEREBY CONCLUDES AS A MATTER OF LAW that:

1.     This Court has jurisdiction over the parties and the claims involved in this action.

2.     This Court is bound by, and has authority to order the establishment of a rent trust fund under Hawaii Revised Statutes §666-21, where there is a dispute over payments of rent.

3. Hawaii Revised Statutes §666-21 requires this Court, upon the request of either a tenant or landlord in a court proceeding in which payment of rent is in dispute, to order the tenant to deposit the disputed rent into the Court as it comes due.

4. When there is a dispute over a claimed rent increase, the amount of rent due before the claimed rent increase took effect shall be deposited.

5. The requirements of Haw.Rev.Stat. §666-21 are mandatory when rent is in dispute.

### *ORDER* DENYING DEFENDANT'S MOTION AND ORDERING RENT TRUST FUND

BASED ON THE FOREGOING AND GOOD CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1. That the preceding Findings of Fact and Conclusions of Law are hereby entered and Defendants' Motion is hereby DENIED.

2. Pursuant to Haw.Rev.Stat. § 666-21, the Chief Clerk ("Chief Clerk") of the Circuit Court of the First Circuit, State of Hawaii ("Circuit Court"), shall open an interest bearing account ("Trust Account") with a financial institution in the State of Hawaii of his/her choice;

3. The Chief Clerk shall use his/her best efforts and judgment in obtaining the highest interest rate for the funds to be deposited into the Trust Account;

4. As long as HGS remains at the Premises, it shall deposit rent with the Circuit Court (for depositing into the Trust Account) according the following schedule:

116013-1 / 4405 - B

4

A.  $273,434.87 deposited within one week of the entry of this

Order and the creation of the Trust account ($251,416,24 for

rent due from February 1, 1999 through May 1, 1999, at

$62,854.06 per month, and $22,018.63 for real property

·taxes due from January 1, 1999 through June 30, 1999),

and

B.  $62,854.06 by Tuesday June 1, 1999, for rent due on June

1, 1999, and

C.  $62,854.06 by Thursday, July 1, 1999, for rent due on July

1, 1999;

Should HGS vacate the Premises at any time before such dates, it shall

not be obligated to continue to deposit the payments identified above.

5.  The Trust Account funds shall be held in trust by the Chief Clerk

pending further order(s) from this Court instructing the Chief Clerk as to the

disbursement of the such funds, as provided by Haw.Rev.Stat. § 666-21(c).

6.  To the extent any findings herein are more properly construed as

conclusions of law, they shall be so construed; to the extent any conclusions of law

herein are more properly construed as findings of fact, they shall be so construed.

DATED: Honolulu, Hawaii, _____ JUN - 3 1999 _____.

DEXTER D. DEL ROSARIO  (SEAL)

_____
JUDGE OF THE ABOVE-ENTITLED COURT

*Hawaiian Grocery Stores, Limited v. GSH and K Investment Group, et al.*, Civil No. 99-0424-02 DDD **Findings of Fact, Conclusions of Law, And Order Denying Defendant and Third-Party Plaintiff GSH and K Investment Group's and Defendant Katsumi Kazama's Motion For Order Directing Payment of All Amounts Due Under Lease To Defendant And Third-Party Plaintiff GSH and K Investment Group Filed March 9, 1999, And Ordering Rent Trust Fund**

APPROVED AS TO FORM:

DAVID H. C. LEE, ESQ.
Attorney for Defendant and
Third-Party Plaintiff
GSH AND K INVESTMENT GROUP
and DEFENDANT KATSUMI KAZAMA

*Hawaiian Grocery Stores, Limited v. GSH and K Investment Group, et al.*, Civil No. 99-0424-02 DDD
**Findings of Fact, Conclusions of Law, And Order Denying Defendant and Third-Party Plaintiff
GSH and K Investment Group's and Defendant Katsumi Kazama's Motion For Order Directing
Payment of All Amounts Due Under Lease To Defendant And Third-Party Plaintiff GSH and K
Investment Group Filed March 9, 1999, And Ordering Rent Trust Fund**

116013-1 / 4405 - 8